IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge William J. Martínez

Civil Action No. 14-cv-01433-WJM-CBS

JIMMY JOSEPH VASQUEZ,

    Plaintiff,

v.

JEANNE DAVIS, in her individual capacity,
KATHLEEN MARTORANO, in her individual capacity,
KEITH MEEK, in his individual capacity,
BRIAN WEBSTER, in his individual capacity,
GATBEL CHAMJOCK, in his individual capacity,
KATHLEEN MELLOH, in her individual capacity,
MAURICE FAUVEL, in his individual and official capacities,
JOHN and/or JANE DOE(s), Clinical Services Administrators and Supervisors, in their official and individual capacities, and
RICK RAEMISCH, in his official capacity,

    Defendants.

## ORDER DENYING DEFENDANTS' MOTIONS TO DISMISS

Plaintiff Jimmy Joseph Vasquez ("Vasquez") is an inmate in the custody of the Colorado Department of Corrections ("CDOC"). (ECF No. 55 ¶ 1.) He brings this lawsuit under the Eighth Amendment (by way of 42 U.S.C. § 1983), alleging that various CDOC employees (collectively, "Defendants") were deliberately indifferent to his medical needs over many years, causing him to develop end-stage liver disease that will likely kill him absent a liver transplant. (*Id.* at 1–2.)

Before the Court are five overlapping motions to dismiss filed by the various Defendants. (ECF Nos. 57, 58, 80, 84, 88.) For the reasons stated below, these motions are denied.

## I.  LEGAL STANDARD

Most of the various motions argue for dismissal under both Federal Rule of Civil Procedure 12(b)(1) (lack of subject matter jurisdiction) and Rule 12(b)(6) (failure to state a claim).  However, those motions invoking Rule 12(b)(1) do not make any explicit lack-of-jurisdiction argument.[1]  The Court therefore analyzes Defendants' motions under the Rule 12(b)(6) standards, which require the Court to "assume the truth of the plaintiff's well-pleaded factual allegations and view them in the light most favorable to the plaintiff."  *Ridge at Red Hawk, LLC v. Schneider*, 493 F.3d 1174, 1177 (10th Cir. 2007).  In ruling on a Rule 12(b)(6) motion, the dispositive inquiry is "whether the complaint contains 'enough facts to state a claim to relief that is plausible on its face.'"  *Id.* (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  Granting a motion to dismiss "is a harsh remedy which must be cautiously studied, not only to effectuate the spirit of the liberal rules of pleading but also to protect the interests of justice."  *Dias v. City & Cnty. of Denver*, 567 F.3d 1169, 1178 (10th Cir. 2009) (internal quotation marks omitted).  "Thus, 'a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and that a recovery is very remote and

---

[1] Defendants bring a statute-of-limitations argument (*see* Part III.A, *infra*), and Defendants may mean to imply that failure to file a § 1983 claim within the statute of limitations deprives this Court of subject matter jurisdiction.  But Defendants cite no authority for the notion that a late-filed § 1983 claim is jurisdictionally barred, and the Court likewise could find no such authority.  Indeed, the existence of such authority would be surprising given that § 1983 does not have an explicit statute of limitations.  Rather, the Supreme Court has instructed lower courts to "borrow" the state-law statute of limitations for an analogous cause of action.  *Bd. of Regents of Univ. of State of N.Y. v. Tomanio*, 446 U.S. 478, 483 (1980).  Thus, it would be difficult to say that Congress intended § 1983's statute of limitations to be jurisdictional when Congress did not create any statute of limitations.  *See, e.g.*, *Henderson ex rel. Henderson v. Shinseki*, 562 U.S. 428, 436 (2011) (when determining whether a filing deadline is jurisdictional, courts must "look to see if there is any clear indication that Congress wanted the rule to be jurisdictional" (internal quotation marks omitted)).

unlikely.'" *Id.* (quoting *Twombly*, 550 U.S. at 556).

## II. FACTS

The Court assumes the following allegations to be true for purposes of this motion.

