IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 14-cv-01433-WJM-CBS

JIMMY JOSEPH VASQUEZ,

Plaintiff,

v.

JEANNE DAVIS, in her individual capacity,
KATHLEEN MARTORANO, in her individual capacity,
KEITH MEEK, in his individual capacity,
BRIAN WEBSTER, in his individual capacity,
GABEL CHAMJOCK, in his individual capacity,
KATHLEEN MELLOH, in her individual capacity,
MAURICE FAUVEL, in his individual and official capacities,
JOHN and/or JANE DOE(s), Clinical Services Administrators and Supervisors, in
their official and individual capacities,
RICK RAEMISCH, in his official capacity,

Defendants.

## AFFIDAVIT OF SUSAN TIONA, M.D.

I, Susan Tiona, being first duly sworn upon oath, depose and state as follows:

1.      My name is Susan Tiona, and I am a physician and I am currently the

Chief Medical Officer for the Colorado Department of Corrections.

2.      I began my work in this position in April of 2015.

3.      I have not been hired or specially employed to provide testimony in

this case.

4.      My education and experience are reflected in my *curriculum vitae*,

which is attached hereto as Attachment 1.



EXHIBIT
A-1

5.      I have reviewed the medical records for an offender named Jimmy Vasquez, and based upon my education, experience, and review of these records, I attest as follow:

**Information regarding Hepatitis C in general:**

6.      The virus that causes Hepatitis C was first identified in the 1980s.

7.      It was not until 1992 that sufficient testing methods were available to reduce the risk of transmission via blood transfusion.  Another decade would pass before treatment was available that had a significant response rate.

8.      The Hepatitis C virus (HCV) is a family of viruses with varying genetic structure called a Genotype.  In this country, the most commonly seen Genotypes are 1, 2, and 3.  Genotype 4 is uncommon, and 5 and 6 are rarely seen.

9.      HCV is usually transmitted through blood to blood contact such as intravenous drug use with shared needles, tattooing with shared equipment that is not sterilized, or body piercing that is performed with shared, unsterilized equipment.  A small percentage of persons have been infected through sexual transmission, although this is not a significant source of new HCV infection.

10.      Most people do not know when they were infected with HCV because only 20 to 30% of newly infected persons are symptomatic.

11.      Between 15 to 20% of people who get HCV will clear the viral infection spontaneously.   In the remaining 80 to 85% of patients, the virus causes a chronic infection of the liver.  Most chronically infected persons will not have any long-term

problems with the infection.  But, in 20 to 25% of chronically infected patients, the infection will cause progressive liver damage leading to cirrhosis.

12.     Cirrhosis develops after two to three decades of chronic infection.  The risk of cirrhosis is greatest in those who consume alcohol along with having HCV infection, and in those who were infected after the age of 40 years. After cirrhosis has been present for 5 to 10 years, the risk of developing liver cancer also increases.

13.     Although only about one-fourth of persons who acquire chronic HCV infection go on to develop complications from the infection, public health interests have been a driving factor in the recommendation that all infected persons be treated, regardless of evidence for liver damage in any given individual.

14.     The authors of the HCV Guidelines, published by the American Association for the Study of Liver Disease (AASLD), state: "Although the HCV GUIDANCE has been welcomed and well received by most clinicians and patients, it has been the target of criticism by some. Most of this criticism results not from the recommendations themselves but from the financial burden that treatment places on patients, insurers, and the government. Cost is a very important concern and the cost of treating hepatitis C has been forecast to triple by 2016. Indeed, although … the experts on the panel are quite cognizant of the short-term financial burden placed on payers by the costs of these drugs…, our perspective in developing this GUIDANCE was solely the interest of the patient, recognizing that others would necessarily have a primary focus on cost and availability of other resources. However, the most recent addition to the HCV GUIDANCE … begins to address the

issue of healthcare resources and societal cost. This new section focuses on how to first direct treatment to those who would derive the greatest and most immediate benefit from therapy. However, to fully address the issue of cost, healthcare practitioners and systems, insurers, government, and especially the pharmaceutical companies <u>all need to share the responsibility of ridding our population of this infection</u>."

15.     Historically, the basis for treating HCV infection was to reduce the viral load in individuals who were experiencing adverse outcomes from the disease. But, as it became apparent that treatment could actually cure the infection, rather than just suppress it, the focus shifted to the public health goal of virus eradication.

16.     Initial treatment regimens, first introduced in the late 1990's, carried serious, even deadly, side effects, and therefore careful patient selection was important.  Very recently, safer treatment drugs have been developed, allowing for an expanded selection of patients for treatment.  Many patients who were previously not eligible for treatment because of the severity of their disease and the harshness of the original treatment medications, are now able to benefit from these newer treatment options.

