**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge William J. Martínez**

Civil Action No. 14-cv-1433-WJM-CBS

JIMMY JOSEPH VASQUEZ,

      Plaintiff,

v.

JEANNE DAVIS, in her individual capacity,
KATHLEEN MARTORANO, in her individual capacity,
KEITH MEEK, in his individual capacity,
BRIAN WEBSTER, in his individual capacity,
GATBEL CHAMJOCK, in his individual capacity,
KATHLEEN MELLOH, in her individual capacity,
MAURICE FAUVEL, in his individual and official capacities,
JOHN and/or JANE DOE(s), Clinical Services Administrators and Supervisors, in their
official and individual capacities, and
RICK RAEMISCH, in his official capacity,

      Defendants.

---

**ORDER DENYING PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION AND
*SUA SPONTE* ORDERING ALTERNATIVE RELIEF UNDER THE ALL WRITS ACT**

---

Plaintiff Jimmy Joseph Vasquez ("Vasquez") is an inmate in the custody of the

Colorado Department of Corrections ("CDOC") and housed at the Sterling Correctional

Facility ("Sterling").  (ECF No. 55 ¶ 1.)  He is infected with the hepatitis C virus ("HCV").

(*Id.* ¶ 42.)  Vasquez brings this lawsuit under the Eighth Amendment to the U.S.

Constitution, alleging that various CDOC employees (collectively, "Defendants") were

deliberately indifferent over many years to the effects that HCV was having on him.

Due to that indifference, he claims he developed end-stage liver disease that will likely

kill him absent a liver transplant.  (*Id.* at 1–2.)

Currently before the Court is Vasquez's Motion for Temporary Restraining Order ("TRO") (the "Motion").  (ECF No. 114.)  The Motion notes the existence of a recently approved drug, Harvoni, that tends to be quite successful in purging HCV, thus preventing further liver damage (although it does not reverse the effects of liver damage already inflicted).  (*Id.* at 2–3.)  The Motion therefore requests a preliminary injunction ordering Defendants to:

1.      "immediately start Mr. Vasquez on a course of Harvoni,"

2.      "secure a medically appropriate MELD score evaluation [discussed in detail below] to determine whether Mr. Vasquez is eligible for a liver transplant and his priority for such a transplant," and

3.      "[i]n the event that Mr. Vasquez is indeed eligible for a transplant, . . . ensure that he receives one in accordance with the community standards of care."

(ECF No. 114 at 4.)

Because this case has been pending since 2014 and all parties have participated, and because Vasquez's requests seek to change the status quo, this Court denied the Motion to the extent it sought a TRO, but construed the Motion as one for a preliminary injunction and ordered briefing accordingly.  (ECF No. 116.)  The Court has received Defendants' Response (ECF No. 120) and Vasquez's Reply (ECF No. 122).  The Court held an evidentiary hearing on February 26, 2016, and took the Motion under advisement at that time.

For the reasons explained below, Vasquez's request to be prescribed Harvoni is moot because CDOC has approved Vasquez for an acceptable alternative drug

2

regimen.  Vasquez's requests regarding MELD score evaluations and eligibility for a liver transplant are not moot, but Vasquez is not entitled to preliminary injunctive relief because he has failed to demonstrate a likelihood of success on the subjective prong of the Eighth Amendment deliberate indifference standard.  Nonetheless, given that Vasquez's life is potentially at stake, the Court will exercise its extraordinary authority under the All Writs Act, 28 U.S.C. § 1651, to order regular MELD score calculations, as well as prompt disclosure of those scores (along with the accompanying data) to Vasquez's counsel.  This relief is sufficient to ensure proper monitoring of Vasquez's liver condition, and to keep his counsel fully informed, so that counsel may seek further relief from this Court, if needed, under appropriate circumstances.

## I. BACKGROUND

### A.   Vasquez's Allegations

The Court has summarized Vasquez's allegations in its prior order denying Defendants' motion to dismiss.  (ECF No. 99.)  *See also* 2015 WL 6662921.  For present purposes, it suffices to note that Vasquez has been infected with HCV since at least 2004, when he entered CDOC custody.  (ECF No. 99 at 3.)  CDOC medical staff have been aware of his condition but, until very recently, have never recommended that Vasquez receive antiviral therapy, or any other form of therapy, intended to eradicate HCV from his system.  (*Id.* at 3–8.)  Although Defendants dispute that they have mistreated Vasquez, all parties currently agree that Vasquez now suffers from decompensated cirrhosis of the liver, a condition which is potentially life-threatening.

