```
                  IN THE UNITED STATES DISTRICT COURT
                      FOR THE DISTRICT OF COLORADO

       Civil Action No. 14-cv-01433-WJM-CBS
       _____

                       RULE 30(b)(6) DEPOSITION OF:
                    SUSAN TIONA, M.D. - June 30, 2016
                      Colorado Department of Corrections

       _____
       JIMMY JOSEPH VASQUEZ,

       Plaintiff,

       v.

       JEANNE DAVIS, in her official capacity,
       KATHLEEN MARTORANO, in her official capacity,
       KEITH MEEK, in his official capacity
       BRIAN WEBSTER, in his official capacity,
       GATBEL CHAMJOCK, in his official capacity,
       KATHLEEN MELLOH, in her official capacity,
       MAURICE FAUVEL, in his individual and official
       capacities,
       JOHN and/or JANE DOE(S), Clinical Services
       Administrators and Supervisors, in their official and
       individual capacities,
       RICK RAEMISCH, in his individual and official
       capacities,

       Defendants.
       _____

                PURSUANT TO NOTICE, the Rule 30(b)(6)
       deposition of SUSAN TIONA, M.D., Colorado Department of
       Corrections, was taken on behalf of the Plaintiff at
       150 East 10th Avenue, Denver, Colorado 80203, on
       June 30, 2016, at 9:04 a.m., before Maria M. Orton,
       Registered Professional Reporter and Notary Public
       within Colorado.
```

**H+G**

**Hunter+Geist, Inc.**

303.832.5966
800.525.8490

1900 Grant Street, Suite 1025
Denver, CO 80203

■ www.huntergeist.com
■ scheduling@huntergeist.com

Your Partner in Making the Record

**EXHIBIT 7**

**1**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 14-cv-01433-WJM-CBS
_____
           RULE 30(b)(6) DEPOSITION OF:
            SUSAN TIONA, M.D. - June 30, 2016
            Colorado Department of Corrections
_____

JIMMY JOSEPH VASQUEZ,

Plaintiff,

v.

JEANNE DAVIS, in her official capacity,
KATHLEEN MARTORANO, in her official capacity,
KEITH MEEK, in his official capacity
BRIAN WEBSTER, in his official capacity,
GATBEL CHAMJOCK, in his official capacity,
KATHLEEN MELLOH, in her official capacity,
MAURICE FAUVEL, in his individual and official capacities,
JOHN and/or JANE DOE(S), Clinical Services Administrators and Supervisors, in their official and individual capacities,
RICK RAEMISCH, in his individual and official capacities,

Defendants.
_____
       PURSUANT TO NOTICE, the Rule 30(b)(6)
deposition of SUSAN TIONA, M.D., Colorado Department of
Corrections, was taken on behalf of the Plaintiff at
150 East 10th Avenue, Denver, Colorado 80203, on
June 30, 2016, at 9:04 a.m., before Maria M. Orton,
Registered Professional Reporter and Notary Public
within Colorado.

**2**

A P P E A R A N C E S

For the Plaintiff:

   ELISABETH L. OWEN, ESQ.
   Prisoners' Justice League of Colorado LLC
   150 East 10th Avenue
   Denver, Colorado 80203

For the Defendants Davis, Martorano, Meek, Webster, Mellow, Fauvel, and Raemisch:

   CHRISTOPHER W. ALBER, ESQ.
   State of Colorado
   Senior Assistant Attorney General
   1300 Broadway
   10th Floor
   Denver, Colorado 80203

Also Present:

   Chloe Gleichman

**3**

I N D E X
EXAMINATION OF SUSAN TIONA, M.D.:                    PAGE
June 30, 2016

By Ms. Owen                                             4

                                                   INITIAL
DEPOSITION EXHIBITS:                             REFERENCE

Exhibit 1  Right Start - Right Step                    19
           Certificate of Completion,
           Jimmy Joseph Vasquez, 2/1/08

Exhibit 2  CDOC Clinical Services Clinical             21
           Standard and Procedure for Health Care
           Providers, Revision Date: April 2004

Exhibit 3  CDOC Refusal of Treatment form              29

Exhibit 4  Administrative Regulation 700-02            60

Exhibit 5  DOC Ambulatory Health Record,               87
           Jimmy Joseph Vasquez, 5/27/05

Exhibit 6  Handwritten Note,                          118
           "Dear Mental Health," 2/18/13

Exhibit 7  Clinical Note, 11/15/12  118

Exhibit 8  DOC Ambulatory Health Record,              119
           Jimmy Joseph Vasquez, 10/28/04

**4**

1       WHEREUPON, the following proceedings were
2   taken pursuant to the Federal Rules of Civil Procedure.
3                    *   *   *   *   *
4       SUSAN TIONA, M.D.,
5   having been first duly sworn to state the whole truth,
6   testified as follows:
7                      EXAMINATION
8   BY MS. OWEN:
9       Q.  Good morning, Dr. Tiona.  How are you?
10      A.  I'm good.
11      Q.  I know that you have been deposed before,
12  and also particularly in the Rule 30(b)(6) context, so
13  I'll just remind you of a couple of things.  First,
14  we'll just agree not to speak over each other so the
15  court reporter can get a good record; and, second, that
16  you are testifying today as a representative of the
17  Department of Corrections rather than yourself, so I
18  won't be asking about your personal knowledge, I'll be
19  asking about what the knowledge of the Department is.
20      A.  Okay.
21      Q.  Okay.  All right.  So let's first talk
22  about Hepatitis C treatment policies in the Department
23  of Corrections.  My client has been incarcerated and is
24  also diagnosed with Hepatitis C since about 2004.  So
25  that's the time frame that we'll be talking about from

### 5

1 then until the present. So if there's something
2 different about the policy in the past versus now, I
3 would just ask you to let me know, if that's okay.
4    A. Okay.
5    Q. So can you just describe for me generally
6 the process by which a prisoner who's diagnosed as
7 Hepatitis C positive obtained Hepatitis C treatment.
8    A. Yes. And I will explain how it is now,
9 and then I'll go back and sort of describe maybe what
10 the evolution has been over time in that regard.
11      It has always been the policy of the
12 Department of Corrections to recognize Hepatitis C as a
13 disorder that should be treated under certain
14 circumstances. Our most current policy is that an
15 offender is first recognized as having Hepatitis C. We
16 do that by testing all offenders when they come into
17 the Department for presence of the Hepatitis C
18 antibody.
19      Once we know they are antibody-positive,
20 then we confirm that they have chronic disease by
21 testing them for the presence of the virus in their
22 system. And we do that over the -- a six-month period
23 of time, a minimum of six months. It can be longer.
24 If a person has a test now, it could -- the second test
25 could be two years from now, if that's what the

### 6

1 circumstance -- but, in general, it has to be at least
2 six months apart.
3      Once a person has known viral presence
4 for six months of longer, we say that they have chronic
5 Hepatitis C. At that point they start being monitored
6 for various conditions that are associated with the
7 Hepatitis C virus. So they are tested at least yearly
8 for liver enzyme abnormalities, and tested for what's
9 called the "APRI score," which is a -- an indicator of
10 how -- how much damage there is to their liver. Once
11 they reach a certain point on their APRI -- it is
12 A-P-R-I -- is the acronym. Once they reach a certain
13 stage on the APRI, we start to treat their condition --
14 we stratify them into separate groups.
15      So an APRI score of .4 or less, we don't
16 currently -- we monitor. We just tell them we are
17 going to monitor their condition. Between .4 and .7,
18 we tell them we are going to refer you for drug and
19 alcohol treatment, because at some point you may
20 require treatment, and so we are going to go ahead and
21 get the drug and alcohol under -- established, and then
22 once you -- if you do progress, you will -- you will at
23 least have that requirement taken care of.
24      At .7, we do start looking at referring
25 them to the committee to decide if that person is

