```
 1            IN THE UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF COLORADO
 2
     Civil Action No. 14-cv-01433-WJM-CBS
 3   _____

 4            RULE 30(b)(6) DEPOSITION OF:
              SUSAN TIONA, M.D. - June 30, 2016
 5            Colorado Department of Corrections
     _____
 6
     JIMMY JOSEPH VASQUEZ,
 7
     Plaintiff,
 8
     v.
 9
     JEANNE DAVIS, in her official capacity,
10   KATHLEEN MARTORANO, in her official capacity,
     KEITH MEEK, in his official capacity
11   BRIAN WEBSTER, in his official capacity,
     GATBEL CHAMJOCK, in his official capacity,
12   KATHLEEN MELLOH, in her official capacity,
     MAURICE FAUVEL, in his individual and official
13   capacities,
     JOHN and/or JANE DOE(S), Clinical Services
14   Administrators and Supervisors, in their official and
     individual capacities,
15   RICK RAEMISCH, in his individual and official
     capacities,
16
     Defendants.
17   _____

18           PURSUANT TO NOTICE, the Rule 30(b)(6)
     deposition of SUSAN TIONA, M.D., Colorado Department of
19   Corrections, was taken on behalf of the Plaintiff at
     150 East 10th Avenue, Denver, Colorado 80203, on
20   June 30, 2016, at 9:04 a.m., before Maria M. Orton,
     Registered Professional Reporter and Notary Public
21   within Colorado.

22

23           H+G

24

25           Hunter+Geist, Inc.
```

303.832.5966
800.525.8490

1900 Grant Street, Suite 1025
Denver, CO 80203

www.huntergeist.com
scheduling@huntergeist.com

Your Partner in Making the Record

EXHIBIT 14

---

**1**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 14-cv-01433-WJM-CBS
_____
        RULE 30(b)(6) DEPOSITION OF:
         SUSAN TIONA, M.D. - June 30, 2016
         Colorado Department of Corrections
_____

JIMMY JOSEPH VASQUEZ,

Plaintiff,

v.

JEANNE DAVIS, in her official capacity,
KATHLEEN MARTORANO, in her official capacity,
KEITH MEEK, in his official capacity
BRIAN WEBSTER, in his official capacity,
GATBEL CHAMJOCK, in his official capacity,
KATHLEEN MELLOH, in her official capacity,
MAURICE FAUVEL, in his individual and official
capacities,
JOHN and/or JANE DOE(S), Clinical Services
Administrators and Supervisors, in their official and
individual capacities,
RICK RAEMISCH, in his individual and official
capacities,

Defendants.
_____
        PURSUANT TO NOTICE, the Rule 30(b)(6)
deposition of SUSAN TIONA, M.D., Colorado Department of
Corrections, was taken on behalf of the Plaintiff at
150 East 10th Avenue, Denver, Colorado 80203, on
June 30, 2016, at 9:04 a.m., before Maria M. Orton,
Registered Professional Reporter and Notary Public
within Colorado.

---

**2**

              A P P E A R A N C E S
For the Plaintiff:

        ELISABETH L. OWEN, ESQ.
        Prisoners' Justice League of Colorado LLC
        150 East 10th Avenue
        Denver, Colorado 80203

For the Defendants Davis, Martorano, Meek, Webster,
Mellow, Fauvel, and Raemisch:

        CHRISTOPHER W. ALBER, ESQ.
        State of Colorado
        Senior Assistant Attorney General
        1300 Broadway
        10th Floor
        Denver, Colorado 80203

Also Present:

        Chloe Gleichman

---

**3**

              I N D E X
EXAMINATION OF SUSAN TIONA, M.D.: PAGE
June 30, 2016

By Ms. Owen 4

 INITIAL
DEPOSITION EXHIBITS: REFERENCE

Exhibit 1  Right Start - Right Step 19
           Certificate of Completion,
           Jimmy Joseph Vasquez, 2/1/08

Exhibit 2  CDOC Clinical Services Clinical 21
           Standard and Procedure for Health Care
           Providers, Revision Date: April 2004

Exhibit 3  CDOC Refusal of Treatment form 29

Exhibit 4  Administrative Regulation 700-02 60

Exhibit 5  DOC Ambulatory Health Record, 87
           Jimmy Joseph Vasquez, 5/27/05