### A. Vasquez's HCV Diagnosis and Imprisonment at Sterling

Vasquez entered CDOC custody in 2004 and was sent to CDOC's Denver Reception and Diagnostic Center, where blood tests revealed that he was infected with HCV (hepatitis C virus). (ECF No. 55 ¶¶ 36, 42.) Vasquez was then assigned to CDOC's Sterling Correctional Facility ("Sterling"). (*Id.* ¶¶ 36, 39.)

Sterling is, "[f]or all practical purposes, . . . two separate facilities," known as the "East Side" and the "West Side." (*Id.* ¶ 28.) The East Side houses minimum-security prisoners, while the West Side houses more dangerous prisoners. (*Id.*) Vasquez was assigned to West Side, and has been there ever since. (*Id.* ¶¶ 39–40.)

### B. Defendant Davis

The first medical professional Vasquez saw at Sterling was Defendant Jeanne Davis ("Davis"), a physician's assistant. (*Id.* ¶¶ 2, 47.) Davis saw Vasquez in November 2004, "confirmed his HCV diagnosis," and ordered that Vasquez "undergo additional liver function testing in six months to determine the chronicity of his disease, in accordance with CDOC policy." (*Id.* ¶ 47.) That policy states that HCV-positive prisoners may receive antiviral drug therapy if they display elevated liver enzymes for six months. (*Id.* ¶ 17.)

Six months later (May 2005), Davis reviewed Vasquez's chart and informed him that he should receive antiviral therapy. (*Id.* ¶¶ 49, 53.) She also told him, however, that he would first need to complete six months of substance abuse resistance classes. (*Id.* ¶¶ 22, 48, 57.) This was also a matter of CDOC policy because

> CDOC does not believe that treatment should be given to patients who are likely to become re-infected. For this reason, anyone who wants to receive potentially curative treatment for chronic viral hepatitis is required to participate in and attend drug and alcohol classes and/or activities which can teach them to avoid returning to habits that can lead to re-infection.

(*Id.* ¶ 21 (internal quotation marks omitted).) But Davis never referred Vasquez to these classes, in violation of a CDOC policy requiring healthcare providers to submit a written referral within twenty-four days of confirming an inmate's need for antiviral treatment. (*Id.* ¶¶ 20, 49–52.)

### C.  Defendant Martorano

Shortly after learning from Davis that he needed to participate in the substance abuse treatment program, Vasquez met with his case manager, Defendant Kathleen Martorano. (*Id.* ¶¶ 3, 56–57.) Vasquez told Martorano that he needed to take the substance abuse classes before he could receive antiviral therapy for his HCV. (*Id.* ¶ 59.) Martorano responded that such classes were only available on Sterling's East Side, and that Vasquez's custody level prevented him from being transferred there, or to any facility offering substance abuse classes. (*Id.* ¶¶ 60–61.) At that time, however, CDOC's most secure facility (the Colorado State Penitentiary) was indeed offering such classes. (*Id.* ¶ 62.) In addition, Martorano had the power to override Vasquez's

custody level so he could at least be transferred to Sterling's East Side. (*Id.* ¶ 63.) Vasquez requested such an override on several occasions, but Martorano "refused each of these requests and eventually threatened to write him up if he kept asking." (*Id.* ¶ 64.)

### D.   Defendant Meek

Sometime in 2005, case management responsibilities for Vasquez were transferred from Martorano to Defendant Keith Meek. (*Id.* ¶ 65.) As with Martorano, Vasquez repeatedly asked Meek for assistance in obtaining a facility transfer or security classification override so that he could take the required substance abuse classes, but Meek repeatedly refused and threatened to write him up. (*Id.* ¶¶ 66–68.)

### E.   Defendant Webster

Sometime in 2006, responsibility for supervising Vasquez's medical care transferred from Davis to Defendant Brian Webster ("Webster"), another physician's assistant. (*Id.* ¶¶ 5, 70.) In October 2006, Webster noted Vasquez's "elevated liver function test numbers" and acknowledged Vasquez's HCV-positive status. (*Id.* ¶ 71.) In October 2007, Webster noted the same. (*Id.* ¶ 72.)