17.     From 1998 until 2011, the only treatment for Hepatitis C was a combination of Interferon and Ribavarin, with potentially severe toxic side effects to the bone marrow (causing decreased white blood cell counts and dangerous anemia), as well as significant skin rash, psychiatric destabilization, and suicidal thoughts.

18.     Interferon and Ribavarin treatment was not overly effective, with response rates ranging from 35% to 90%, depending on the Genotype of Hepatitis C with which a patient was infected.  Providers had to weigh the relatively low response rates for treatment against the risks of the medications.

19.     Interferon and Ribavarin treatment was contraindicated for patients with decompensated liver cirrhosis.  Decompensated cirrhosis is evidenced by the presence of ascites, esophageal varices, or laboratory evidence of decline in liver synthetic function such as the prothrombin time, INR >1.5, albumin < 3.0 g/dL, or total bilirubin > 4 mg/dL.

20.     Until 2011, the Interferon and Ribavarin (Inf/Rib) treatment was the only option for Hepatitis C.  In 2011, two new medications were approved to be used in conjunction with Inf/Rib.  These medications improved the success rate of the Inf/Rib, but did not improve the side effects, and therefore the same patient selection process was required.

21.     In 2013, Sovaldi was introduced to the market.  Although much safer in itself, this drug also needed to be used with Ribavarin or Inf/Rib, so appropriate patient selection was still a concern.  To this day, Sovaldi with Ribavarin remains the regimen that is proven to be most effective for patients with Hepatitis C Genotypes 2 and 3.

22.     Finally, in November 2014, Harvoni was introduced as a breakthrough medication for Hepatitis C treatment.  It could be used without Inf/Rib, and had a

success rate of over 95%.  However, it was only approved as a stand-alone

medication for use in patients with Hepatitis C Genotypes 1, 4 and 5.

### Information regarding the evolution of CDOC Hepatitis C Treatment Standards:

23.     It is the intent of the Department of Corrections to provide a standard

of Hepatitis C care and treatment that is consistent with currently published

guidelines.  As guidelines change over time, the CDOC re-evaluates the

department's Clinical Standard and makes adjustments needed to maintain that

intent.

24.     Since 2004, the CDOC has developed seven versions of the DOC

Hepatitis C Clinical Standard in response to changes in published guidelines.

25.     The CDOC clinical standards for the treatment of Hepatitis C are

clinically sound and evidence-based at the time of development.

26.     The CDOC clinical standards for the treatment of Hepatitis C place

strong emphasis on treatment of substance abuse issues prior to treatment for

Hepatitis C, as well as avoidance of high risk behaviors such as tattooing and the

consumption of alcohol.

27.     Successful treatment of Hepatitis C does not provide immunity to re-

infection with Hepatitis C.  It is the position of the CDOC that it is

counterproductive to provide treatment to offenders who are at high risk for re-

infection as this would represent inefficient utilization of resources.

28.     The greatest risk of re-infection within CDOC occurs with drug abuse

(to include abuse of prescription medications, not necessarily limited to DEA

controlled substances), and tattooing within the correctional environment.  Alcohol use is also viewed as evidence of ongoing high risk behavior.

29.     Because Hepatitis C is slowly progressive, the requirement to complete alcohol and drug treatment prior to treatment for Hepatitis C is not expected to contribute to significant progression of liver disease prior to initiation of treatment.

30.     CDOC alcohol and drug treatment programs have given priority to enrolling offenders who are potential candidates for Hepatitis C treatment, and the usual pre-requisites for enrollment in these substance abuse classes are waived for Hepatitis C treatment candidates.

**The status of Mr. Vasquez's treatment for Hepatitis C:**

31.     Mr. Vasquez was admitted to the Department of Corrections in 2004, and was found to be positive for the hepatitis C virus upon entry into the system.

32.     It is documented that Mr. Vasquez was given a copy of the Hepatitis C treatment protocol in October 2004.  According to that protocol, the patient is responsible to coordinate with his case manager in order to obtain the requisite alcohol and drug treatment.

33.     Mr. Vasquez, who has a substantial history of substance abuse, was required to complete his substance abuse treatment in order to be eligible for Hepatitis C treatment, as per the CDOC Clinical Standards.

34.     Mr. Vasquez requested Hepatitis C treatment on two occasions.  The first was in 2005 and the second was in 2012.  On both occasions, the provider

documented that Mr. Vasquez was educated on the need to complete alcohol and drug treatment prior to being eligible for Hepatitis C treatment.