**B.     Potential Antiviral Treatment Protocols**

It is unclear from the current record whether, prior to 2013, any existing HCV treatment regimen could have successfully eliminated HCV from Vasquez's system. Fortunately for Vasquez, the last two to three years have seen new drugs enter the market that can fight HCV much more effectively than previously available treatment options.  One such drug is Harvoni, which Vasquez specifically requests in his Motion. However, since filing the Motion, it has become clear that Harvoni has not been approved to treat HCV genotype 3, which is the form of HCV in Vasquez's system. However, another recently approved drug, Sovaldi, is effective against HCV genotype 3 when combined with a pre-existing drug, Ribavarin.

**C.     Vasquez's Approval for Sovaldi/Ribavarin Treatment**

Defendants' sole witness at the preliminary injunction hearing was Dr. Susan Tiona, CDOC's Chief Medical Officer, whom the Court admitted as an expert in family medicine and infectious diseases, including HCV treatment.  Dr. Tiona is not a defendant in this case.

 Dr. Tiona testified that CDOC's Infectious Disease Committee, on which she sits, preliminarily approved Vasquez for Sovaldi/Ribavarin treatment on Friday, February 19, 2016 (the same day Vasquez filed his Motion), and formally approved such treatment the following Monday, February 22, 2016.[1]  Dr. Tiona expects that the treatment will begin on or about March 11, 2016.  Once begun, it will run for 24 weeks.

---

[1] Dr. Tiona testified that all of this took place before she learned of Vasquez's lawsuit, much less his Motion.  Given the disposition below, the Court need not make any finding in that regard.

Dr. Tiona believes that Vasquez has a 75% chance of becoming HCV-free through a complete course of Sovaldi/Ribavarin treatment.  The major risk Vasquez faces is from decreasing hemoglobin levels, a side effect of Ribavarin.  If those levels get dangerously low, both Sovaldi and Ribavarin must be stopped because Sovaldi is not approved to be administered without Ribavarin.  In that event, Dr. Tiona has maintained contact with a pharmaceutical company that expects to have another promising antiviral drug approved by the end of this year, and Vasquez would be considered for that treatment.

**D.     MELD Scores—Dr. Bacon's Testimony**

Vasquez's expert at the hearing was Dr. Bruce Bacon, whom the Court admitted as an expert on liver diseases and HCV treatment, including transplant procedures. Because Dr. Bacon agreed that Sovaldi/Ribavarin was an appropriate treatment for Vasquez, most of Dr. Bacon's testimony focused on the likelihood that Vasquez may need a liver transplant.

Dr. Bacon testified that an individual's priority for receiving a liver transplant is governed by a standard accepted nationwide known as the Model for End-stage Liver Disease, or "MELD."  A MELD score is calculated by entering the results of certain laboratory tests into a formula, which then yields a number between 6 and 40.  In very simple terms, an individual with a score of 40 will likely die very soon without a liver transplant, whereas an individual with a score of 6 may never need a transplant.  Dr. Bacon said that a MELD score of 15 is the generally accepted point at which an individual should be worked up for transplant eligibility.  A work-up for transplant eligibility is done by a transplant center and involves numerous tests of the various body

systems, and also considers socioeconomic factors.

When asked to assume that Vasquez had a MELD score of 11, Dr. Bacon stated that he might still have Vasquez worked up for transplant eligibility based on other factors (*e.g.*, episodes of internal bleeding as well his decompensated liver cirrhosis). In other words, a MELD score of 15 is not a magic number, but a generally accepted guideline.  Given Vasquez's current condition, Dr. Bacon recommends that Vasquez's MELD score be calculated every three months.

When asked regarding Vasquez's likelihood of suffering total liver failure during the 24-week Sovaldi/Ribavarin regimen that Vasquez should soon begin, Dr. Bacon opined that it was "unlikely," and that Vasquez is relatively "stable."  When asked regarding Vasquez's likelihood of suffering total liver failure in the year or two after a successful Sovaldi/Ribavarin regimen, Dr. Bacon noted that Vasquez's MELD score would likely decrease in that time period, meaning that the chance of liver failure would then be even lower.