### 7

1 appropriate for treatment. There are also some other
2 monitoring conditions that occur after a point- --
3 after a person has an APRI score of .7. The drug and
4 alcohol requirement has been established for a very
5 long time. It's been the policy for a long time, at
6 least since 2004. The requirement for that -- the
7 reason behind that is that offenders, or any -- any
8 person who gets treated for Hepatitis C could
9 potentially be reinfected if they were to continue the
10 behaviors that caused them to be infected in the first
11 place.
12      So it's not the best use of resources if
13 we treat an offender -- or a person in general, but I
14 mean, in our situation the offender -- when they have
15 not shown any kind of commitment to changing their
16 lifestyle so that they are going to avoid, hopefully,
17 reinfection in the future.
18      So currently, the drug and alcohol
19 requirement is that they will complete whatever is
20 necessary, based on their substance abuse score that is
21 done by the Mental Health department. There are some
22 individuals who have no requirement. They're Level 1,
23 and they don't require any treatment, and whatever
24 treatment they do require, we actually put them at the
25 front of the list to get into that class, whatever

### 8

1 class that is that's required. And then once they meet
2 that requirement, that's -- that's just -- that's
3 basically what we like to see as their expression of
4 their commitment to staying in a healthy lifestyle.
5      And then from there, the -- the decision
6 process -- if you want me to go -- do you want me to go
7 into how we make that decision for who gets treated, or
8 do you want me to go back and say how this has changed
9 over the course of time?
10    Q. Why don't you tell me how what you just
11 talked about has changed over the course of time.
12    A. Okay. So from 2004, there -- there were
13 some policies before that, but you asked me from 2004,
14 so -- so from 2004, initially, at that point in time,
15 we were only testing individuals for Hepatitis C if
16 they had an elevation in their liver enzymes. So the
17 first difference, basically, is that we were not
18 necessarily aware of everyone who had Hepatitis C
19 infection coming into the system.
20      Once they were -- if they did have
21 elevated liver enzymes, then -- and they were tested
22 for Hepatitis C, then the same would follow, they would
23 be checked for the chronic -- whether it was chronic or
24 not, and they would be referred for taking drug and
25 alcohol classes.

9

1  In 2008 the -- the change -- there were
2  two changes that were made in that policy. One was
3  that we were now going to test every individual coming
4  into the Department for Hepatitis C, regardless of
5  whether they had any liver problems. And, secondly,
6  the type of drug and alcohol treatment that was
7  required was loosened -- the standard was loosened up a
8  bit, in that it was recognized that there were
9  individuals who were not able to get into the drug and
10 alcohol treatment classes that they required for their
11 substance abuse level because of different policies in
12 regards to the Mental Health department and their
13 substance abuse classes.
14      And so in 2008, the word- -- basically,
15 the wording changed from formal drug and alcohol class
16 to any available alcohol -- drug and alcohol class at
17 the offender's facility. So, essentially, what that
18 did was enabled offenders who might not otherwise be
19 able to be moved to a facility to get their drug and
20 alcohol, they could take Alcoholics Anonymous, for
21 example, AA classes, and attend those, and meet the
22 requirement for the drug and alcohol portion of their
23 treatment.
24      Then in 2012 or '13 -- and I can't
25 remember now right off the top of my head -- the next

10

1  time the policy changed, there was -- there had been at
2  that time, then, with the next policy change an
3  agreement and an actual change in the administrative
4  regulation pertaining to substance abuse treatment so
5  that offenders who were required to take whatever level
6  of treatment was needed for their substance abuse
7  score, those individuals could actually access the
8  needed classes rather than just settling for AA
9  treatment.
10      The -- that -- that actually made, I
11 think, the policy more -- more realistic, in that there
12 is a rare individual who had acquired Hepatitis C
13 through some means other than IV drug use or
14 tattooing. It's rarely sexually transmitted, but it
15 can be. And -- and, of course, before they started
16 testing for Hepatitis C in our blood supply, there --
17 there were some who had gotten blood transfusions, and
18 gotten it in that way. There were also, actually, some
19 military who got it from mass vaccinations.
20      But anyhow, what it did at that point,
21 then, was made it very realistic, meaning that the ones
22 who really did not have a substance abuse problem and
23 had shown that on their substance abuse score did not
24 have to take classes in order to get treated. And
25 those who had a serious substance abuse problem were

11

1  going to be adequately treated. Rather than just
2  saying, well, you can go to AA and that will be good
3  enough, which is not really good enough. It's not good
4  enough to do that. You have to get the intensive
5  treatment.
6       So that's where the policy, I think,
7  became very much applicable to what our goal was, to
8  try to get these folks treated so that they were not
9  going to resume their lifestyle and get reinfected once
10 we got them treated.
11      Q. Great. Okay. So I have some follow-up
12 questions based on what you just told me.
13      A. Okay.
14      Q. So let's talk about past policies. You
15 mentioned that there was testing to determine whether
16 somebody's Hepatitis C was chronic?
17      A. Uh-huh.
18      Q. And that if it was, they were referred
19 for drug and alcohol; is that correct?
20      A. Yes.
21      Q. Was that always the case? So, I guess,
22 in other words, my question is, is the triggering
23 condition for a referral to drug and alcohol classes
24 chronicity?
25      A. Yes.

12

1       Q. Okay. And whose responsibility was it to
2  complete that referral?
3       A. According to the policies, there -- there
4  is a -- there was a form, an attachment to those
5  policies, that was a referral for drug and alcohol
6  treatment. And that was initiated by the provider who
7  had seen the individual and recognized that they were
8  potentially a treatment candidate. And, of course,
9  that didn't mean that we were committing to treating
10 them. It meant that if in the future you need
11 treatment, at least get your drug and alcohol classes
12 finished and accomplished so that that was one barrier
13 that was out of the way.
14      Q. Sure. And is it fair to characterize
15 that -- never mind. Got it. Okay. So then you talked
16 about if you -- correct me if I misheard this -- if you
17 are a person who qualifies for referral to drug and
18 alcohol classes because you need hepatitis -- or for
19 Hepatitis C treatment needs, you get put at the front
20 of the list?
21      A. That is the way it is now.
22      Q. Okay.
23      A. And I will explain that there was a time
24 when there was some disconnect in that regard, where we
25 had a policy from the medical clinical services side

**Page 17**

1    them in -- in the totality, because the problem is
2    going to be, I -- I can treat you, but if you go back
3    out and -- and do drugs, you are not going -- you still
4    are going to be unsuccessful. Would I -- would an
5    individual -- are there individual practices that
6    require that? I have no idea.
7    **Q. Okay.**
8    A. I don't -- I do not know. And I -- and,
9    again, I don't know if the insurance companies
10    individually require it.
11    **Q. Okay. Let me ask the question hopefully**
12    **back in the DOC context. Is the DOC policy -- so let**
13    **me first ask: It's mandatory that somebody in DOC**
14    **participate in drug and alcohol classes before**
15    **receiving antiviral treatment, correct?**
16    A. For the most part, yes.
17    **Q. Okay.**
18    A. Within our -- within the -- the written
19    policy, that is correct.
20    **Q. Is there any circumstance where that**
21    **policy should be deviated from?**
22    A. So the -- the policies are and procedures
23    are in place for us to be able to guide how we look --
24    and view healthcare decision-making throughout the
25    system so we can remain -- we can remain consistent.