Exhibit 6  Handwritten Note, 118
           "Dear Mental Health," 2/18/13

Exhibit 7  Clinical Note, 11/15/12 118

Exhibit 8  DOC Ambulatory Health Record, 119
           Jimmy Joseph Vasquez, 10/28/04

---

**4**

1       WHEREUPON, the following proceedings were
2  taken pursuant to the Federal Rules of Civil Procedure.
3           *   *   *   *   *
4       SUSAN TIONA, M.D.,
5  having been first duly sworn to state the whole truth,
6  testified as follows:
7              EXAMINATION
8  BY MS. OWEN:
9       Q.  Good morning, Dr. Tiona.  How are you?
10      A.  I'm good.
11      Q.  I know that you have been deposed before,
12 and also particularly in the Rule 30(b)(6) context, so
13 I'll just remind you of a couple of things.  First,
14 we'll just agree not to speak over each other so the
15 court reporter can get a good record; and, second, that
16 you are testifying today as a representative of the
17 Department of Corrections rather than yourself, so I
18 won't be asking about your personal knowledge, I'll be
19 asking about what the knowledge of the Department is.
20      A.  Okay.
21      Q.  Okay.  All right.  So let's first talk
22 about Hepatitis C treatment policies in the Department
23 of Corrections.  My client has been incarcerated and is
24 also diagnosed with Hepatitis C since about 2004.  So
25 that's the time frame that we'll be talking about from

## 25

    A. I'm missing 11 and 12 and 13 and 14.
        MS. GLEICHMAN: Mine too.
        MR. ALBER: Mine is too.
        MS. OWEN: Is everybody?
        THE DEPONENT: Are you missing it too?
        MS. OWEN: No. We'll come back to that page.
        THE DEPONENT: Okay.
    Q. (BY MS. OWEN) Okay. Well -- or how about I'll just represent to you that page 14 says, "The patient must see a medical provider and request treatment for Hepatitis C." Would you have the same answer with respect to that?
    A. Could I -- could I see it in context so I can see what the --
    Q. Sure.
    A. Oh, so this was the -- you know, I think this might be missing off of -- I was looking for this attachment on my copy at home -- or at the office, and I -- I'm wondering if it was missing off of whatever got downloaded to me. So -- okay. So what happens then -- and I know that there was -- and this clears up a lot, because there was a reference in -- in your client's medical record that said that he had been given this attachment, and I couldn't find what

## 26

attachment that was, but -- okay. So -- so, I guess, if a person who -- who can read English is given this attachment, and you are saying in paragraph --
    Q. 1.
    A. -- 1, "The patient must" --
        THE COURT REPORTER: If you're going to read it, I can't --
        THE DEPONENT: I won't read it out loud.
    A. Again, I -- I think that this is a dual -- it appears there's a dual responsibility, that medical providers need to discuss options with any patient who could potentially have those options. I suppose I can see a situation where a patient would say, Well, I'll think about it, and I'll send you a kite and let you know if I want treatment or not, or at the time of that appointment a patient could say, I -- yes, I would like to request treatment.
        I suppose that's the same for any -- any illness where you say, Do you want treatment or not. But it was specifically put into this policy that they had to request that treatment. But, again, it doesn't say the method by which that needs to take place. And I -- I would say it would have either been a verbal or a written indication that they were requiring or -- or requesting treatment.

## 27

    Q. (BY MS. OWEN) Okay. It's the Department's policy -- and tell me if this has ever not been the case, to your knowledge. It's the Department's policy that when somebody actively declines to have medical treatment provided to them that they have to sign a refusal form, correct?
    A. In general, yes, in most cases. I -- I know that, for example, with Hepatitis C, when we discuss treatment with individuals, if a provider is very adamant that a patient should pursue treatment for Hepatitis C, and that individual says, I'm not going to do it, then yes, we would have them sign a refusal. If it was a situation where -- where it was a trade-off -- some individuals had reached a point where they said, I understand interferon is very -- it can be dangerous, I can get sick, I don't necessarily want the treatment.
        If that individual indicated to me they didn't want treatment, I would not make them sign a refusal at that point. I would just say that was their individual choice. But -- so in general, yes, but with some caveats.
    Q. Would it be the practice to at least note in the medical records that the person consciously made a decision not to pursue treatment?
    A. I would say that should be a -- a