In June 2008, Webster noted that Vasquez's liver function test numbers were even higher than previously. (*Id.* ¶ 73.) Webster therefore made a note to "begin Lactulose," a medication used to treat high ammonia levels in patients with liver disease. (*Id.* ¶¶ 74–75.) Webster also added to Vasquez's chart, "Cirrhosis Liver w/o mention alcohol," and notified Vasquez that HCV was causing worsening liver function. (*Id.* ¶¶ 76–77.) Webster saw Vasquez again in December 2008, noted still-high liver

function test numbers and ammonia concentration, and instructed Vasquez not to take NSAIDs.  (*Id.* ¶ 79.)

Although Webster knew that Vasquez needed to complete substance abuse treatment classes before obtaining antiviral therapy, Webster never referred Vasquez to those classes.  (*Id.* ¶¶ 82–83.)

**F.    Defendant Chamjock**

Defendant Gatbel Chamjock ("Chamjock"), another physician's assistant at Sterling, began working with a Vasquez in 2008.  (*Id.* ¶¶ 6, 85.)  In May 2009, he reviewed Vasquez's chart and noted "complain[ts] of intermittent abdominal pain," HCV, and "possible cirrhosis of the liver."  (*Id.* ¶ 85.)  Chamjock therefore obtained an outside consultation through which Vasquez's liver and pancreas were examined via ultrasound.  (*Id.* ¶¶ 86, 88.)  During a June 2009 visit, Chamjock noted Vasquez's jaundiced skin and enlarged liver.  (*Id.* ¶ 87.)  At that visit, Chamjock told Vasquez that the results of the ultrasound were not yet in, and Vasquez never subsequently learned what those results were.  (*Id.* ¶¶ 88–89.)

Vasquez did not see Chamjock again until May 2010, where Vasquez complained of abdominal pain.  (*Id.* ¶ 90.)  Chamjock observed blood in Vasquez's vomit and urine, prescribed antibiotics, and asked Vasquez to return the next week for a follow-up visit.  (*Id.* ¶¶ 91–92.)  During that follow-up visit, Vasquez complained of "constant off and on abdominal pain."  (*Id.* ¶ 93.)  Chamjock responded by advising Vasquez "to stop eating spicy food and big meals late at night."  (*Id.* ¶ 94.)

Although Chamjock knew that Vasquez needed to complete substance abuse treatment classes before obtaining antiviral therapy, Chamjock never referred Vasquez to those classes.  (*Id.* ¶¶ 97–99.)

**G.     Defendant Melloh**

Defendant Kathleen Melloh, a physician's assistant, saw Vasquez in January 2012[2] based on Vasquez's complaints of vomiting blood.  (*Id.* ¶¶ 109–11.)  Melloh noted Vasquez's jaundiced skin and "acknowledged his cirrhosis."  (*Id.* ¶ 112.)  Melloh also "acknowledged the medical necessity of antiviral drug therapy treatment" but insisted that Vasquez would first need to complete the six-month substance abuse training.  (*Id.* ¶¶ 114–15.)  Vasquez informed Melloh that he had completed "Right Start-Right Step, a faith-based substance abuse class," in 2008, but Melloh would not accept that.  (*Id.* ¶¶ 116–17.)

After meeting with Melloh, Vasquez "submitted multiple medical kites[3] requesting to sign a contract agreeing to participate in drug and alcohol classes."  (*Id.* ¶ 118.)

**H.     Defendant Fauvel**

Defendant Maurice Fauvel ("Fauvel") is another physician's assistant at Sterling.  (*Id.* ¶ 8.)  Fauvel examined Vasquez in February 2012 in response to his medical kites.  (*Id.* ¶ 122.)  Fauvel "purportedly referred" Vasquez "to his case manager to become

---

[2] No medical provider saw Vasquez in 2011.  (*Id.* ¶ 103.)  Vasquez argues that some unknown clinical care supervisor knew or should have known of his need for further treatment during that time, but took no action.  (*Id.* ¶¶ 104–08.)