35.     Mr. Vasquez was enrolled in Level 4b Phase 1 and Phase 2 substance abuse treatment on 7/23/2012 and completed those classes on 1/11/2013.

36.     At the time of completion of those classes, Mr. Vasquez's clinical status prevented him from being immediately considered for Interferon/Ribavarin treatment, and additional medical testing (liver biopsy) was requested.

37.     Prior to that testing being completed, Mr. Vasquez had an episode of bleeding from enlarged blood vessels in his esophagus in May 2013.

38.     Mr. Vasquez had clinical evidence for decompensated liver cirrhosis and was not a treatment candidate using any of the drugs available at that time.

39.     A gastrointestinal specialist recommended against treatment in December 2013.

40.     In 2015, with the advent of improved treatment regimens, Mr. Vasquez could medically qualify for Hepatitis C treatment, and his CDOC provider submitted his Hepatitis C Evaluation Worksheet to the Infectious Disease Committee (IDC) chairperson on November 10, 2015.

41.     The IDC meets quarterly to review all of the packets that have been submitted since the previous meeting. Therefore, depending on the timing of the submission relative to the IDC meeting, it may be as long as 90 days before a decision is rendered on an individual case.

42.    Mr. Vasquez's packet was evaluated by the IDC on February 19, 2016. Upon review of his worksheet, it was found that Mr. Vasquez had completed a lower level of substance abuse treatment than was actually required for his substance abuse needs.   However, after further review of that issue, it was decided that Mr. Vasquez had substantially satisfied the intent of the alcohol and drug treatment requisites, and was therefore approved for Hepatitis C treatment.   *See* Documents attached hereto as Attachment 2.

43.    Mr. Vasquez was provisionally approved for Hepatitis C treatment on February 19, 2016, and formally approved for treatment on February 22, 2016 after determination that his alcohol and drug requirements had been met.

44.    Mr. Vasquez has decompensated cirrhosis with Genotype 3.   He will be treated with a combination of Sovaldi and Ribavarin for 24 weeks.   His treatment will commence in March 2016 at the facility where he is currently incarcerated.

Further, affiant sayeth naught

*Susan M. Tiona, MD*

Dr. Susan Tiona

Subscribed and sworn to before me in the County of El Paso , State of
Colorado, this 24th day of February 2016.

*Teresa B Reynolds*

Notary Public

TERESA B REYNOLDS
NOTARY PUBLIC
STATE OF COLORADO
NOTARY ID 19924002350
MY COMMISSION EXPIRES MARCH 5, 2020

My commission expires:
3/5/2020

10

# SUSAN M. TIONA, M.D.

████████████

████████ (cell)   **719-226-4511 (office)**   **susan.tiona@state.co.us**

## PROFESSIONAL EMPLOYMENT

- **April 2015 to Present** Chief Medical Officer, Colorado Department of Corrections, Colorado Springs, CO.

- **June 2004 to March 2015** Facility physician with Corrections Corporation of America, Kit Carson Correctional Center, Burlington, CO.
  **Scope of Practice:**
  - Responsible for acute and chronic care of approximately 800 adult male inmates.
  - Acute care includes first-response for medical emergencies such as orthopedic injuries, lacerations, syncope, chest pain, asthma exacerbation, overdose, blunt-force trauma, cardiac arrest, allergic reactions, stroke symptoms, acute GI bleed, diabetic hypoglycemia and abdominal pain.
  - Chronic care encounters include comprehensive onsite care for diabetes, hypertension, hyperlipidemia, asthma, COPD, chronic kidney disease, coronary artery disease, hepatitis, and seizures, as well as a wide variety of endocrine, GI, GU, rheumatologic and chronic pain disorders.
  - Procedures include laceration repair, I&D, toe nail removal, reduction of dislocated interphalangeal joints, simple reduction of shoulder dislocations (if it can be accomplished without scheduled drugs which are not available in the prison), IV fluid management, large joint injections, trigger point injections, splinting and casting

- **November 2013 to Present** *Locum Tenens* physician with Southeast Colorado Hospital District, Springfield, CO.
  **Scope of Practice:**
  - Responsible for emergency department coverage; inpatient admission, daily care, and discharge; and clinic coverage.
  - Emergency room coverage includes pediatric and adult care of a variety of acute illness and injury, as well as stabilization of trauma, stroke, and cardiac patients for transfer to a higher level facility.
  - Inpatient coverage includes admission, daily management and discharge of pediatric and adult patients with a variety of low to moderate acuity conditions such as dehydration, urosepsis, pneumonia, complications of chronic liver and/or renal disease, complications of diabetes, altered mental status, asthma or COPD exacerbations and pancreatitis.
  - Clinic coverage includes managing a variety of acute pediatric and adult problems such as sinusitis, otitis, bronchitis, rashes, boils, pediatric fever, dehydration, AGE, and cystitis.