### E.    MELD Scores—Dr. Tiona's Testimony

Dr. Tiona generally agreed with Dr. Bacon.[2]  The MELD score of 11 posited to Dr. Bacon came from Dr. Tiona's own calculation, which she did the day before the preliminary injunction hearing based on bloodwork data gathered in October 2015. Specifically, Dr. Tiona calculated a MELD score of 11.3.  According to Dr. Tiona, that

---

[2] Their major point of disagreement, which is not presently relevant, related to the possibility of providing a liver transplant to someone still infected with HCV.  Dr. Bacon testified that the continuing presence of HCV is not a barrier to a transplant.  Dr. Tiona, while not disagreeing with that specific point, nonetheless believes that HCV should be treated before any transplant because untreated HCV would begin to erode the new liver just as it had done the old.

score suggests that Vasquez has about a 6% chance "of having a non-survival event of some kind in the next three months related to liver disease."

Dr. Tiona says that CDOC has not been calculating Vasquez's MELD score thus far, but the MELD score is based on blood tests that CDOC regularly administers to Vasquez anyway.  Thus, CDOC could calculate his MELD scores historically, and could calculate his MELD scores going forward with little more effort than it already plans to expend.

Dr. Tiona agreed with Dr. Bacon that Vasquez's MELD score might go down after Sovaldi/Ribavarin treatment.  She therefore believed the best course of action would be to "get [Vasquez] treated, get his virus taken care of and then check his MELD score every three months to monitor that, and if it does progress upward and starts to creep toward the 15 [mark], then we could look at a referral [to a transplant center for a transplant eligibility work-up]."

## F.      Potential Withdrawal of Treatment as a Disciplinary Measure

CDOC requires inmates who wish to receive HCV antiviral therapy to complete drug and alcohol resistance classes.  The reasoning behind this requirement is that HCV infections most commonly come through high risk behaviors connected to substance abuse, and it is a waste of resources to treat inmates for HCV who may then go forward and reinfect themselves through, *e.g.*, sharing needles.

Before beginning the drug and alcohol resistance classes, inmates must sign a "Contract for Alcohol and Drug Treatment."  (Plaintiff's Exhibit 5 at Bates page 814.) That document states that

> [t]reatment for hepatitis C will not be approved if you have

7

> any evidence of high risk behavior since the time of
> enrollment into alcohol and drug treatment.  This includes
> any [Code of Penal Discipline] conviction for tattooing,
> contraband related to drugs or alcohol, misuse or abuse of
> prescription medications, or sexual activity with another
> offender or staff. . . .  If there is evidence of high risk
> behavior, you are not eligible for treatment until you have
> repeated alcohol and drug classes . . . .

(*Id.*)  Vasquez signed this contract.  (*Id.*)

After successfully completing these classes, and inmate is required to sign a

"Patient Contract Concerning Hepatitis C Treatment."  (Defendants' Exhibit G.)  Under

that contract the inmate must agree to the following condition:

> I will abstain from all illegal substances and high risk
> behaviors, including but not limited to IV, oral or inhaled drug
> use, during the evaluation or course of this treatment.
> Treatment will be discontinued for tattooing, possession of
> drug paraphernalia or any other indication of drug or alcohol
> use since starting the Alcohol and Drug Education program.
> If I fail to follow this requirement, I will not be considered a
> candidate for this therapy and/or therapy will be
> discontinued.

(*Id.*)  Vasquez signed this contract as well.  (*Id.*)

Vasquez believes that prison discipline is often arbitrary, and he worries that the

slightest slip-up might prompt officials at Sterling to discontinue the Sovaldi/Ribavarin

treatment.  Michael Latiolais, one of Vasquez's fellow inmates, testified at the

preliminary injunction hearing that before he (Latiolais) received Harvoni, prison staff

threatened to end the treatment early if he received "*any* kind of write-up" (emphasis

added).  However, neither Latiolais nor Vasquez have ever had medical care withdrawn

as punishment, nor are they aware of an inmate who had medical care withdrawn as

punishment.  Moreover, Vasquez testified—and Dr. Tiona confirmed—that he has

8

never had a write-up for any reason during his twelve years in CDOC custody.

## II.  PRELIMINARY INJUNCTION STANDARD

A preliminary injunction is an extraordinary remedy; accordingly, the right to relief

must be clear and unequivocal.  *See, e.g.*, *Flood v. ClearOne Commc'ns, Inc.*, 618 F.3d

1110, 1117 (10th Cir. 2010).  To meet this burden, a party seeking a preliminary

injunction must show: (1) a likelihood of success on the merits, (2) a threat of

irreparable harm, which (3) outweighs any harm to the non-moving party, and that

(4) the injunction would not adversely affect the public interest.  *See, e.g.*, *Awad v.