**Page 18**

1    By statute, the state -- the chief medical officer
2    actually has the authority, the ultimate authority, to
3    make any treatment decision within or without policy.
4    There are certainly going to be in very
5    rare cases a situation -- in fact, we -- we have a
6    situation very similar to that currently, where an
7    individual might -- who has an acute -- acute hepatitis
8    might actually get to that point where they require
9    treatment acutely regardless of their drug and alcohol
10    circumstance in order to prevent them from having to
11    need a liver transplant.
12    So can I personally override policy in
13    that regard? Yes. Is it written in policy that I can
14    override policy? No. Because it's just the a
15    statutory right that I would have if that became
16    necessary.
17    There are actually individuals, a couple
18    of individuals, that we have approved for treatment who
19    actually did not qualify -- who did not complete the
20    classes they were -- should have completed based on
21    their substance abuse score. We approved them -- I
22    instructed them to be approved, because the fault was
23    not theirs. It was -- it was actually an error in what
24    treatment they got referred to. So can that policy be
25    overridden, and could it be in circumstances where it

**Page 19**

1    was medically indicated? Yes.
2    **Q. Right. And those circumstances would be**
3    **where overriding a policy is necessary to prevent**
4    **someone from suffering some sort of life-threatening --**
5    A. Yes.
6    **Q. -- or other deleterious effects of**
7    **Hepatitis C?**
8    A. Yes.
9    **Q. Okay. All right. So you mentioned in**
10    **2008 that the requirements were loosened for what sort**
11    **of drug and alcohol was required. I'm going to show**
12    **you a certificate and ask if you can tell me whether**
13    **this program would satisfy that requirement.**
14    (Deposition Exhibit 1 was marked.)
15    **Q. Do you think that this certificate that**
16    **we are looking at is something that would have**
17    **satisfied the drug and alcohol requirement for**
18    **Hepatitis C treatment post-2008?**
19    A. So first, I -- when we get certificates
20    like this, I always have to go back to the drug and
21    alcohol person and ask them how long was this course,
22    because they don't ever say how long the course was.
23    **Q. Okay.**
24    A. So the -- what -- according to the policy
25    in 2008, what has to happen is they have to have a

**Page 20**

1    total of six months. If this course, for example, was
2    12 weeks, then I would have instructed the individual
3    that they needed to continue to go to AA once a week to
4    finish up that six months, but yes, as -- as -- with
5    the relaxed requirements in 2008, any drug and alcohol
6    program that was available to the offender at the
7    offender's facility would have qualified as at least
8    part of that six-month requirement.
9    **Q. If a medical provider was presented with**
10    **this certificate, would you expect that they would do**
11    **that verification of whether it was a six-month program**
12    **or not?**
13    MR. ALBER: I'm going to object as to
14    outside the scope.
15    A. From the policy, the -- the --
16    **Q. (BY MS. OWEN) (Nodded head up and down.)**
17    A. The -- the individual -- and, again, this
18    is where waters get muddied and different individuals
19    think different people have the right -- the
20    responsibility to do this or that. As a -- as a -- as
21    an in- -- as per policy, the offender actually has the
22    burden to show to clinical services that they have
23    completed a six-month program of some kind or different
24    programs that totaled six months. So that is their
25    burden to have to do that.

### 45

1 conundrum that we face, that the reason to treat
2 Hepatitis C in -- in a group of individuals is simply
3 to prevent transmission of that disease and eventually
4 eradicate that disease. The purpose to treat the
5 disease in any one individual is to prevent that person
6 from dying from that disease.
7 So we have the presence of a disease
8 where only 80 percent of individuals -- excuse me --
9 where only 20 percent of individuals are going to
10 benefit from that treatment, in that regard progressing
11 to illness or death. The other 80 are only going to be
12 treated in an effort to prevent them from transmitting
13 the disease to someone else, except that the disease is
14 known to be transmitted in very specific ways, and
15 perhaps teaching people not to share needles, et
16 cetera, would be a more cost-effective way to prevent
17 the transmission rather than the -- the medication
18 itself, but that's just the public health debate that
19 is ongoing.
20 **Q. Sure. In the context of the Department**
21 **of Corrections, speaking of sharing needles, people**
22 **aren't supposed to be using drugs in DOC, right?**
23 MR. ALBER: I'm going to object as to
24 outside the scope.
25 A. No, they're not supposed to be.

### 46

1 **Q. (BY MS. OWEN) But, certainly, it sounds**
2 **like from a Hepatitis C treatment standpoint, there's**
3 **an assumption that that happens, nevertheless; is that**
4 **correct?**
5 A. I would say that's correct, yes.
6 **Q. So has it, therefore, been the Department**
7 **of Correction's policy to treat as many people with**
8 **Hepatitis C as possible to prevent spread of the**
9 **disease?**
10 A. No.
11 **Q. Why not?**
12 A. For several reasons. One, again, the --
13 the -- the more reasonable way to prevent the disease
14 process, when you are looking at resource allocation
15 and how -- what can we do to prevent this disease
16 spread, is for education -- and substance abuse
17 education and substance abuse treatment so that
18 individuals are not engaging in that kind of behavior.
19 Likewise, we get -- it's -- it's not
20 reasonable to say that if we eradicate Hepatitis C
21 within the Department that we will -- that that's going
22 to be a static -- a static circumstance, because we
23 have a fluctuating population. Most of our population
24 has not stayed within our confines. And, again, if we
25 just treat them and we don't give them the substance

### 47

1 abuse education, they're going to get out, get
2 reinfected, come back in, and start the process all
3 over again.
4 So we would effectively be throwing
5 resources after a situation that's not well-controlled,
6 because we have no control over what those individuals
7 do when they get out. You know, the American
8 Association for Liver Disease [sic] has said that it's
9 a -- it is a -- the -- Hepatitis C is a public health
10 concern, in that -- that all entities that encounter a
11 person with Hepatitis C need to work together to -- to
12 solve this problem. So it can't be any one entity,
13 because no one entity is going to be able to solve the
14 problem, no matter how much money we throw at it.
15 **Q. Okay. Does CDOC fund its drug and**
16 **alcohol programming in part through federal funding?**
17 MR. ALBER: I'm going to object as to
18 outside the scope.
19 A. I don't think so. I don't -- I don't
20 believe so, but I can't say with a hundred percent
21 certainty, because, to my knowledge, our -- the money
22 we use to treat our individuals comes from our budget,
23 our -- our pharmacy budget. I don't believe it's from
24 any extra outside sourcing.
25 **Q. (BY MS. OWEN) Including drug and alcohol**

### 48

1 **classes? And you may just not know.**
2 A. I don't, yeah.
3 **Q. Okay. How much does it cost the**
4 **Department to treat one person with antiviral**
5 **medication for Hepatitis C?**
6 MR. ALBER: Object as to outside the
7 scope.
8 A. It varies from -- depending on the
9 medication that has to be used and the person's
10 genotype, which changes the course of treatment. The
11 shortest course of treatment that we have is $40,000.
12 The longest course of treatment is about 160,000. And
13 the middle of the road is 80,000. Most of our
14 individuals fall into that 80,000 category.
15 **Q. (BY MS. OWEN) Genotype 3 with interferon**
16 **and ribavirin?**
17 A. Well, it's not interferon anymore.
18 **Q. Right. But when it was.**
19 A. When it was?
20 **Q. Yeah.**
21 A. Oh, okay. I believe it was in the
22 neighborhood of 45,000. And I can't be exact, because
23 I don't remember now, because we haven't used
24 interferon in a while, how long they had to take the
25 treatment.