## 28

standard practice, yes.
    Q. Okay. And at what point do you think that it would be required that a medical provider have somebody sign a refusal form if they did not want to pursue Hepatitis C treatment?
    A. So, again, this would -- this goes outside -- there's no policy -- there's nothing in our policy that states that a person has to make a decision about Hepatitis C treatment, either say yes or no or sign one way or the other. So I'm not -- I guess I can't necessarily speak specifically to Hepatitis C in regards to what a DOC policy is. I will say that the practice is that if an individual is refusing a treatment that -- that a practitioner feels is potentially life-saving, or limb-saving, or that greatly impacts their longevity, then we would ask them to sign a refusal if they said, I'm not going to pursue that treatment.
        So, again, with Hepatitis C, there -- there are points in time along the Hepatitis C illness spectrum where a person could reasonably make a decision not to pursue treatment at that point in time. And, in that case, to tell them, Well, then, you need to sign a refusal, I wouldn't say would be -- would -- would be reasonable. Does that answer your question?

29

1  Q. It does. Just a follow-up: So later on
2  that continuum, though, you know, where it's less of
3  a -- it makes sense from a medical standpoint not to
4  pursue treatment, i.e., if you don't get treatment, you
5  are almost certainly going to suffer some sort of
6  life-shortening or life-ending consequence --
7      A. Right.
8      Q. -- at that point, the medical provider
9  should have them sign a refusal form if they don't want
10 treatment?
11     A. I would advise the practitioner to have
12 them sign a form, yes.
13     Q. Okay.
14         (Deposition Exhibit 3 was marked.)
15     Q. This is actually the DOC treatment
16 refusal form, correct?
17     A. Yes.
18     Q. And this one is when Mr. Vasquez
19 apparently had a burn from working in the kitchen.
20 Does this look -- just looking at that document, does
21 it look to you to be something that was
22 life-threatening to him?
23     A. No.
24     Q. Okay.
25     A. But -- can I explain that?

30

1      Q. Sure.
2      A. Okay. So in the -- in the setting of
3  a -- let me -- so let me back up. All -- any --
4  anytime a person is recommended to have treatment, the
5  DOC policy -- and the person says, I don't want that,
6  we have them sign refusals. We have them sign a
7  refusal because they didn't want to go out to a medical
8  appointment. We have them sign a refusal because they
9  were called down for a dressing change, and they didn't
10 want the dressing change. No, those are not
11 life-threatening. Those are not optional refusals.
12         The situation you were describing before,
13 the case where you are having a discussion with an
14 individual and you say, I would recommend that you
15 pursue this action, and the individual says, I don't
16 want to pursue that action at this time, then no, I'm
17 not going to make them sign a refusal because they have
18 a difference of opinion.
19         But it is our policy that any time an
20 individual is brought forward to the clinical services
21 department for -- specifically for a certain treatment,
22 and they say, I don't want that treatment, then we do
23 have them sign a refusal.
24     Q. And what's the purpose for that policy?
25     A. So, typically, it is because -- well, I

31

1  think the main reason is to show that we did approach
2  an individual with the option to have some kind of
3  treatment and they opted not to. And we can write in
4  the chart, The patient opted not to, but the patient
5  can come back and say, They didn't -- they didn't ask
6  me if I wanted my dressing changed, or they did not
7  bring me forward for this.
8         So there is some -- it's -- it's
9  protective somewhat for the Department to say yes, that
10 we did offer them this treatment and they -- they
11 declined. Typically, a burn is not going to cause a
12 problem, but if he had gotten a terrible infection or a
13 flesh-eating type of infection or something, at least
14 we could say we did try to give you some treatment.
15     Q. And you will agree with me that this form
16 actually includes a waiver of liability?
17     A. It does.
18     Q. So that if DOC gets sued for not treating
19 that particular condition, they can say, Wait a minute,
20 we talked about this, it was the patient's choice not
21 to get treatment?
22     A. Well, not being a lawyer, I guess I
23 can -- I don't know that -- I suppose that that's the
24 intent of that. I -- I . . .
25     Q. But from a medical professional