[3] The Court presumes that a "medical kite" is some form of written request by a prisoner.

enrolled" in the substance abuse program, but Fauvel never filled out the required written referral. (*Id.* ¶¶ 124–25.)

In May 2012, Fauvel noted Vasquez's conditions, including cirrhosis with liver failure and high ammonia levels. (*Id.* ¶ 129.) In August 2012, Fauvel again noted Vasquez's symptoms and the possible need for a liver biopsy. (*Id.* ¶¶ 130–31.)

Sometime while under Fauvel's care, Vasquez finally went through the substance abuse classes. (*Id.* ¶¶ 132–33.) Near the end of those classes, in October 2012, Vasquez met with a nurse, Ruth Ross (not a defendant here), and told her that he would soon complete his classes. (*Id.* ¶ 134.) Ross observed Vasquez's jaundiced face and claimed she would discuss the possible liver biopsy with Fauvel. (*Id.*)

Vasquez and Ross met again in February 2013 and Ross again noted Vasquez's request for antiviral treatment. (*Id.* ¶ 135.) Ross therefore sent a handwritten note to "[Sterling] mental health" stating that Vasquez should have a liver biopsy, but Fauvel never scheduled a biopsy. (*Id.* ¶¶ 136–37.)

Also in February 2013, Vasquez "began experiencing stomach pain and pain on the right side of his torso around his liver," for which he submitted another kite. (*Id.* ¶¶ 138–39.) Over the next two months, Sterling personnel repeatedly scheduled and then canceled medical appointments, during which time his pain was increasing. (*Id.* ¶¶ 140–42.) Eventually Vasquez submitted a grievance against Fauvel. (*Id.* ¶ 150.) Part of Fauvel's response states: "HepC was diagnosed long ago and treatment consideration is a long and [tortuous] process. I cannot speak to why this was not treated in the past." (*Id.* (emphasis removed).)

8

I.   **Vasquez's Ultimate Diagnosis**

On May 3, 2013, Vasquez "began vomiting copious amounts of blood and experiencing excruciating abdominal pain." (*Id.* ¶ 152.) He was emergency evacuated to Denver Health and received emergency surgery to correct the acute problems. (*Id.* ¶¶ 152–53.) The doctors at Denver Health diagnosed Vasquez with advanced-stage cirrhosis of the liver such that antiviral drug therapy was no longer a possibility. (*Id.* ¶¶ 157–58.) Rather, "the only treatment that could save his life would be a liver transplant." (*Id.* ¶ 159.) In December 2013, furthermore, Vasquez was diagnosed with a form of myeloma likely caused by hypersplenism (*i.e.*, an overactive spleen), itself likely caused by his cirrhosis. (*Id.* ¶ 173.) "CDOC is apparently still considering providing Mr. Vasquez with some form of treatment." (*Id.* ¶ 176.)

### III.  ANALYSIS

A.   **Statute of Limitations**

All Defendants except Fauvel claim that the relevant statute of limitations expired before Vasquez filed this lawsuit. The Court disagrees.

Because Congress did not enact a statute of limitations for § 1983 claims, Colorado law supplies the limitations period. *See Burnett v. Grattan*, 468 U.S. 42, 47–49 (1984). Colorado law provides a two-year statute of limitation for "[a]ll actions upon liability created by a federal statute where no period of limitation is provided in said federal statute." Colo. Rev. Stat. § 13-80-102(1)(g).

Despite reliance on the Colorado statute, "federal law controls issues related to when federal causes of action accrue." *Alexander v. Oklahoma*, 382 F.3d 1206, 1215

(10th Cir. 2004). Generally, federal claims accrue "when the plaintiff knows or has reason to know of the existence and cause of the injury which is the basis of his action." *Id.* (internal quotation marks omitted).