**EXHIBIT**

**Attachment 1**

- **May 2011 to September 2012** Facility physician with Colorado Department of Corrections, Territorial Correctional Facility, Canon City, CO.
    - **Scope of Practice:**
        - Responsible for acute and chronic care of approximately 800 adult male inmates.
        - Acute care included first-response for medical emergencies such as orthopedic injuries, lacerations, syncope, chest pain, asthma exacerbation, overdose, blunt-force trauma, cardiac arrest, allergic reactions, stroke symptoms, diabetic hypoglycemia and abdominal pain.
        - Chronic care encounters included comprehensive onsite care for diabetes, hypertension, hyperlipidemia, asthma, COPD, chronic kidney disease, coronary artery disease, hepatitis, and seizures, as well as a wide variety of endocrine, GI, GU, rheumatologic and chronic pain disorders.
        - 24-bed infirmary – provided coverage for medical rounds for infirmary patients when needed.
        - Procedures performed were similar to those listed in the above section, with the addition of therapeutic paracentesis and complicated wound management.

- **July 2000 to June 2004** Part-time family practice, First Care Physicians, Fort Collins, CO.
    - **Scope of Practice:**
        - Community family practice clinic with both scheduled and walk-in appointments, caring for all ages.
        - Responsible for after-hours walk-in appointments, managing a variety of acute problems such as sinusitis, otitis, bronchitis, rashes, boils, pediatric fever, dehydration, AGE, cystitis, nephrolithiasis, ingrown toenails, finger dislocations, lacerations, etc.

- **February 1998 to June 2000** Solo family practice, Footprints Family Care, Fort Collins, CO.
    - **Scope of Practice:**
        - Solo family practice clinic, caring for all ages (no OB)
        - Routine scope of family medicine, including in-patient and clinic care

- **July 1995 to January 1998** Staff family practice physician, 28th Medical Group, Ellsworth AFB, SD.
    - **Scope of Practice:**
        - Responsible for the care of active duty and dependent family members
        - Clinic: acute and chronic care with standard scope of family medicine
        - 18-bed hospital: inpatient management of adult and pediatric patients with conditions such as dehydration, asthma exacerbation, pyelonephritis, diabetic complications, AMI rule-out, croup, pancreatitis, acute gastroenteritis, etc.
        - Level III ER: Initial management of all on-base emergencies. Situations managed would have included a variety of typical small ED presentations for urgent and emergent care, specifically including orthopedic injury, ocular injury, meningitis, coronary syndromes, CVA, asthma exacerbation, lacerations, penetrating wounds, abdominal pain, and acute GI bleed.

- **July 1993 to June 1995** *Locum tenens* physician at Franciscan-Skemp Health System affiliated facilities: St. Mary's Hospital, Sparta, WI; St. Joseph's Hospital, Arcadia, WI; Skemp Walk-In Clinics, LaCrosse, WI and Onalaska, WI.
  - **Scope of Practice:**
    - Franciscan-Skemp Health System consisted of a network of rural hospitals and clinics with opportunity for resident physicians to staff rural Level III emergency departments in 24 and 48 hour shifts.
    - Situations managed would have included a variety of typical rural ED presentations for urgent and emergent care, specifically including diabetic hyperglycemic coma, cardiac arrest, complicated laceration repair, and therapeutic arthrocentesis for hemarthrosis.

- **July 1992 to June 1995** Resident physician, St. Francis Hospital, LaCrosse, WI (Franciscan-Skemp Health System).

*EDUCATION*

- **Residency** *(July 1992 to June 1995)* St. Francis/Mayo Family Practice Residency, LaCrosse, WI.
- **Medical School** *(August 1988 to June 1992)* Loyola University Stritch School of Medicine, Maywood, IL.
- **Undergraduate** *(September 1986 to June 1988)* University of Oregon, Eugene, OR, Pre-Med studies.
- **Undergraduate** *(September 1982 to August 1985)* Oregon State University, Corvallis, OR, Bachelor of Science in Computer Science.