Ziriax*, 670 F.3d 1111, 1125 (10th Cir. 2012).

Although this inquiry is, on its face, relatively straightforward, there are a variety

of exceptions.  If the injunction will (1) alter the status quo, (2) mandate action by the

defendant, or (3) afford the movant all the relief that it could recover at the conclusion of

a full trial on the merits, the movant must meet a heightened burden.  *See O Centro

Espirita Beneficiente Uniao do Vegetal v. Ashcroft*, 389 F.3d 973, 975 (10th Cir.2004)

(en banc).  Specifically, the proposed injunction "must be more closely scrutinized to

assure that the exigencies of the case support the granting of a remedy that is

extraordinary even in the normal course" and "a party seeking such an injunction must

make a strong showing both with regard to the likelihood of success on the merits and

with regard to the balance of harms."  *Id.*

## III.  ANALYSIS

**A.      Partial Mootness & Lack of Ripeness**

In the briefing leading up to the preliminary injunction hearing, Defendants

largely took the position that injunctive relief was moot because CDOC would soon begin Vasquez on the Sovaldi/Ribavarin regimen.  (*See* ECF No. 120.)  Given Vasquez's concession that Sovaldi/Ribavarin is more appropriate than Harvoni, the Court agrees that this portion of Vasquez's request for relief is moot.

The Court emphasizes, however, that this mootness finding is heavily informed by Dr. Tiona's hearing testimony about CDOC's intentions in the next few weeks.  The Court found Dr. Tiona to be generally sincere and credible.  Based on that, the Court takes Dr. Tiona at her word that Sovaldi/Ribavarin treatment will actually begin on or about March 11, 2016.  Moreover, the Court takes Dr. Tiona at her word that the Sovaldi/Ribavarin treatment will not be canceled or interrupted unless medically necessary or unless Vasquez commits a *confirmed* violation of his treatment contract.  Should the Court's trust turn out to be misplaced, Vasquez may revive his claim for antiviral therapy.

Counsel for Defendants conceded at the preliminary injunction hearing that Vasquez's remaining requests (regarding MELD scores and a potential liver transplant) are not moot.  Nonetheless, the liver transplant portion of Vasquez's Motion—"[i]n the event that Mr. Vasquez is indeed eligible for a transplant, . . . ensure that he receives one in accordance with the community standards of care" (ECF No. 114 at 4)—is not ripe.  Vasquez's transplant eligibility turns on at least three considerations: (1) his MELD scores; (2) professional medical judgment, based on his MELD scores combined with his other symptoms, to determine whether a transplant work-up is appropriate; and (3) the results of the transplant work-up, if one is ordered.  Obviously, the second and third considerations rely heavily on the first consideration.

10

Even outside the prison context, this would make injunctive relief difficult to fashion, and it is particularly difficult in the prison context: "In any civil action with respect to prison conditions . . . [p]reliminary injunctive relief must be narrowly drawn, extend no further than necessary to correct the harm the court finds requires preliminary relief, and be the least intrusive means necessary to correct that harm." 18 U.S.C. § 3626(a)(2).  Here, the number of moving parts would mostly prevent the Court from entering a sufficiently narrow injunction.  The Court is unqualified to specify, *e.g.*, the hemoglobin level below which withdrawal of antiviral treatment is appropriate, the appropriate course of alternative treatment if antiviral therapy fails, the exact MELD score at which Vasquez must be worked up for a transplant, and so forth.

Thus, the Court finds that the only request for injunctive relief that is both ripe and sufficiently narrow is Vasquez's request for MELD score evaluations.[3]  The remaining analysis evaluates only that request.