49

**Q. 24 weeks.**
A. But it's -- it's about 45,000.
**Q. All right. Under CDOC's policies and practices with respect to folks diagnosed with Hepatitis C, do those people participate in the chronic care clinic?**
A. That has -- that has changed over periods of time. They were chronic care -- I -- I do not have access to the old ARs, so I -- the -- whether they're in chronic care or not is in the Administrative Regulations, and I did not have access to those. So this is -- I'm recollecting that up until approximately 2008 to 2009 they were followed under chronic care. And then it dropped off for a while, several years. And now it's back on, as they are following under chronic care. And I don't know the exact years in which -- it has fluctuated back and forth.
**Q. Okay. So what would it mean to be followed under chronic care?**
A. The -- the presumption is that if an individual has a chronic care condition that they're going to be seen on a regular basis for that chronic care condition. So -- and, typically, that's six months. It might be as long as a year, if it's something that they're very, very stable and -- for

50

example, if a person had Hepatitis C and they were completely stable, had no problems, it might be a year; but, otherwise, if they -- they were supposed to be on chronic care, it would be about every six months.
**Q. And what sort of monitoring or evaluations would be done in those six months?**
A. For the Hepatitis C in particular?
**Q. Sure.**
A. So it would come down to whatever policy's in place at the time. Typically, it would involve some lab work. If nothing else, just an evaluation of the patient, asking them about symptomatology that might indicate that they're having some advancement of their disease. And I know that at varying times our policies have been very specific about how often they get certain labs ordered or ultrasounds, or what have you. So that would be part of the component of those -- of those meetings, those appointments.
**Q. And if at any point during those -- that chronic care monitoring process the provider believed that somebody's condition was worsening, Hepatitis C, what should that provider do?**
A. Well, per policy, if an individual looks as if they could be benefiting from treatment, that

51

individual should be -- that offender should be initiated into the treatment track, unless the offender says, I don't want treatment.
**Q. Okay. When the chronic care system has been in place, is that system one where a particular provider gets assigned a particular patient?**
A. That varies from facility to facility.
**Q. Okay.**
A. So some facilities will do it that way. Others will rotate, depending on the availability of a provider.
**Q. Do you know at Sterling --**
MR. ALBER: I'm going to object as to outside the scope.
A. I know that right now -- now they -- that is what they do. They have -- they have -- their policy is -- or their standard is that they have individuals assigned to a provider based on their housing unit. I don't know throughout the course of time if that's always been what they had done.
**Q. (BY MS. OWEN) If somebody was assigned to the chronic care clinic and maybe even one particular provider but they ended up seeing another provider, and that provider was aware of the Hepatitis C and deteriorating condition, what are the**

52

**non-chronic-care provider's obligations with respect to the patient?**
MR. ALBER: Object as to outside the scope.
A. So, again, I think there is no particular policy on that, so I'm speaking just more or less individually. But when a practitioner -- when an individual -- when an offender is being seen on a chronic care basis by a certain practitioner, and then there is some kind of acute event and that person ends up seeing another practitioner because they have got some kind of illness or a cold, or a burn, or a sprain, or whatever, that person who is the -- the practitioner who is seeing the offender for that reason is only focused on that reason on that particular encounter.
And, in fact, we are -- in -- in the Department of Corrections we do discourage practitioners from inviting offenders to bring up multiple issues at an acute care encounter. And a reason for that is -- is for -- myriad reasons, as far as clinic flow and just structuring the clinic and encouraging offenders to use the kite system rather than just bombarding an individual with problems.
So would I expect a person who is seeing an individual for an upper respiratory infection to go

**73**

1  disease committee. And -- and so the infectious
2  disease committee, basically, was presenting the policy
3  and -- again, just the -- the whole -- the mechanism
4  for getting offenders treated.
5       Q. Got it. It was not a training about
6  Hepatitis C treatment, in general?
7       A. Not that I recall. I think it was really
8  mostly just going over the policy and -- and making
9  sure that everyone knew how to get their offenders
10 taken care of.
11      Q. Okay.
12      A. And we may have had others that pertained
13 to Hepatitis C, and I -- in fact, now that I said that,
14 we did also have, that I remember, a drug rep from a
15 different -- a drug company from a medication we don't
16 use currently. That was a different lecture. And they
17 did discuss some aspects of Hepatitis C during that
18 lecture.
19      Q. What drug was that?
20      A. It was the one that's been recalled from
21 the market. Was it telaprevir, teleprevir? I don't
22 know.
23      Q. That's okay.
24      A. I'll look it up when -- I'll look it up
25 for you to -- to spell it.

**74**

1       Q. Do you know around when that was?
2       A. Okay. Was that --
3          THE DEPONENT: I won't talk under my
4  breath.
5       A. I think it was around 2011.
6       Q. (BY MS. OWEN) Okay. In the event that a
7  provider hadn't been specifically trained about some
8  aspect of providing Hepatitis C treatment to a
9  prisoner, what is DOC's expectation of what that
10 provider should do?
11      A. So are you --
12         MR. ALBER: I'm going object as to
13 outside the scope.
14      A. Are you referring to treatment as in --
15 so two things: First of all, the provider would be
16 expected to be familiar with the policy. Anything
17 that -- and, clearly, these policies, which are a few
18 pages, are not meant to be an all-inclusive discussion
19 of every aspect of treatment of any illness, in
20 particular Hepatitis C. And the expectation is that
21 individual practitioners will have additional knowledge
22 or seek additional knowledge in order to completely
23 care for a patient with Hepatitis C.
24         The -- the Department does provide -- and
25 has for many years, I think at least -- at least eight

**75**

1  years -- access to the UpToDate resource, which is a
2  professionally recognized online resource for
3  information, for medical information. And because most
4  of our providers don't have Internet access on the
5  computers they have, they can't go on and Google
6  something or search for something. So we -- we have
7  always -- we have for years purchased the right to
8  access the UpToDate.
9          And it is considered to be a relatively
10 comprehensive source of information for a wide variety
11 of medical conditions. And so that would have been
12 another way that a person -- a practitioner could get
13 information about a condition they're not necessarily
14 very familiar with.
15      Q. (BY MS. OWEN) Got it. Okay. Let's talk
16 specifically about Jim Vasquez now. Is it the
17 Department's position that he's received appropriate
18 care for his Hepatitis C throughout his incarceration?
19      A. According to the policy of our
20 Department, there were missed opportunities for
21 Mr. Vasquez to be referred for Hepatitis C treatment.
22 Whether that has impacted him permanently remains to be
23 seen, but certainly there were opportunities where a
24 policy was in place where he could have been referred
25 for access and was not.

**76**

1       Q. Could you describe specifically those
2  opportunities.
3       A. So -- and, again, I -- I can only go by
4  what is documented. I don't have any knowledge,
5  obviously, of undocumented interactions of Mr. Vasquez
6  with the practitioner, Mr. Vasquez with the case
7  manager, or what have you. So I can only speak to
8  what -- what appears to be the case.
9          And certainly in -- in 2008 it was fairly
10 well-established by the Department that there was a
11 disconnect between our drug and alcohol requirement and
12 the expectations of the drug and alcohol educators
13 about -- in regards to getting our offenders treated
14 for drug and alcohol so that they could then pursue
15 treatment for their Hepatitis C.
16         And I think it was -- was fairly
17 well-promoted that if an offender could not get the
18 treatment they needed at their facility and could not
19 be moved to another facility, that at least enrolling
20 them in the -- or -- or suggesting that they enroll
21 themselves in the alcohol -- Alcoholics Anonymous class
22 could suffice for the drug and alcohol requirement.
23 And so I think that it would have been to Mr. Vasquez's
24 benefit if he had been instructed to do that.
25         I -- I don't know with certainty that he

77

1 wasn't instructed to do that, but it appears that he --
2 he didn't. He completed a class that I think was
3 probably not a full 24-week class, and certainly,
4 again, was not the class that was required for him
5 personally based on his substance-abuse level. And so
6 it seems to me there that was an opportunity to get him
7 to finish up that six-month requirement and that
8 perhaps that was missed. Um . . .
9     **Q. Let me just interrupt you briefly. You**
10 **said, you know, you can't say that he wasn't**
11 **recommended to go to AA, or whatever. There's nothing**
12 **in the documentation that tells you that he was**
13 **recommended to go do that, correct?**
14     A. There are -- there is a -- some -- the
15 Chron entry -- the Chron, C-h-r-o-n, which is a --
16 the -- a means by which the custody personnel can
17 document interactions with offenders. We -- we don't
18 use it medically. There is a Chron entry from earlier
19 in two-thousand . . .
20     **Q. '05.**
21     A. -- '05, oh, okay -- where he -- where the
22 case manager did say, Well, why don't you go ahead and
23 take the AA classes and that may help. I don't know if
24 he ever did that. And I don't know if that was ever
25 reinforced, you know, to him that, yes -- and,