32

1  standpoint?
2      A. I think that's the -- that's the --
3  that's probably the understanding of the medical
4  professional who is handing the person this form.
5      Q. Okay. All right. So let's go back to
6  the treatment protocol. And we'll just use the 2004
7  one. If anything that we are talking about, if you
8  think it's -- it's become different over time, can you
9  just let me know?
10     A. Sure.
11     Q. Okay. So this protocol, the 2004
12 treatment protocol, says that the Department "commits
13 to making every reasonable effort to place eligible
14 inmates with HCV into available substance abuse
15 programs." And you will find that on page 7, which
16 hopefully you've got. At the top of the page. It's
17 the second full sentence in that top paragraph.
18     A. Uh-huh.
19     Q. What happens under this policy if there
20 is not an available treatment program?
21     A. So according to the policy, it states,
22 "If a program is not available at the particular
23 facility where the inmate is incarcerated, the CDOC
24 will transfer that inmate to a facility that does offer
25 the required program within 60 days of the written

**Page 61**

A. So Attachment A is a placement matrix. And, essentially, what this attachment does, is -- it shows various medical, disability, dental, psychological, and then sex offender categories and needs, and matches the facilities that are able to accept individuals with those levels of needs.

So if an exception needs to take place, such that -- for example, if a person has an M4 code, but they need a class that is only offered at -- and some of this is cut off -- at, let's say -- I'm assuming that's Fremont -- Fremont Correctional Facility, for example, if an M4 is not allowed to be normally assigned to Fremont Correctional Facility, but -- which isn't the case, because it's just cut off -- but, anyhow, the form Attachment B would be used to indicate to Offender Services that it is okay to place that individual at this facility, even though they have an M code that otherwise would not allow them to be there, because that individual needs some sort of treatment not available at their current facility. So that would be one of these treatments.

Q. Like, for example, participation in the drug and alcohol program?

A. Yes.

Q. Okay. When were these two documents

**Page 62**

created?

A. I do not -- I cannot say that I know the answer to that.

Q. Do you think that they're new or have they always existed?

A. They probably existed for quite some time. And, again, I did not have access to the old ARs, so I'm not sure how long ago, but this -- this matrix and this waiver pertain to noncustody issues.

Q. Okay.

A. So medical, by using this waiver, we can't -- we cannot request that -- that security -- that Offender Services place an offender at a lower custody facility based on medical needs. We can simply ask that -- or instruct them that it is okay to override one of these medical needs to place that offender.

Q. So this would only apply in the situation where somebody was going closed to closed, for example?

A. Yes.

Q. Okay. I understand. Got it. Thank you. Continuing to look at this policy, as we talked about, the effective date is June 1, 2016. I also don't have the old policies, so I'm sorry for that. But it appears to me that this policy is really quite

**Page 63**

different from the ones that preceded it. Does that seem correct to you?

A. Well, I will say that I have been making some drastic changes to a lot of our policies and procedures in the last year, so it's possible that this might have some substantial changes, because I did make some changes, I believe.

Q. Do you know what -- and I know you don't have the old one sitting in front of you, but even without that, do you know what sort of generally the changes made to this policy are?

A. I -- I believe that some of the issues with -- under the Hunger Strike area are relatively updated. And is this not the policy where we say what our chronic care -- so I thought that we had in 700-02 in the past an indication of the chronic care conditions.

Q. You know what --

A. Oh, chronic care disease. There we go.

Q. I'm sorry. Do you have complete copy of this? Because now I'm looking at this and I'm missing pages 4 through 8.

MR. ALBER: Yeah, they're the same.

A. Wait. 2, 3, 4. I think I have them. 2, 3, 4, 5, 6, 7. What are you missing?

**Page 64**

Q. (BY MS. OWEN) I'm missing 4 through 8, so you have the complete one?

A. I have a complete one. But let me look at this, because -- as I recollect, and I might be wrong, I thought the old -- the previous versions of this had an indication of which chronic care diseases fell under the chronic care clinic. But it does not say that currently.

Q. Okay. What section are you pointing to with the hunger strike changes?

A. 13. And I don't know if those are changes for sure, but I believe we had made some updates to that.

Q. Okay. Am I correct that DOC reserves the right to administer life-saving treatment to people on a hunger strike?

MR. ALBER: I'm going to object as to outside the scope.

A. Yes.

Q. (BY MS. OWEN) Okay. What's the reason for that?

MR. ALBER: Again, I'm going to object as to outside the scope.