Defendants argue that Vasquez knew of his injury and the cause as early as 2005, when he became eligible for the substance abuse program but no one would authorize it for him. (ECF No. 57 at 4–5; ECF No. 58 at 4.) Defendant Chamjock more particularly argues that, according to Vasquez's allegations, Vasquez knew of his worsening symptoms and Chamjock's failure to refer him to the substance abuse program no later than May 2010. (ECF No. 58 at 4.) Vasquez did not file this lawsuit until May 2014 (ECF No. 1), which is obviously more than two years after 2005 or 2010. Vasquez responds that his injury did not accrue until May 2013, when he was admitted to Denver Health and learned that his HCV had become incurable and that he would likely die without a liver transplant. (ECF No. 75 at 5–13.)

In these circumstances, Vasquez has the better argument. Vasquez's claim rests not just on his current dire medical condition, but on the alleged delay in receiving medical care that may have prevented his condition from progressing this far. "[A] delay in medical care only constitutes an Eighth Amendment violation where the plaintiff can show that the delay resulted in substantial harm. We have held that the substantial harm requirement may be satisfied by lifelong handicap, permanent loss, or considerable pain." *Garrett v. Stratman*, 254 F.3d 946, 950 (10th Cir. 2001) (citation and internal quotation marks omitted).

The Tenth Circuit has observed in an unpublished disposition that HCV is usually a slowly progressing disease. *Whitington v. Moschetti*, 423 F. App'x 767, 773 (10th Cir.

2011). Thus, delay in receiving treatment, including delay occasioned by CDOC's six-month substance abuse training requirement, does not qualify as "substantial harm" absent something more, such as end-stage liver disease. *Id.* Relying on *Whitington*, a recent unpublished disposition from this District held that a prisoner failed to allege substantial harm based on delay in receiving HCV treatment: "Because HCV is slowly progressive, the CDOC's requirement that patients complete drug and alcohol classes prior to antiviral treatment should not be expected to contribute to significant progression of liver disease prior to initiation of treatment." *Wright v. Hodge*, 2015 WL 1408753, at *6 (D. Colo. Mar. 25, 2015).

Given these decisions, Vasquez argues that he would have been thrown out of court had he filed as early as Defendants claim he should have filed. But if the statute of limitations nonetheless accrued when Defendants say it did, he "would face the impossible predicament of being unable to file within the supposed statute of limitations for not actually having a claim, but also unable to file when he does have a claim because the statute of limitations has run." (ECF No. 75 at 9–10.)

Defendants offer no response to this eminently reasonable point other than to observe that *Whitington* and *Wright* addressed the elements of Eighth Amendment liability, not accrual of a claim. (ECF No. 77 at 3; ECF No. 78 at 2.) Defendants' observation is correct but immaterial. "A civil rights action accrues when *facts that would support a cause of action* are or should be apparent." *Alexander*, 382 F.3d at 1215 (internal quotation marks and alterations omitted; emphasis added). If lifelong handicap, permanent loss, or considerable pain is an element of a delay-in-care cause of action, then a prisoner's delay-in-care claim is not ripe until such handicap, loss, or

pain occurs. And if the claim is not ripe, it is impossible to see how the statute of limitations could be running on it.

*Whitington* and *Wright*, although not precedential, are persuasive authority that delay in treating HCV, without more, does not rise to an Eighth Amendment violation. Defendants do not argue otherwise. Accordingly, Vasquez's cause of action did not accrue until he acquired a lifelong handicap, suffered a permanent loss, or experienced considerable pain. *Garrett*, 254 F.3d at 950. Vasquez learned of his "lifelong handicap" or "permanent loss" in May 2013, and had no reason to know that he had acquired such a condition any earlier than that. Moreover, although Vasquez alleges incidents of pain as early as 2009 (*see* ECF No. 55 ¶¶ 85, 93, 109), no Defendant argues that any particular incident constitutes the "considerable pain" necessary for a delay-in-care claim. The Court therefore finds that Vasquez's complaint does not demonstrate a failure to file within the statute of limitations. Defendants' motions are denied in this regard.