*PROFESSIONAL ASSOCIATIONS*

- Board certified in Family Practice, 1995 to present
- Unrestricted license to practice medicine in Colorado, 1998 to present
- Certified Correctional Health Professional (CCHP), 2005 to present
- Member of the Academy of Correctional Health Professionals, 2005 to present
- Member of the Society of Correctional Physicians, 2005 to present
- ACLS, ATLS and PALS certified

*PROFESSIONAL ACTIVITIES*

- *Healthy Inmates 2020*, Project Coordinator, April 2010 to Present
- Speaker, NCCHC Updates in Correctional Health Care, Nashville,TN; April 2010; "Healthy People 2020: Correctional Care Insights"
- Speaker, NCCHC Updates in Correctional Health Care, Las Vegas, NV; April 2009; "Correctional Public Health: For the Good of the Community"
- Speaker, Operational Excellence in Correctional Healthcare Conference (World Research Group), Las Vegas, NV; December 2008; "Chronic Care Models that Work"
- Speaker, NCCHC Conference, Nashville, TN; October 2007; "Chronic Knee Pain: Evaluation and Management with Emphasis on Cost Containment"

Hepatitis C Evaluation, Management and Treatment (11/2015)                                    Attachment G

## Colorado Department of Corrections
### Infectious Disease Committee Determination Worksheet

Offender Name: _Vasquez_                          DOC Number _49323_

Date of Committee Meeting: _2|19|16_

Committee Action:

_____✓_____ Recommend for treatment in next treatment group *(Approved for Treatment)*

_____ Recommend consultation with
         ☐ Infectious Disease
         ☐ Gastroenterology
         ☐ Other _____
         then proceed with treatment if approved by specialist

_____ Remains eligible and will be considered again at next quarterly meeting

_____ Committee requests the following additional information: _____
_____
_____

_____ Not recommended for treatment at this time, with the following
explanation: _____
_____
_____

Copy of Committee Decision forwarded to:

    Submitting provider: _Kautz_

    Facility HSA: _G Ward_

    Date: _2|22|16_

**EXHIBIT**
**Attachment 2**

Hepatitis C Evaluation, Management and Treatment (11/2015)

Attachment F
Page 2

## Colorado Department of Corrections
## Hepatitis C Pre-Treatment Evaluation Worksheet

Offender Name: Vasquez, Jimmy          DOC #: 49323

| Required Lab Tests | Result | Date | Required Lab Tests | Result | Date |
|---|---|---|---|---|---|
| AST | 84 | 10/15 | Platelets | 59 | 10/15 |
| APRI Score | 3559 | 2/16 | Albumin | 3.4 | 10/15 |
| HgA1C | 4.7 | 9/15 | PT/INR | 1.1 | 9/15 |
| Pregnancy Test (females) | NA | | Child-Turcotte-Pugh class | | |
| HCV RNA Quant (copies/ml) | 16,220 ERA | 10/15 | HCV Genotype | 3 | 9/15 |
| HIV Antibody (pos/neg) | Neg | 9/15 | HepBSAg (pos/neg) | Neg | 11/15 |
| **Complete this Section ONLY if offender has Genotype 2 or 3** | | | | | |
| EKG | NSR | 9/15 | CXR | Neg | 11/15 |
| Hemoglobin/Hematocrit | 12.4/35.5 | 10/15 | Absolute Neutrophil Count (ANC) | 2.2 | 10/15 |
| Creatinine | 1.07 | 10/15 | eGFR | 78 | 10/15 |

T. Kautz                                              11/18/15
Name of Provider submitting this worksheet    Provider's Signature          Date

**Fax the completed worksheet and accompanying documentation to the infectious disease committee chairperson – DOC HQ Infection Control Nurse (fax no. 719-226-4533 or 719-226-4565). The form may also be scanned to the appropriate e-mail address.**

**Put the original completed packet in the offender's medical record (either hard copy or scanned to the electronic health record).**

**Date faxed (or scanned) to committee chair:_____ By:_____**

+) Sign In   👤 Create an Account

| | HCV Medications ❯ | Course Modules ❯ | **Clinical Calculators** ❯ | Slide Lectures | Core Concepts | Master Bibliography | Search |

Clinical Calculators

**APRI Calculator**

AUDIT-C Questionnaire

BMI Calculator

CrCl Calculator

CAGE Questionnaire

CTP Calculator

FIB-4 Calculator

Glasgow Coma Scale

GFR Calculator

MELD Calculator

SAAG Calculator

## AST to Platelet Ratio Index (APRI) Calculator

This is an AST to Platelet Ratio Index calculator tool. Enter the required values to calculate the APRI value. The APRI Score will appear in the oval on the far right (highlighted in yellow). Most laboratories use 40 IU/L as the value for the AST upper limit of normal.



$$APRI = \frac{\dfrac{AST\ Level\ (IU/L)}{84}}{\dfrac{AST\ (Upper\ Limit\ of\ Normal)\ (IU/L)}{40}} \times 100 = 3.559$$

Platelet Count $(10^9/L)$: 59

**Interpretation:**
In a meta-analysis of 40 studies, investigators concluded that an APRI score greater than 1.0 had a sensitivity of 76% and specificity of 72% for predicting cirrhosis. In addition, they concluded that APRI score greater than 0.7 had a sensitivity of 77% and specificity of 72% for predicting significant hepatic fibrosis.