## B.    "Disfavored" Injunction

Vasquez's MELD score request, if granted, would constitute a "disfavored" injunction because, at a minimum, this Court would be requiring CDOC to take certain actions it is not currently taking.  *See O Centro*, 389 F.3d at 975.  Thus, Vasquez "must

---

[3] In addition to the ripeness problem, there are also serious jurisdictional questions inherent in any request that this Court order a transplant to take place.  No transplant center is a party here—and even if the case were otherwise, it is highly doubtful that the Court could order a transplant center even to place Vasquez on a list to receive a transplant, much less actually give him one.  *See, e.g., Miller v. Bannister*, 2011 WL 666097, at *1 (D. Nev. Feb. 14, 2011) ("The Court notes that it likely would have no authority to require a third-party organization to put Plaintiff on its transplant list even if his evaluation for eligibility were favorable, and that it would almost certainly have no authority to require such an organization to dedicate an organ to him.").

make a strong showing both with regard to the likelihood of success on the merits and with regard to the balance of harms."  *Id.*  The Court finds that the likelihood-of-success element is dispositive here.

## C.    Likelihood of Success on the Merits

Likelihood of success turns on the elements of Vasquez's underlying claim, namely, a claim for cruel and unusual punishment.  The Eighth Amendment's prohibition against cruel and unusual punishment encompasses deliberate indifference by prison officials to a prisoner's serious medical needs.  *Howard v. Waide*, 534 F.3d 1227, 1235 (10th Cir. 2008).  "Deliberate indifference" involves "a two-pronged inquiry, comprised of an objective component and a subjective component."  *Self v. Crum*, 439 F.3d 1227, 1230 (10th Cir. 2006).  The objective component requires a "sufficiently serious" medical need, meaning "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention."  *Sealock v. Colorado*, 218 F.3d 1205, 1209 (10th Cir. 2000) (internal quotation marks omitted).  The subjective prong examines the state of mind of the defendant, asking whether "the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference."  *Farmer v. Brennan*, 511 U.S. 825, 837 (1994).  This is a high standard.  "[N]egligent failure to provide adequate medical care, even one constituting medical malpractice, does not give rise to a constitutional violation."  *Perkins v. Kan. Dep't of Corrs.*, 165 F.3d 803, 811 (10th Cir. 1999).

1.   *Objective Component*

There appears to be no dispute here that Vasquez suffers from a sufficiently serious medical condition diagnosed by a physician.  Thus, Vasquez's likelihood of proving the objective component is not at issue.

2.   *Subjective Component*

Subjective indifference requires that the prison official "know[] of and disregard[] an excessive risk to inmate health or safety."  *Farmer*, 511 U.S. at 837.  Moreover, when considering injunctive relief, this inquiry turns on "the prison authorities' current attitudes and conduct."  *Id.* at 845 (citation and internal quotation marks omitted).  In light of this standard, Vasquez faces two significant problems.

First, Vasquez has presented no evidence of any current Defendant's state of mind.  Vasquez's Motion instead attributes indifference to CDOC *writ large*.  (*See* ECF No. 114 at 9.)  But CDOC, as an institution, cannot have a subjective state of mind. *See, e.g.*, *Martinez v. Beggs*, 563 F.3d 1082, 1089 (10th Cir. 2009) ("the subjective component requires *the prison official* to disregard the risk of harm claimed by the prisoner" (emphasis added)).  Thus, the Court noted at the preliminary injunction hearing that "an institution cannot have sentient thoughts," and asked, "to which defendants are you attributing this . . . indifference in this case?"  Vasquez's counsel responded, "our position is that . . . the collective knowledge of the employees of the Colorado Department of Corrections satisfies the subjective prong."  But Vasquez has pointed the Court to no authority in which collective knowledge can allow some particular official to "both be aware of facts from which the inference could be drawn

that a substantial risk of serious harm exists, and . . . also draw the inference." *Farmer*, 511 U.S. at 837.

Second, Vasquez has no evidence that anyone within CDOC is currently acting with indifference toward his medical condition.  He has recently been approved for the admittedly appropriate Sovaldi/Ribavarin treatment.  He has received, and continues to receive, regular blood tests from which a MELD score can be calculated—although the actual calculation of a MELD score has apparently only happened once, *i.e.*, the day before the preliminary injunction hearing.  But in that vein, Dr. Tiona volunteered at the preliminary injunction hearing, "If somebody wants me to do a MELD score every three months based on the labs [Vasquez is] going to have drawn, that can certainly be done."  Thus, the relevant CDOC decisionmaker is aware of Vasquez's condition, is taking appropriate steps to address it, and is willing to take additional steps as well.  To the extent Dr. Tiona's current attitude can be attributed to some Defendant in this case (a question which the Court does not reach), there is no evidence of continuing indifference, much less "a strong showing" of such indifference.  *O Centro*, 389 F.3d at 975.  Vasquez therefore cannot show the likelihood of success necessary for preliminary injunctive relief, and the Court need not analyze the remaining preliminary injunction requirements.