78

1 actually, at that time it would not have helped,
2 because the -- the -- unfortunately, the policy at that
3 time was not for AA classes. The policy at that time
4 was that he had to take his -- you know, his -- the
5 substance abuse classes that related to his condition,
6 his substance abuse condition.
7     So -- but certainly in 2008, even if he
8 had -- if he had taken those AA classes, all of that
9 would have been retroactively approved as -- as meeting
10 the requirement for the drug and alcohol. So had he
11 taken those and signed in and had logs that said he
12 signed in, copies of the sign-in sheets, that could
13 have actually -- it could have benefited him. At the
14 time, perhaps that wasn't impressed on him enough
15 that -- that he needed to do.
16     **Q. And there's nothing in the medical**
17 **records showing that a medical provider advised him to**
18 **go enroll in or attend AA classes?**
19     A. Not that I was able to find, no.
20     **Q. Okay. And there was no drug and alcohol**
21 **class referral form completed for him until 2012,**
22 **correct?**
23     A. I don't believe so. There's nothing
24 indicating that that was done.
25     **Q. Okay. All right. So continue telling me**

79

1 **about missed opportunities.**
2     A. So in reviewing -- in reviewing
3 Mr. Vasquez's lab tests that were done between 2008 and
4 about 2010 and seeing that he did access medical on
5 several occasions, I think there were some -- some --
6 the missed opportunity for a provider to recognize that
7 his labs were deteriorating. I think at that time -- I
8 believe that was the time at which there was no chronic
9 care for Hepatitis C.
10     And, of course, I also -- I also do think
11 that there was a culture that existed at that time
12 wherein there were providers who did feel that it was
13 the responsibility of the -- of the individual to
14 request treatment -- the offender to request treatment
15 or request intervention or request an appointment.
16     So had Mr. Vasquez never been seen for
17 anything that might have been a sign of a liver
18 problem, then I can see where that would be a
19 reasonable expectation. And I don't have copies of his
20 records from that particular period of time in front of
21 me, but it seems to me that there were times when he
22 would have complaints that maybe could have been
23 referenced -- referable to his Hepatitis C condition.
24     And I think at that point it would have
25 been to Mr. Vasquez's benefit if the practitioner had

80

1 recognized that this gentleman maybe needed to be
2 approached about, Have you given consideration to being
3 treating, rather than just waiting for him to send a
4 kite in.
5     And, again, I don't know that he didn't
6 send a kite in. I also know he had some grievances
7 during that time, but I was not able to get access to
8 those grievances, the contents of those grievances, to
9 see if he was trying to get treated. I don't know what
10 his attempts were during that period of time.
11     I can only see from the medical record
12 that it might have been -- or should have been
13 someone's response to maybe, at least, document in the
14 chart that -- that deterioration was noticed but
15 discussed with the offender and he didn't want
16 treatment, or something to that effect. And nothing to
17 that effect is found in the record.
18     **Q. Okay. Is -- you mentioned, you know,**
19 **things that might -- and I'm poorly paraphrasing you --**
20 **but things that might trigger a provider's, you know,**
21 **response to say, Hey, you need to consider treatment at**
22 **this point, right?**
23     A. (Deponent nodded head up and down.)
24     **Q. Is abdominal pain one of those things?**
25     A. It can be, because abdominal pain can be

81

1  caused by ascites, or buildup of fluid in the abdomen
2  when the liver starts to not work very well and the
3  fluid shifts a little bit. It can also be caused by
4  the swelling of the blood vessels and the veins in the
5  abdominal area. Now, there are many, many things that
6  can cause abdominal pain that aren't related to
7  Hepatitis C, but certainly that would be a
8  consideration for somebody -- evaluating somebody for
9  abdominal pain with known Hepatitis C.
10     Q. At some point, Mr. Vasquez deteriorated
11  to the point that he could not safely receive
12  interferon anymore, correct?
13     A. Yes.
14     Q. Do we know what point at which that was?
15     A. I don't recall the exact lab test. I
16  will tell you that what -- what happens -- what
17  happened over the course of time -- and this would have
18  been in the 2011 to 2012 time frame. I tried to
19  memorize these dates, and it didn't --
20     Q. You are doing very well.
21     A. -- it didn't -- it didn't stick. There
22  was a point at which Mr. -- what -- what happened over
23  the course of time was that Mr. Vasquez's white blood
24  cell count started to drop, his platelet count started
25  to drop, his bilirubin level started going up. And

82

1  these are indicators of someone whose liver is not
2  functioning well and is actually developing some
3  fibrosis, or scarring.
4     The medication for treatment was, at that
5  time, the interferon and ribavirin combination -- had
6  some set cutoffs for some of these lab values, that if
7  a person dropped below those, they could not qualify
8  for treatment. And at some point in that -- in -- I
9  think it was around 2011, Mr. Vasquez's platelet count
10  dropped to a level that was considered a
11  contraindication, or making him no longer able to take
12  the medication, and his white blood count got very
13  dangerously low -- or close to that -- not dangerously
14  low, but close to that cutoff, very close to that
15  cutoff.
16     After -- and then, of course, he
17  experienced -- immediately after he actually finished
18  his classes, he experienced the intestinal bleeding.
19  And that's another sign, obviously, that the liver is
20  having problems. But even prior to that, really it was
21  the lab values that started to deteriorate that did
22  show that he was starting to have some problems.
23     Q. And his providers were monitoring those
24  lab values over the course of time, correct?
25     A. Well, they signed them. So I -- I can

83

1  say they signed them.
2     Q. Okay. There have been statements made in
3  this case -- I think one was in a declaration that you
4  signed, actually -- that Mr. Vasquez requested
5  Hepatitis C treatment twice, once in 2005 and once in
6  2012. What is the basis for the Department's position
7  in that respect?
8     A. Well, it would have been from any -- some
9  kind of documentation from his encounters.
10     Q. Medical encounters?
11     A. I believe, yes.
12     Q. Okay.
13     A. And it may also -- now that I said
14  that -- it may also have been that I got that
15  implication from the Chron entries, where he had gone
16  saying, I need -- I need treatment, but I need drug and
17  alcohol and, therefore, my presumption is that he must
18  have requested treatment.
19     Q. Could it also have been in a grievance?
20     A. It -- it could have been. And I -- and I
21  do believe at one time I have seen some grievances in
22  some material I had been given. I just wasn't able to
23  pull them up to prepare for the deposition, but . . .
24     Q. Got it. I think in your declaration you
25  also said that the Hepatitis C protocol requires that

84

1  an inmate coordinate with his case manager to obtain
2  drug and alcohol classes. What's the basis for that
3  statement?
4     A. So once a -- once an individual -- once a
5  provider has sent the drug and alcohol referral, if
6  there's going to need to be any kind of movement, like
7  if the individual is going to have to go to a different
8  facility to obtain that -- that drug and alcohol class,
9  that has to go through the case manager.
10     Q. Okay.
11     A. And that's where -- the part where I was
12  saying they're basically the liaison, because at that
13  point medical can't get him moved anywhere, and neither
14  can drug and alcohol. It has to go through the case
15  manager.
16     Q. Got it. When was Mr. Vasquez's Hepatitis
17  C genotype determined?
18     A. You know, I -- I was not able to find the
19  exact time of that in the records that I was able to
20  review just prior to coming here. But at -- in -- in
21  some of the earlier labs, in 2008 or 2009, someone had
22  written on one of the labs, Genotype 1A. So they knew
23  at that time.
24     So my presumption is that it must be
25  in -- it must have been at a time when the -- maybe we

## Page 89

1  handout or is it the whole policy?
2      A.  It -- it should have been just the
3  handout.  We were -- we did not give -- we did not hand
4  entire clinical standards to individuals.
5      Q.  Got it.
6      A.  We weren't supposed to.
7      Q.  Okay.
8      A.  So I -- I believe what she meant was --
9  or that that was the -- the attachment that would have
10 explained how -- how Mr. Vasquez could go about getting
11 Hepatitis C treatment.
12     Q.  Okay.
13     A.  And so she then, presumably, sent a
14 letter to the patient, which is what she indicates in
15 her plan, that the patient is to send a kite to medical
16 if he is interested in treatment for the Hepatitis C
17 virus.
18         And one of the reasons that she was doing
19 that is that at that time, chronicity was established
20 based on elevation of the liver tests.  It -- it is not
21 currently our standard, it's based on something
22 different.  But at that time the individual had to show
23 that their liver enzymes remained elevated for at least
24 a six-month period of time.
25         So when Mr. Vasquez, if he did indeed