A. And let me start by saying that I recognize this is a globally controversial issue;

### 65

1  however, the -- the thought behind the -- our right to
2  intervene in a person's hunger strike is that
3  hunger-striking behavior is a form of -- of self-harm,
4  even though it's a long-term form of self-harm.
5       And in the same manner that we will not
6  let a person hang, and just let them hang because they
7  wanted to die and therefore they should hang, right --
8       THE DEPONENT: Can you say something
9  about me being facetious at that point?
10       THE COURT REPORTER: (No verbal
11  response.)
12     A.  And so in that same manner, we obviously
13  are going to intervene in someone cutting on themselves
14  or hanging or otherwise causing a perfectly healthy
15  body to deteriorate to a point of death. And the
16  viewpoint of the Department of Corrections is that
17  hunger-striking is a -- can be a form of that
18  self-harming behavior. Initially, it is usually some
19  sort of reaction to a situation that the offender wants
20  to effect a change in and, therefore, they initiate a
21  hunger strike to make that change.
22       However, when that hunger strike
23  proceeds, it becomes a type of self-harm when it gets
24  to a level where that behavior is actually going to
25  cause permanent damage to their body or perhaps even

### 66

1  death. And at that point it's akin to self-harming or
2  suicidal behavior, and so we intervene in that.
3     **Q.  (BY MS. OWEN) Because DOC has an**
4  **interest in preventing people from experiencing serious**
5  **medical damage or even death, correct?**
6     A.  Yes.
7     **Q.  Okay. Let's talk about training of**
8  **medical staff. How has that worked in the past and how**
9  **does it work now?**
10     A.  I think that has been relatively stable
11  over the course of a number of years. And when you say
12  "training," are you -- are you referring to just our
13  medical staff and how we are trained for medical
14  conditions, or are you speaking about training as a --
15  as a correctional professional?
16     **Q.  Let's start with just how medical staff**
17  **are trained to perform their job duties.**
18     A.  Okay.
19     **Q.  And then if there's like some other**
20  **correctional training -- we'll, let's just start with**
21  **medical training.**
22     A.  Okay. So -- and then, of course, you
23  have varying levels of medical professionals within the
24  medical department. So we have nursing. We have
25  mid-level providers. We have M.D. and D.O. providers.

### 67

1  And then there are administrative groups -- or
2  administrative individuals within that group as well.
3       So all of -- all of the medical
4  professionals in the Department are expected to
5  maintain their licensure and whatever educational
6  requirements are -- are needed in order to maintain
7  their licensure. So nurses are required -- are
8  expected to take whatever number of CEUs are required
9  for their license. Docs and -- doctors and mid-levels
10  are provided to -- are expected to maintain their CMEs.
11       The Department does not pay individuals
12  for -- does not pay for training sessions for
13  individuals in that regard. They do give paid days off
14  in order to go attend training events, up to 40 hours a
15  year. And I believe that policy has been in place for
16  a number of years. And I can't say exactly, but I'm
17  sure it goes back a number of years.
18       So, professionally, you are just expected
19  to -- to maintain your knowledge in your field and do
20  what you need to do to maintain your license and to
21  maintain your board certification, if that's what you
22  want to -- if that's what you have.
23       Within the Department, there are -- and,
24  again, this depends a little bit on your -- what role
25  you play in clinical. And I don't know as much about

### 68

1  nursing and how they're trained, but as -- should I --
2  can I speak mostly to the providers? If that's --
3     **Q.  Absolutely.**
4     A.  Okay. So providers -- so when we first
5  come into the Department, we are given the training
6  academy, of course. We go through the training
7  academy. And the contents of the training academy and
8  the length of that training academy fluctuates all the
9  time. Sometimes it's two weeks, and sometimes it's six
10  weeks, and now it down to three weeks. And it -- so
11  the -- what we get within that academy is not always
12  static. But, in general, we are taught about
13  offender -- relationships with offenders and providers.
14       We are given some education on types of
15  communicable diseases within corrections that might be
16  specific to corrections. We are given training on how
17  to protect ourselves and that sort of thing, if that
18  became necessary. In the recent past, there were
19  actually -- there was actually some more specific
20  training on diabetes, dental emergencies, what we
21  had -- what were called "breakout sessions" for the
22  training academy. Some of those have been eliminated
23  very recently, but there is still some content specific
24  to clinical within the training academy.
25       Once a provider gets to a facility, they