## B.     Failure to State a Claim

Defendants Chamjock, Fauvel, Melloh, and Webster argue that Vasquez has failed to state an Eighth Amendment claim against them. (ECF Nos. 57 at 5–9; ECF No. 58 at 4–7; ECF No. 84 at 2–5.)[4]

---

[4] Defendants Davis, Meek, and Raemisch say they join Fauvel's motion in full (*see* ECF No. 80 at 1; ECF No. 88 at 1), but Fauvel's failure-to-state-a-claim arguments are specific to the allegations Vasquez makes against him. These arguments do not apply to Davis, Meek, and Raemisch. Accordingly, Davis, Meek, and Raemisch have not moved to dismiss for failure to state a claim. Nor has Martorano. She and Fauvel filed a joint motion to dismiss, but the failure-to-state-a-claim section addresses Fauvel only. (*See* ECF No. 57 at 5–8.)

The Eighth Amendment protects against the infliction of "cruel and unusual punishments." U.S. Const. amend. VIII. The Eighth Amendment's prohibition against cruel and unusual punishments encompasses deliberate indifference by prison officials to a prisoner's serious medical needs. *Howard v. Waide*, 534 F.3d 1227, 1235 (10th Cir. 2008). Prison staff members (*e.g.*, guards, medical personnel) can in some circumstances demonstrate deliberate indifference if they control access to those who can treat the inmate's condition and they delay or refuse to grant such access. *See Estelle v. Gamble*, 429 U.S. 97, 104–05 (1976); *Mata v. Saiz*, 427 F.3d 745, 751 (10th Cir. 2005); *Sealock v. Colorado*, 218 F.3d 1205, 1211 (10th Cir. 2000).

1. Objective Component

"Deliberate indifference" involves "a two-pronged inquiry, comprised of an objective component and a subjective component." *Self v. Crum*, 439 F.3d 1227, 1230 (10th Cir. 2006). The objective component requires a "sufficiently serious" medical need, meaning "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Sealock*, 218 F.3d at 1209 (internal quotation marks omitted).

No Defendant actually argues against the objective component here. Defendants instead assume *arguendo* that it has been satisfied and move on to the subjective component. (ECF No. 57 at 7; ECF No. 58 at 6; ECF No. 84 at 4–5.) This is somewhat surprising given that Vasquez gifted Defendants an argument. Specifically, although the *Whitington* and *Wright* cases save Vasquez's claim from foundering on the statute of limitations, they do so through their respective holdings that untreated HCV,

without more, does not satisfy the objective component. *See Whitington*, 423 F. App'x at 773; *Wright*, 2015 WL 1408753, at *5–6.

Given this, it would seem that at least some of the Defendants (particularly those who worked with Vasquez in the early stages of his disease) might merit dismissal. But, absent briefing from the parties on the question, the Court will not so hold. The Court will therefore move on to Defendants' arguments regarding the subjective component.

2. Subjective Component

The subjective prong examines the state of mind of the defendant, asking whether "the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer v. Brennan*, 511 U.S. 825, 837 (1994). This is a high standard. "[N]egligent failure to provide adequate medical care, even one constituting medical malpractice, does not give rise to a constitutional violation." *Perkins v. Kan. Dep't of Corrs.*, 165 F.3d 803, 811 (10th Cir. 1999).

a. *Fauvel*

As described in Part II.H, above, Vasquez alleges that Fauvel, in 2012 and 2013, became aware of Vasquez's condition and noted disturbing lab results, but Fauvel failed to follow up with a liver biopsy despite considering it, failed to submit the appropriate referral so that Vasquez could attend substance abuse classes, and potentially ignored several requests from Vasquez to be seen as his symptoms worsened. Fauvel argues that these allegations do not rise above simple negligence. (ECF No. 57 at 7–8.) To the contrary, at least at the pleading stage, they create a

plausible inference that Fauvel knew what was likely happening to Vasquez's liver but he simply did not care.  That is enough to show deliberate indifference.  Vasquez has adequately pleaded a claim against Fauvel.