Source: Lin ZH, Xin YN, Dong QJ, et al. Performance of the aspartate aminotransferase-to-platelet ratio index for the staging of hepatitis C-related fibrosis: an updated meta-analysis. Hepatology. 2011;53:726-36.

ℹ **Whole number values starting with 0**
  Prior to October 13th, 2015, values entered as "050" instead of "50" would have resulted in incorrect score calculations. These numbers were interpreted in base 8 instead of base 10. Values entered with a decimal point (e.g. "0.50") were not impacted.

**Funded by a grant from the Centers for Disease Control and Prevention**

**HCV Medications**

Daclatasvir (Daklinza)
Elbasvir–Grazoprevir (Zepatier)
Ledipasvir-Sofosbuvir (Harvoni)
Ombitasvir-Paritaprevir-Ritonavir (Technivie)
Ombitasvir-Paritaprevir-Ritonavir and Dasabuvir (Viekira Pak)
Peginterferon alfa-2a (Pegasys)
Peginterferon alfa-2b (PegIntron)
Ribavirin (Copegus, Rebetol, Ribasphere)
Simeprevir (Olysio)
Sofosbuvir (Sovaldi)
Boceprevir (Victrelis)
Telaprevir (Incivek)

**Course Modules**

Screening and Diagnosis of Hepatitis C Infection
Evaluation, Staging, and Monitoring of Chronic Hepatitis C
Management of Cirrhosis-Related Complications
Evaluation and Preparation for Hepatitis C Treatment
Treatment of Chronic Hepatitis C Infection
Treatment of Special Populations and Special Situations
Special Topics

**Slide Lectures**
**Core Concepts**
**Master Bibliography**

**Contributors**
**Site Overview**
**Content Bundles**

**Clinical Calculators**

APRI Calculator
AUDIT-C Questionnaire
BMI Calculator
CrCl Calculator
CAGE Questionnaire
CTP Calculator
FIB-4 Calculator
Glasgow Coma Scale
GFR Calculator
MELD Calculator
SAAG Calculator

Copyright © 2016 Hepatitis C Online

Help | Contact Us | Terms and Conditions | Privacy Policy
CE (CNE/CME) Notices

Hepatitis C Evaluation, Management and Treatment (11/2015)                    Attachment F
                                                                             Page 1

## Colorado Department of Corrections
## Hepatitis C Pre-Treatment Evaluation Worksheet

Offender Name: Vasquez, Jimmy   DOC #: 49323   MRD: 12-31-9498

Date of Birth: 1-3-60   Age when infected with HCV: 44   Years since infection: 12

Mode of infection (i.e. transfusion, IVDU, unknown, etc.) Unknown

| Initial Screening Information | | | Date |
|---|---|---|---|
| Date the offender received the Hepatitis C Patient Education handout. | | | 9-23-15 10-2-15 |
| Dates of HCV RNA Qualitative positive repeated twice over 6 month period: 9-23-15, 10-20-07 | | | |
| Date the offender signed the Contract for Alcohol and Drug treatment. (Attach copy of contract) | | | 10-2-15 |
| Date clinical services received notice that the offender completed his/her required alcohol and drug classes. (Attach copy of Referral and Verification form) Offender's Substance Abuse Code: 5 | | | 9-23-15 |
| Date the offender signed the Contract for Hepatitis C Treatment. (Attach copy of contract) | | | 9-23-15 |
| Has the offender's case manager been contacted to verify that offender has not engaged in high risk behavior since completion of alcohol and drug classes? | (Yes) | No | ∅ reports |
| Does the offender have evidence of poorly controlled chronic disease such as: congestive heart failure, coronary artery disease, pulmonary disease, diabetes, autoimmune disease, inflammatory bowel disease, or untreated latent TB infection? | (Yes) | No | cirrhosis multiple myeloma esophageal varices   pancytopenia |
| Does the offender have clinically apparent ascites? | (Yes) | No | ∅ requiring paracentesis |
| Has the offender been hospitalized for encephalopathy? | Yes | (No) | |
| Has the offender had a liver ultrasound for HCC screening? | (Yes) | No | |
| If yes, is there evidence for cirrhosis on U/S imaging? | (Yes) | No | N/A |
| Has the offender had a liver or abdominal CT scan for any reason? | Yes | (No) | |
| If yes, is there evidence for cirrhosis on CT imaging? | Yes | No | N/A |