### IV.  ALTERNATIVE RELIEF UNDER THE ALL WRITS ACT

Given Vasquez's condition and the fact that his condition is potentially life-threatening, the Court *sua sponte* considers alternative relief under 28 U.S.C. § 1651, commonly known as the All Writs Act.  In relevant part, the Act states: "The Supreme

Court and all courts established by Act of Congress may issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law." 28 U.S.C. § 1651(a). This authority "is to be used sparingly and only in the most critical and exigent circumstances." *Wis. Right to Life, Inc. v. Fed. Election Comm'n*, 542 U.S. 1305, 1306 (2004) (Rehnquist, C.J., in chambers) (internal quotation marks omitted). In cases such as this, where the plaintiff fails to establish the traditional preliminary injunction elements, the plaintiff "must make a showing of irreparable injury sufficient in kind and degree to override these factors cutting against the general availability of preliminary injunctions." *Sampson v. Murray*, 415 U.S. 61, 84 (1974).

An instructive example of the foregoing is *FTC v. Dean Foods Co.*, 384 U.S. 597 (1966). There, the Supreme Court held that an injunction under the All Writs Act preserving the status quo was appropriate because, without it, certain companies would complete their merger, one of those companies would then cease to exist, and the lower courts would likely be deprived of any meaningful opportunity to review the merger. *Id.* at 604–05.

If Vasquez were to suffer liver failure and death, the Court would not be deprived of jurisdiction to hear claims brought by his estate, but it would certainly be deprived of jurisdiction to order the injunctive relief that forms a major part of his case. In other words, the Court's jurisdiction turns, in part at least, on Vasquez remaining alive.

In this case, Vasquez's death from lack of a liver transplant is not imminent. His own expert, Dr. Bacon, believes that any major deterioration in Vasquez's condition is unlikely during the 24-week antiviral regimen that will soon begin, and even less likely in the ensuing years if the treatment successfully eradicates HCV from Vasquez's body.

15

Thus, Vasquez's situation is not particularly dire *at the moment*. Even so, without regular monitoring of his likely need for a liver transplant, his situation could become dire and perhaps irreversible before CDOC has time to react appropriately. Thus, in these unique circumstances, and particularly because an individual's life is at stake, the Court finds that an order under the All Writs Act requiring regular MELD score calculations is appropriate to preserve the Court's jurisdiction.

Dr. Bacon testified that calculating Vasquez's MELD score every three months would be appropriate in light of Vasquez's current condition. Dr. Tiona admitted that this course of action would pose no significant burden. The Court will therefore enter an order requiring CDOC to calculate a new MELD score at least every three months, and then to send the data underlying each score, as well as the score itself, to Vasquez's counsel.[4]

## V. CONCLUSION

For the reasons set forth above, the Court ORDERS as follows:

1. Vasquez's Motion for Temporary Restraining Order, construed by the Court as a Motion for a Preliminary Injunction (ECF No. 114) is DENIED; and

2. Defendant Raemisch, in his official capacity as Executive Director of the Colorado Department of Corrections is ORDERED as follows:

---

[4] Nothing in this order prevents CDOC from testing Vasquez more frequently than every three months. Although the Court does not have sufficient information at this time to establish MELD score thresholds at which more-frequent MELD testing is appropriate, the Court nonetheless expects Dr. Tiona and her subordinates to apply sound medical judgment in that regard.

a.      Beginning no later than March 31, 2016, and continuing at least every three months thereafter until final judgment is entered in this matter or until further order of the Court (whichever comes first), Defendant Raemisch shall ensure that appropriate subordinates perform the laboratory tests necessary to calculate Plaintiff Vasquez's MELD score, and that appropriate subordinates in fact calculate Plaintiff Vasquez's MELD score;

b.      No later than five business days after each MELD score calculation, Defendant Raemisch shall cause his counsel to transmit the record of the relevant laboratory tests, and the record of the MELD score itself, to Vasquez's counsel; and

c.      If unforeseen circumstances make this order somehow impractical or unworkable, Defendant Raemisch may move to modify this order, but only after good faith consultation with Vasquez's counsel (who shall likewise confer in good faith) regarding the potential for a stipulated modification.

Dated this 29th day of February, 2016.

BY THE COURT:

William J. Martinez
United States District Judge

17