## Page 90

1  receive that handout, in 2004, in October, when he
2  received that, at that point it did not -- we had not
3  established that he had a chronic illness, a chronic
4  infection.  And so now basically what she was doing was
5  letting him know that, yes, you do have a chronic
6  infection and that you need to let us know if you want
7  treatment.
8      Q.  Okay.  There's no copy of this letter in
9  the file anywhere, correct?
10     A.  I -- I would not be surprised if there
11 was not.  So -- I have not ever seen the letter.  And,
12 typically, what these are, are simply internally
13 generated forms that vary from facility to facility
14 where we communicate with an offender using one of
15 these forms.  And so my supposition would be that the
16 content of the letter contained that information, but
17 yes, there is no way to -- there is no way to prove
18 that she sent that letter because it's not in the
19 charts.
20     Q.  Okay.  Did her simply sending a letter
21 rather than calling Mr. Vasquez in to have a
22 person-to-person discussion accord with the DOC policy
23 in effect at the time?
24     A.  Well, let me look at the policy.
25     Q.  Okay.

## Page 91

1      A.  Let me get the right one.  So the policy
2  states that the offender is required to -- or, excuse
3  me -- the practitioner is responsible for educating the
4  patient about the disease process and the treatment
5  available.  I -- my supposition would be that she
6  presumed that that educational piece might have taken
7  place previously, but, again, I don't know that for a
8  fact.  You know, I think that -- to the letter of the
9  policy, it really doesn't say, unless you can see
10 otherwise.  I don't see where it says that it has to be
11 a face-to-face . . .
12     Q.  So page 2, at the very bottom of the
13 page, the last paragraph, the second sentence says,
14 "The medical care team is obligated to advise each
15 patient of his or her diagnosis, the prognosis, and the
16 recommended management program."  Do you think that
17 sending a letter with the information indicated in this
18 ambulatory health record accords with that intention?
19     A.  I think that meets the bare minimum of
20 advising the patient of the diagnosis.  I think it also
21 makes a supposition on the part of the practitioner
22 that this individual had already been counseled to that
23 effect previously when he received the Hepatitis C
24 policy.
25         I think a best practice would have been

## Page 92

1  for a face-to-face encounter with an individual, an
2  offender, to discuss with them the entire picture, but
3  I think that if he indeed received that information,
4  that letter, which it sounds like he did, because then
5  he requested drug and alcohol, I think that the -- the
6  minimum requirement of notifying the offender, advising
7  the offender of his diagnosis was met.
8          Clearly, there was not a complete --
9  complete discussion on education and lifestyle
10 modification, and et cetera, at that particular time,
11 but I think she could have expected that that might
12 have taken place going forward and that this was the --
13 the way to handle it at this time to get him the
14 information he needed.
15     Q.  A prognosis refers to a specific
16 assessment of a person's likely progression with a
17 disease, right?
18     A.  Correct.
19     Q.  Okay.  So that wouldn't be something in a
20 handout?
21     A.  No.  Well, not necessarily.  Prognosis
22 could be, in this situation, the -- in the -- in the
23 handout, the prognosis could be, in general, over the
24 course of time, as we had discussed previously, that 80
25 percent of people do fine, 20 percent of people do not

**93**

1  do fine. No, I think in his case, he is probably,
2  obviously, one of the 20 percent that will not do fine
3  because his liver enzymes have continued to be
4  elevated.
5         And, again, not knowing exactly the full
6  contents of that letter, I can't say that she didn't
7  mention that in the letter. But certainly having a
8  discussion with him about the possible outcome of not
9  being treated versus being treated and -- and
10 documenting that would have been a better practice.
11       **Q. Okay. And as we've been talking about,**
12 **the handout that he gets, could you actually just look**
13 **at the policy and tell me which handout that would**
14 **refer to?**
15       A. Oh, that is -- is that Attachment A? No.
16 There was a different one that we were looking at
17 earlier.
18       **Q. So earlier we looked at page 14, which is**
19 **Attachment A1.**
20       A. Oh, there.
21       **Q. But there's also an Attachment B1 that is**
22 **called an Information Sheet. So I wonder which one of**
23 **those it was.**
24       A. Well, I can't tell you, because it
25 doesn't say which attachment he got. I'm going to

**94**

1  presume it was B.
2        **Q. Okay. Is that presumption based on the**
3  **statement in this policy at page 5, paragraph 7, that**
4  **says, "Attachment B should be utilized for patient**
5  **education"?**
6        A. Yes.
7        **Q. Okay. As we are looking at these**
8  **attachments, Attachment C1, which is called the**
9  **"Initial checklist for CDOC patients who want to be**
10 **considered for treatment for Hepatitis C," which is at**
11 **page 18, at what point is a provider expected to**
12 **complete this document?**
13       A. That is the document that we would
14 complete once the offender has finished the drug and
15 alcohol portion of their prerequisite. And then this
16 information would have been sent -- I guess at this
17 time there was no infectious disease committee, so it
18 was apparently sent to the chief medical officer, who
19 would make that determination whether the person got
20 treated or not.
21       **Q. Okay. What about Attachment D1, on page**
22 **19? When and how would a patient -- a prisoner or**
23 **patient be asked to sign this document?**
24       A. And, again, I'm going to look to see if
25 it specifies something in -- so the intent of that --

**95**

1  and I -- and I think it is not as clear as it could be
2  in the body of this policy -- the intent of that is
3  that when an individual is counseled on drug and
4  alcohol -- excuse me -- on their disease condition, and
5  if they choose to accept treatment, that at that time
6  they would sign this contract, given -- so that they
7  can give the provider assurance that they understand
8  what the requirements are, that they do have to do
9  these drug and alcohol classes, and that they promise
10 not to be engaging in behaviors that are otherwise
11 going to cause them to not be eligible, and et cetera.
12        So typically this form is actually signed
13 at the time when they are told or instructed about the
14 drug and alcohol requirement and referred for the drug
15 and alcohol.
16       **Q. So would you expect that Ms. Davis would**
17 **have given Mr. Vasquez a copy of this contract with her**
18 **letter?**
19       A. No, because that would have been if he --
20 what she was basically telling him to do was to request
21 treatment. We read somewhere where -- earlier, where
22 it said that the offender had to request treatment.
23       **Q. Right.**
24       A. And I think that, again, the
25 interpretation of this policy was cloudy at times

**96**

1  between practitioner and practitioner -- or between
2  practitioner and offender. But I think what she
3  expected was that she's sending a letter saying yes,
4  you do have chronic Hepatitis C, if you want treatment,
5  send us a kite, and then when you come in, we'll give
6  you this full -- this full picture -- full workup. And
7  at that time, he would have been expected to get that
8  contract signed and the referral for the drug and
9  alcohol signed and sent and that kind of thing.
10       **Q. Okay. So the contract and the referral**
11 **are done essentially at the same time?**
12       A. Typically, yes.
13       **Q. It's the provider's obligation to get the**
14 **contract to the patient, correct?**
15       A. The -- Attachment D?
16       **Q. Yeah.**
17       A. Yes. They have no other way of having
18 access to that.
19       **Q. I understand what you just said about**
20 **what it seems Ms. Davis intended or, you know,**
21 **understood her obligations under the policy to be.**
22 **From the Department's standpoint, was her decision not**
23 **to provide Mr. Vasquez with a drug and alcohol contract**
24 **at this time appropriate?**
25       A. I think so, yes.