        b.    *Chamjock*

As described in Part II.F, above, Vasquez alleges that Chamjock, from 2008 to 2010, became aware of Vasquez's worsening symptoms (including enlarged liver, bloody vomit and urine, and complaints of frequent abdominal pain), but failed to follow up on a diagnostic ultrasound, failed to authorize Vasquez for substance abuse classes, and simply advised Vasquez to stop eating spicy food and large meals late at night.  Like Fauvel, Chamjock claims that the allegations against himself do not suggest anything more than mere negligence.  (ECF No. 58 at 7.)  But, as with Fauvel, the Court disagrees.  As pleaded, Vasquez's allegations create a plausible inference that Chamjock knew of the seriousness of Vasquez's condition but chose not to treat it seriously.  Vasquez has adequately pleaded a claim against Chamjock.

        c.    *Webster*

As described in Part II.E, above, Vasquez alleges that Webster, from 2006 to 2008, observed Vasquez's continually increasing liver function test and ammonia concentration numbers, at least suspected cirrhosis of the liver, informed Vasquez that his HCV was indeed affecting the liver, and recommended medication to control Vasquez's ammonia levels, but failed to authorize Vasquez for the substance abuse classes that stood in his way to obtaining antiviral therapy.  Webster appears to argue that his continuing care shows the opposite of deliberate indifference, and he was at best negligent in failing to authorize Vasquez for substance abuse classes.  (ECF No.

84 at 3–4.) The Court again disagrees. Vasquez's allegations create a plausible inference that Webster gained a longitudinal picture of Vasquez's health and thereby understood that his symptoms were worsening, but took no serious effort to help him obtain the treatment that would prevent the problems Vasquez eventually faced. Vasquez has adequately pleaded a claim against Webster.

        d.    *Melloh*

As described in Part II.G, above, Vasquez alleges that Melloh, in 2012, knew Vasquez had been vomiting blood, knew he was suffering from cirrhosis, and knew that he needed antiviral therapy, but nonetheless insisted that he first go through substance abuse classes and refused to accept a different organization's program in lieu of CDOC's requirement. Melloh argues that her treatment of Vasquez shows the opposite of deliberate indifference (ECF No. 84 at 4–5), but the Court finds that Vasquez has raised a plausible inference that Melloh knew of the serious and advanced nature of Vasquez's condition but refused to prescribe the appropriate treatment. Vasquez has adequately pleaded a claim against Melloh.

**C.    Qualified Immunity**

All Defendants except Chamjock argue that they are entitled to qualified immunity. (ECF No. 57 at 8–9; ECF No. 80 at 1; ECF No. 84 at 5–6; ECF No. 88 at 1.) "Qualified immunity shields federal and state officials from money damages unless a plaintiff pleads facts showing (1) that the official violated a statutory or constitutional right, and (2) that the right was clearly established at the time of the challenged conduct." *Ashcroft v. al-Kidd*, 131 S. Ct. 2074, 2080 (2011) (internal quotation marks omitted). Defendants attack both of these elements.

As to the first element, the Court's analysis above establishes that Vasquez has sufficiently pleaded a violation of his Eighth Amendment right to be free from cruel or unusual punishment.  As to the second element, Defendants' only argument is that "[t]here is no clearly established law in this jurisdiction that states that the actions of Defendants, as alleged in the Complaint, violated any law." (ECF No. 57 at 9; ECF No. 84 at 6.)  Defendants cannot possibly mean this as a serious argument.  Defendants (and their counsel) well know that the standard for Eighth Amendment medical treatment claims, including delay-in-care claims, has been established for decades. *See, e.g., Estelle*, 429 U.S. at 104–05; *Olson v. Stotts*, 9 F.3d 1475, 1477 (10th Cir. 1993).  Defendants, on this record, are not entitled to qualified immunity.

## IV.  CONCLUSION

For the reasons stated above, Defendants' motions to dismiss (ECF Nos. 57, 58, 80, 84, and 88) are DENIED.

Dated this 2nd day of November, 2015.

BY THE COURT:

William J. Martinez
United States District Judge