Trisha Kautz, DNP                          2-10-16
Print name of Provider    Provider's Signature          Date

**Colorado Department of Corrections**
**Hepatitis C Evaluation Worksheet**

Attachment D, page 2                                                    Updated   May 2015

Name _Vasquez, Jimmy J_                    DOC # _49323_

| Mental Health Considerations | | | Date |
|---|---|---|---|
| Evidence or history of suicide ideation and/or suicide attempt? ~~last~~ Avoid 1993 today | ☑ Yes | ☐ No | 1993 |
| History of severe psychiatric disorder? | ☐ Yes | ☑ No | |
| Major mental illness poorly controlled? | ☐ Yes | ☑ No | |
| Recent aggressive behavior problems? | ☐ Yes | ☑ No | |
| Ancillary Concerns | | | Date |
| Evidence of concerns with risk behaviors? | ☐ Yes | ☑ No | |
| Evidence of non-compliance with treatment or evaluations? | ☐ Yes | ☑ No | |
| Patient refused to sign contract? | ☐ Yes | ☑ No | |
| Other? | ☐ Yes | ☑ No | |

_Breston K. Willson, MS_        _[signature]_ MS     _10/2/15_
Print name, Mental Health provider      Signature          Date

**Complete the above work sheet; attach pertinent documentation including evidence of Alcohol and Drug education.  Submit to the infectious disease sub-committee attention DOC Infection Control Nurse (fax no. 719-226-4533 or 719-226-4565).**

| Code of Penal Discipline (COPD) charges, list all drug, alcohol, and high risk behavior charges | Date |
|---|---|
| | |
| | |
| | |
| | |

**Attachment G , page 2**      **Patient Contract Concerning**      Updated **May 2015**
                               **Hepatitis C Treatment**

7. I will abstain from any medication not prescribed for me or approved for me to purchase from the canteen during the evaluation or the course of this treatment. I understand failure to do so can result in discontinuing this treatment. I will consult with a health care provider before taking any new medication from canteen.

8. I understand I must participate in alcohol and drug education prior to starting this treatment and successfully complete drug and alcohol treatment as recommended by the DOC alcohol and drug employee as required by AR 700-20.

9. I will abstain from all illegal substances and high risk behaviors, including but not limited to IV, oral or inhaled drug use, during the evaluation or course of this treatment. Treatment will be discontinued for tattooing, possession of drug paraphernalia or any other indication of drug or alcohol use since starting the Alcohol and Drug Education program. If I fail to follow this requirement, I will not be considered a candidate for this therapy and/or therapy will be discontinued. I must have a minimum of one year with no evidence of high risk behavior to be considered for treatment. In addition, if I engage in high risk behaviors related to alcohol or drugs while undergoing alcohol and drug treatment, or while undergoing evaluation or treatment for hepatitis C, I must repeat alcohol and drug classes (for alcohol and drug related behaviors), and I must wait a minimum of one year to be considered again for treatment of hepatitis C. In this case, I must remain free of high risk behaviors at this time.

10. I will submit to random urine drug tests prior to and during treatment. If I refuse, I will not be considered a candidate for this treatment.

11. I understand if I have any positive drug screen checks during the course of this treatment, treatment will be discontinued.

12. I will not participate in tattooing during the course of this treatment. I understand if I do, or if I am convicted of a COPD violation involving tattooing, or tattoo equipment, treatment will be discontinued.

13. I understand if I do not come in for my medication as prescribed to treat my hepatitis C, therapy will be discontinued.

14. I understand that the medications to treat hepatitis C may make me feel angry and irritable, but that controlling my behavior is my responsibility and taking this medication will not excuse any misconduct.

15. I understand that treatment will be discontinued if in the medical judgment of the attending provider there are medical or behavioral issues that warrant this decision.



**Attachment G**          **Patient Contract Concerning**          Updated May 2015
**Hepatitis C Treatment**

1. I understand that treatment with therapy (interferon / pegylated interferon / ribavirin) may cause flu-like symptoms (fever, chills, headache, aching muscles and or joints, rapid pulse, nausea, vomiting, and general feeling of being "rundown"). It may also cause fatigue, hair loss, bone marrow suppression, apathy, irritability, depression, suicidal ideation, and changes in my thinking processes. Tolerance to these side effects may develop within a few weeks or may persist. For some patients the side effects may necessitate stopping treatment. I also understand that initiating treatment may make my liver disease worse or even cause death.