97

1 Q. Was her decision not to complete a drug
2 and alcohol referral form at that time appropriate?
3 A. Yes.
4 Q. Why do you say that?
5 A. Again, assuming that she believes from
6 the -- the policy that the offender has to request
7 treatment that -- if -- if a person doesn't request
8 treatment, there's no point in referring them for drug
9 and alcohol, there's no point in having them sign a
10 contract, because if they don't want -- they don't want
11 treatment for their Hepatitis C, then it just stops
12 there if the individual doesn't want it.
13 This -- the -- this -- the burden of
14 re- -- of request that was placed on the offender by
15 this policy would have meant to her that she needs to
16 wait for him then to respond to this letter and, say,
17 send in a kite, yes, I want treatment, and then at that
18 point pursue, Here's your contract here and I'll send
19 you -- I'll send the drug and alcohol referral form,
20 and et cetera.
21 I think, at this point, based on just
22 seeing some labs, knowing that he hasn't had his
23 chronicity established, I don't think this was an
24 inappropriate response on her part to get this
25 individual a notification that this was -- that, Here's

98

1 your situation. I think where it -- it might fall
2 short is in does this individual get his letter? Do we
3 know that he got his letter? And I think having a copy
4 of the letter documented in the chart as, Here's what
5 was sent is more valuable than just a synopsis, which
6 is what it sounds like was sent.
7 Q. First of all, chronicity was established
8 at this point, right? That was the purpose of this --
9 A. Yes.
10 Q. -- encounter?
11 A. Yes.
12 Q. Which wasn't an encounter?
13 A. Right. It was -- the purpose of the
14 documentation was to say that he has a chronic disease,
15 yes.
16 Q. Okay. And certainly Ms. Davis was
17 personally aware of that, as indicated by this
18 document?
19 A. Yes.
20 Q. Okay. And Ms. -- there's nothing to
21 indicate that Ms. Davis had reason to believe that
22 Mr. Vasquez did not want treatment, like affirmatively
23 didn't want treatment or was refusing treatment?
24 A. Well, I think that -- I'm not sure that
25 she would have had any way of knowing one way or the

99

1 other.
2 Q. Right. I mean, so she did not have that
3 information?
4 A. She didn't -- correct.
5 Q. And there's nothing to indicate she asked
6 him and he said, I don't want treatment?
7 A. At this point, correct. Yes.
8 Q. Okay.
9 A. And I don't believe -- I would have to go
10 back in the record to see -- but I don't believe that
11 there was any indication even prior to that that
12 somebody had had a discussion with him, If you are
13 chronic, would you accept treatment. Because that just
14 wasn't a discussion that would be made until we knew
15 they were chronic.
16 Q. Right. And there's nothing to indicate
17 that she actually asked him outright, Do you want
18 treatment or not?
19 A. Correct.
20 Q. Okay. Considering the course of
21 Mr. Vasquez's treatment during his incarceration, is it
22 fair to say that he should have received Hepatitis C
23 treatment before he actually did, from a medical
24 standpoint?
25 A. From a medical standpoint, I think it

100

1 would have been in his best interest had he received
2 Hepatitis C treatment earlier in the course of his
3 incarceration, certainly at a point where he was
4 showing that there was not only liver enzyme elevation
5 but some progressive deterioration. He would be an
6 individual that if he had said, I don't want Hepatitis
7 C treatment, I would have had him sign a refusal,
8 because I think in -- certainly by 2008 or 2009, I
9 think it was -- there were -- there were signs that
10 this -- that -- that it would be important for him to
11 be successfully treated for his disease.
12 Q. If Mr. Vasquez was not in prison and had
13 gone to a medical provider at the same rate and
14 frequency that he did while he was incarcerated, would
15 he have received treatment for his Hepatitis C?
16 MR. ALBER: I'm going to object as to
17 outside the scope.
18 A. Well, you know, that's actually -- it
19 would be pure speculation to even -- to try to say.
20 Q. (BY MS. OWEN) Okay. You don't have to
21 answer.
22 A. Well, I have -- I have an opinion.
23 Q. Okay.
24 A. I mean, I -- I definitely have an
25 opinion. I -- I -- if your question is, does him --

25 (Pages 97 to 100)

**101**

1  did him being incarcerated prevent him from -- or
2  interfere with his -- his access to healthcare and
3  getting treated, my scenario response to that would be
4  had Mr. Vasquez not been incarcerated, he probably
5  would have continued to heavily use drugs, he probably
6  would not have been aware or cared that he had
7  Hepatitis C, because drug users just -- that's not on
8  their agenda, their priority list, because of the
9  influence of the medication -- of the drugs.
10       Even if he had stopped using drugs and
11 had gone to a facility and -- or to a doctor and said,
12 I'm now ready, I'm clean and I'm ready to be treated,
13 access to treatment is -- for -- for an individual who
14 has no insurance is extraordinarily difficult.  And
15 until very recently, as you are aware, a person in
16 Mr. Vasquez's circumstance would not have qualified,
17 very likely, for public aid, or Medicaid, for example.
18 And the treatment is extraordinarily costly and
19 requires commitment on a person's part to come and get
20 their medication, take their medication regularly, and
21 et cetera.
22       And it's possible he wouldn't qualify on
23 that basis.  He may have -- he may -- and I don't know
24 what the financial resources are of his family -- so
25 unless somebody can come out and say, I'm going to pay

**102**

1  the 45 or 50 thousand dollars, typically what the
2  barrier had been, and still continues to be for many,
3  although not as bad these days, but the barrier would
4  be, I don't have the money for treatment and so I still
5  wouldn't get treatment.
6        Could there be drug programs maybe he
7  could have access to?  Possibly.  Could he have
8  possibly access to a clinical trial?  Maybe.  But even
9  those clinical trials would have required that he
10 proved that he was going to stay clean, because no
11 clinical trials would have touched him with a -- as a
12 drug addict.
13       And so I think he would have -- I
14 personally believe he would have faced very different
15 barriers to getting treated, and -- and possibly may
16 not have made to it treatment because he may have just
17 continued in drug use and never made it to that point.
18       So the road not taken is just that.  And
19 I can't say, but barriers exist everywhere in all
20 circumstances and in every situation.  And I think the
21 barriers he faced in -- in the Department of
22 Corrections were unfortunate.  And, you know, I -- I
23 would venture to say not excusable, but certainly I
24 can't say that, oh, if he had been on the outside, he
25 would have been treated and he would have been fine.

**103**

1        Q.  Barring continued drug use outside of
2  prison and cost issues, from a purely medical-provider
3  standpoint, would he have been able to enter a
4  Hepatitis C treatment regimen?
5        MR. ALBER: Object as to outside the
6  scope.
7        A.  His -- he would have been -- it would
8  have been suggested to him that he -- had he accessed
9  an individual provider who had awareness of his
10 Hepatitis C and knew what to look for and all that,
11 would someone have recommended treatment for him?  I
12 would say in that, you know, fictitious scenario, yes,
13 he -- it probably would have been offered to him.
14       Q.  (BY MS. OWEN)  Okay.  Does the Department
15 know how much it cost for Mr. Vasquez to be treated at
16 Denver Health in May of 2013?
17       MR. ALBER: Objection as to outside the
18 scope.
19       A.  I -- I'm sure if I had to find the bill
20 for that I could tell you, but I don't personally know
21 at this point.
22       Q.  (BY MS. OWEN)  Would there have been a
23 bill from Denver Health to the Department of
24 Corrections for that stay and surgery?  Like, is that
25 generally how it works?

**104**

1        A.  When he had his -- are you talking about
2  when he had his intestinal bleeding?
3        Q.  Uh-huh.
4        A.  Let me think of when he -- this is 2012,
5  so we had CHP.  So yes.
6        THE DEPONENT:  Did I say that too fast?
7        THE COURT REPORTER:  No.
8        A.  Yes.  He -- what would have happened is
9  that the bills for that encounter, or that stay in the
10 hospital, would have gone to our third-party payer,
11 Correctional Healthcare Partners.  They would have paid
12 the bill.  And yes, there would be record of that
13 somewhere.
14       Q.  (BY MS. OWEN)  Okay.  Would the same be
15 true for his brief stay at the Sterling Regional
16 Medical Center also in May of 2013?
17       A.  Yes.  Any healthcare encounters that are
18 outside of a facility would have the -- the cost of
19 those encounters would be -- would be known through our
20 third-party payer.
21       Q.  Would that also be true for his ongoing
22 care at the Rocky Mountain Cancer Centers?
23       A.  Yes.
24       Q.  Okay.  So that would be true from 2013 to
25 today?