2. I understand some of the side effects can be lessened by taking Tylenol from canteen as needed for symptom management, drinking at least 64 ounces of water/day, pacing my activities and my rest, and maintaining a healthy diet. I understand I am expected to follow these suggestions as necessary to help with any side effects.

3. I understand that one of the medications in this therapy, interferon, is by injections (shots). Pegylated interferon injections will be given once a week. I agree present to the appropriate med line every week to receive this injection. Some treatment regimens do not include peginterferon, consult your healthcare practitioner.)

4. I agree to periodic health evaluations including blood tests to monitor my overall health, side effects of the medicine, and to monitor treatment. Refusal to allow laboratory monitoring while I am on hepatitis C treatment will result in my treatment being stopped.

5. I understand that treatment will be required for at least a 12 week period. I understand that depending on the type of virus I have, the length of treatment and the terms of this contract may extend to 24 weeks of medication, lab work, and provider checkups.

6. I understand this therapy can cause severe birth defects. I understand that it is extremely important and absolutely required that I do not become pregnant, or father a baby. If female, I agree to have a pregnancy test prior to starting treatment, and to have monthly pregnancy tests. (Only women who have had a hysterectomy are exempt from this requirement). I will ensure that birth control measures are used during and six months following treatment. I understand that if I or my partner becomes pregnant, this therapy for Hepatitis C will be discontinued, and I will assume all liability for any complications and/or birth defects.

If male, I understand that my female partner should not become pregnant while I am receiving treatment for hepatitis C, to include six months following the end of hepatitis C treatment.



Attachment G , page 3          **Patient Contract Concerning**          Updated May 2015
                                **Hepatitis C Treatment**

16. Finally, I understand that this therapy may not cure my disease and that even without treatment I could maintain good health.


Patient Signature _____ Date Oct 2, 2015

Provider Signature _____ Date 10/2/15

Attachment E                **Colorado Department of Corrections**          Updated May 2015
                            **Contract for Alcohol and Drug Treatment**

Testing has demonstrated that you are chronically infected with hepatitis C. Treatment for viral hepatitis is expensive and, even if it is successful, it does *not* prevent you from becoming re-infected if you do things that expose you to the virus again. **DOC does not believe that treatment should be given to patients who are likely to become re-infected.** For this reason, anyone who wants to receive potentially curative treatment for chronic hepatitis C is required to participate in and attend alcohol and drug classes as recommended by the DOC alcohol and drug program in accordance with AR 700-20. Continued substance abuse while incarcerated in the DOC strongly indicates that a person is not an appropriate candidate for treatment for hepatitis C. Compliance with the following requirements is **MANDATORY** for anyone wishing to start or maintain treatment for chronic viral hepatitis.

1.      You must be evaluated by DOC alcohol and drug staff. If drug and/or alcohol issues are identified you must complete drug and alcohol treatment recommended by the DOC drug and alcohol program AR 700-20. Alcohol and Drug treatment must be completed prior to submission of evaluation worksheet 1 and treatment for hepatitis C. If you do not enroll or if you do not complete alcohol and drug treatment, you will not qualify for hepatitis C treatment. It is your responsibility to provide medical services with proof of your completion of the required alcohol and drug treatment. You may fulfill this requirement through documentation from a alcohol and drug employee. In the event alcohol and drug employee identifies no issues with substance abuse and recommend no treatment for substance abuse, the requirement for alcohol and drug treatment is waived.

2.      Treatment for hepatitis C will not be approved if you have any evidence of high risk behavior since the time of enrollment into alcohol and drug treatment. This includes any COPD conviction for tattooing, contraband related to drugs or alcohol, misuse or abuse of prescription medications, or sexual activity with another offender or staff. Additional evidence of high risk behavior includes a positive urine drug test for drugs of abuse, or failure to provide a urine specimen for drug testing when requested, regardless if the request is from clinical services or custody/control. If there is evidence of high risk behavior, you are not eligible for treatment until you have repeated alcohol and drug classes (for alcohol and drug -related behaviors), and you must remain free of any high risk behavior prior to being considered for treatment.

3.      Treatment will be discontinued if you have evidence of high risk behavior, as described above, while on active treatment for hepatitis C.

4.      You must agree to take the prescribed medications for treatment of hepatitis C as prescribed. Skipping doses, refusing doses, or changing the dose will result in discontinuation of the hepatitis C treatment. Treatment will not be re-authorized or re-started.

I have read this document carefully, understand it, and want to receive treatment for my chronic hepatitis infection. I understand that if I do not follow these rules I will not be started on treatment or, if treatment has begun, it will be stopped and not restarted.

_____          49323          Oct 2, 2015
Patient's Name                     DOC #           Date