### Page 105

1 A. Yes.
2 Q. Okay. So Mr. Vasquez did ultimately get
3 Hepatitis C treatment this year, correct?
4 A. Yes.
5 Q. What's the reason for that?
6 A. The -- the reason he got treated was
7 because he was again presented to the infectious
8 disease committee -- and let me back up.
9 So when he finally did finish his drug
10 and alcohol treatment in 2012, at the end of 2012, at
11 that time his condition had progressed to a point where
12 he could not take the interferon and the ribavirin, he
13 was too ill. Once the Department changed the policy in
14 two-thousand- -- late 2015, and then acquired the
15 medication, the new medications, to be treating
16 individuals, and then letting our providers know that
17 now we have the ability to treat offenders who were
18 previously unable and ineligible to be treated, we
19 started then getting the requests from those providers
20 to start getting these -- these offenders treated.
21 And so Mr. Vasquez was presented to the
22 committee in February. I don't remember the exact day.
23 He was -- when we reviewed his -- his application, the
24 drug and alcohol class that he had been assigned to and
25 had taken was actually not the correct class for his

### Page 106

1 substance abuse level. And there were actually two
2 individuals that had that condition that same day, that
3 situation.
4 So immediately after the meeting, he
5 was -- he was actually tabled at that time, tabled
6 immediately. After the meeting, I ended up having a
7 discussion with the drug and alcohol personnel to find
8 out what -- what happened, where the breakdown was, and
9 determined that this was absolutely not any fault of
10 Mr. Vasquez that he had not gone to the correct class.
11 And he was clearly -- in addition to
12 that, looking at his medical situation, clearly was not
13 going to tolerate another six months of a TC program
14 before he could get treatment. So he was approved for
15 treatment, actually, through the infectious disease
16 committee.
17 Q. Okay. How did the infectious disease
18 committee become aware of Mr. Vasquez's purported need
19 for treatment?
20 A. It was from his application from the --
21 the provider who eventually sent that in. And I'm not
22 sure who that -- who that was.
23 Q. Okay. But it would be that
24 request-for-treatment form?
25 A. Yes.

### Page 107

1 Q. Okay.
2 A. The evaluation -- request for evaluation
3 of treatment. It's -- it's one of the attachments to
4 our current clinical standard. It's essentially the
5 replacement to . . .
6 Q. That checklist we were looking at?
7 A. Yes, that checklist. It's more extensive
8 now.
9 Q. Did you say that the -- the new drug
10 regimen -- and we are talking about Harvoni, Sovaldi,
11 right -- that was approved in late 2015?
12 A. No. That was when we changed our policy.
13 Q. Okay.
14 A. No, it was approved -- I believe it was
15 either 2013 or 2014. I -- I don't remember the exact
16 time when it came out. There was some lag from the
17 time it got approved to when our policy changed.
18 Q. Before 2015, though?
19 A. Yes.
20 Q. And people in the Department of
21 Corrections were receiving that drug regimen in 2015?
22 A. It was -- the -- that particular drug
23 regimen began to be used as soon as the policy was
24 changed in May of 2015.
25 Q. Okay. It's not the Department's

### Page 108

1 contention that no one was aware of Mr. Vasquez's
2 Hepatitis C condition throughout the course of his
3 incarceration, correct?
4 A. Correct.
5 Q. All right. So today is Mr. Vasquez still
6 on the treatment regimen?
7 A. Yes.
8 Q. Okay. And is it looking successful?
9 A. Yes.
10 Q. Okay. His MELD score that you've been
11 calculating --
12 A. Yes.
13 Q. -- it went up recently?
14 A. Uh-huh, yes.
15 Q. What's the reason for that?
16 A. So let me just describe a little bit
17 about the MELD score and what goes into that so we --
18 so there's an understanding of what that score is and
19 what it means. So the MELD score used to be three
20 components and now it's four components. Just got
21 changed, like, January of 2016.
22 So we take four components of -- the --
23 the creatinine, which is an indicator of kidney
24 function; bilirubin, which is an indicator of liver
25 function; the -- the INR, which is also an indication

### 117

drinking because we -- you are incarcerated, and we have you on, presumably, medications, he's not on meds that are causing this problem, now we can presume it is probably a Hepatitis C issue. But, again, without knowing what the liver biopsy is, it's hard to say that he is definitely in the high-risk category.

They only talk about -- it looks like -- he's talking -- let's see, they talk on -- first, second -- I guess, if we have to put him into something, he definitely -- he probably does not meet with the second group. We don't know with certainty that he is even in the third or fourth group, so I guess if we are going to have to put him somewhere, he would be in Number 1.

Q. Okay.

A. Even though we don't have a liver biopsy for sure.

Q. And he doesn't fall into the second group because he does have elevated LA- -- ALT --

A. Well, yeah, I wouldn't call those minimally elevated AST levels. So . . .

Q. Okay. And we think not the third or fourth group, because there's no indication he was experiencing either compensated or decompensated --

A. Correct.

### 118

Q. -- cirrhosis in 2005?

A. Correct.

Q. Okay.

(Deposition Exhibit 6 was marked.)

Q. Can you tell me who this note is written to?

A. Who it's written to? Mental health. The note says, "Dear Mental Health, good afternoon. My email is not working. Will you kindly follow up on this patient for me, please. He is to have a liver biopsy for possible Hep C treatment. Thank you, Ruth" somebody. And, "Please see attached."

Q. Is this to a particular individual or --

A. No. And my guess is it would have gone in the Mental Health box.

Q. Okay. So there's like a mailbox?

A. Yes. Every facility has a Mental Health inbox.

Q. Okay.

A. I would have to guess that's where that would go.

Q. Okay.

(Deposition Exhibit 7 was marked.)

Q. This is a Mental Health contact, I believe. If you look at the last paragraph of the

### 119

substance of this kite response, it says, "I, as a Mental Health provider, cannot interview and sign off on a Hep C treatment until West Medical provides you with the form for that interview," et cetera. Is this an accurate recitation of how the process was supposed to work?

A. Yeah, I think it's mostly accurate.

Q. Okay.

(Deposition Exhibit 8 was marked.)

Q. If you will look at the Plans/Orders section of this, it says, "Schedule CCC at permanent facility." Is "CCC" chronic care clinic?

A. Yes.

Q. Okay. And when it says, "Schedule CCC," does that mean like who is supposed to -- who is this directed to?

A. Whoever reads this form.

Q. So to a staff person?

A. It is. So I would -- I would assume that this -- the nurse who took off this order -- one of two people could have done this. Either the nurse who took off the order would have gone into the system and put the kite into the system to schedule the chronic care appointment. Now, I will say in 2004, which is when this was done, the system for scheduling appointments

### 120

varied, again, from facility to facility, and it was not -- there wasn't one way of guaranteeing that a person was going to get a chronic care appointment.

So the intent of writing this would be either that the nurse would be able to enter the appointment, which I think at this time may not have been the case, or that when this individual got to his permanent facility and the nurse was doing her intake review, would have seen, oh, this person needs to be on chronic care, and would have put that person on the chronic care list per that facility's method.

Q. Okay. Is it fair to say, generally speaking, that in this Plans/Orders section of an ambulatory health record, anything that is some sort of directive and doesn't say specifically for the patient to do something is directed at DOC medical staff?

A. Not necessarily. And the reason is it's -- it's both plans and orders.

Q. Uh-huh.

A. So sometimes we will put something in here such as patient was educated on such and such, or patient was instructed to do this or that, or we might even say the plan is to call University Hospital and discuss with so-and-so. It's -- it's typically up to the nurse, then, who takes off this to -- who notes the