```
 1              IN THE UNITED STATES DISTRICT COURT
                   FOR THE DISTRICT OF COLORADO
 2
     Civil Action No. 14-cv-01433-WJM-CBS
 3   _____

 4              RULE 30(b)(6) DEPOSITION OF:
               SUSAN TIONA, M.D. - June 30, 2016
 5             Colorado Department of Corrections

 6   _____

     JIMMY JOSEPH VASQUEZ,
 7
     Plaintiff,
 8
     v.
 9
     JEANNE DAVIS, in her official capacity,
10   KATHLEEN MARTORANO, in her official capacity,
     KEITH MEEK, in his official capacity
11   BRIAN WEBSTER, in his official capacity,
     GATBEL CHAMJOCK, in his official capacity,
12   KATHLEEN MELLOH, in her official capacity,
     MAURICE FAUVEL, in his individual and official
13   capacities,
     JOHN and/or JANE DOE(S), Clinical Services
14   Administrators and Supervisors, in their official and
     individual capacities,
15   RICK RAEMISCH, in his individual and official
     capacities,
16
     Defendants.
17   _____

18           PURSUANT TO NOTICE, the Rule 30(b)(6)
     deposition of SUSAN TIONA, M.D., Colorado Department of
19   Corrections, was taken on behalf of the Plaintiff at
     150 East 10th Avenue, Denver, Colorado 80203, on
20   June 30, 2016, at 9:04 a.m., before Maria M. Orton,
     Registered Professional Reporter and Notary Public
21   within Colorado.

22

23           H+G

24

25           Hunter + Geist, Inc.
```

303.832.5966
800.525.8490

1900 Grant Street, Suite 1025
Denver, CO 80203

■ www.huntergeist.com
■ scheduling@huntergeist.com

Your Partner in Making the Record

**EXHIBIT 1**

Case 1:14-cv-01433-WJM-CBS   Document 164-1   Filed 08/25/16   USDC Colorado   Page 2 of 4

Vasquez v. Davis                    SUSAN TIONA, M.D.                    6/30/2016

## 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 14-cv-01433-WJM-CBS
_____
            RULE 30(b)(6) DEPOSITION OF:
         SUSAN TIONA, M.D. - June 30, 2016
           Colorado Department of Corrections
_____

JIMMY JOSEPH VASQUEZ,

Plaintiff,

v.

JEANNE DAVIS, in her official capacity,
KATHLEEN MARTORANO, in her official capacity,
KEITH MEEK, in his official capacity
BRIAN WEBSTER, in his official capacity,
GATBEL CHAMJOCK, in his official capacity,
KATHLEEN MELLOH, in her official capacity,
MAURICE FAUVEL, in his individual and official
capacities,
JOHN and/or JANE DOE(S), Clinical Services
Administrators and Supervisors, in their official and
individual capacities,
RICK RAEMISCH, in his individual and official
capacities,

Defendants.
_____
         PURSUANT TO NOTICE, the Rule 30(b)(6)
deposition of SUSAN TIONA, M.D., Colorado Department of
Corrections, was taken on behalf of the Plaintiff at
150 East 10th Avenue, Denver, Colorado 80203, on
June 30, 2016, at 9:04 a.m., before Maria M. Orton,
Registered Professional Reporter and Notary Public
within Colorado.

## 2

              A P P E A R A N C E S
For the Plaintiff:
         ELISABETH L. OWEN, ESQ.
         Prisoners' Justice League of Colorado LLC
         150 East 10th Avenue
         Denver, Colorado 80203

For the Defendants Davis, Martorano, Meek, Webster,
Mellow, Fauvel, and Raemisch:

         CHRISTOPHER W. ALBER, ESQ.
         State of Colorado
         Senior Assistant Attorney General
         1300 Broadway
         10th Floor
         Denver, Colorado 80203

Also Present:

         Chloe Gleichman

## 3

                    I N D E X
EXAMINATION OF SUSAN TIONA, M.D.:           PAGE
June 30, 2016

By Ms. Owen                                    4

                                           INITIAL
DEPOSITION EXHIBITS:                      REFERENCE

Exhibit 1  Right Start - Right Step            19
           Certificate of Completion,
           Jimmy Joseph Vasquez, 2/1/08

Exhibit 2  CDOC Clinical Services Clinical     21
           Standard and Procedure for Health Care
           Providers, Revision Date: April 2004

Exhibit 3  CDOC Refusal of Treatment form      29

Exhibit 4  Administrative Regulation 700-02    60

Exhibit 5  DOC Ambulatory Health Record,       87
           Jimmy Joseph Vasquez, 5/27/05

Exhibit 6  Handwritten Note,                  118
           "Dear Mental Health," 2/18/13

Exhibit 7  Clinical Note, 11/15/12     118

Exhibit 8  DOC Ambulatory Health Record,      119
           Jimmy Joseph Vasquez, 10/28/04

## 4

1        WHEREUPON, the following proceedings were
2   taken pursuant to the Federal Rules of Civil Procedure.
3               *   *   *   *   *
4        SUSAN TIONA, M.D.,
5   having been first duly sworn to state the whole truth,
6   testified as follows:
7               EXAMINATION
8   BY MS. OWEN:
9        Q.  Good morning, Dr. Tiona.  How are you?
10       A.  I'm good.
11       Q.  I know that you have been deposed before,
12  and also particularly in the Rule 30(b)(6) context, so
13  I'll just remind you of a couple of things.  First,
14  we'll just agree not to speak over each other so the
15  court reporter can get a good record; and, second, that
16  you are testifying today as a representative of the
17  Department of Corrections rather than yourself, so I
18  won't be asking about your personal knowledge, I'll be
19  asking about what the knowledge of the Department is.
20       A.  Okay.
21       Q.  Okay.  All right.  So let's first talk
22  about Hepatitis C treatment policies in the Department
23  of Corrections.  My client has been incarcerated and is
24  also diagnosed with Hepatitis C since about 2004.  So
25  that's the time frame that we'll be talking about from

1 (Pages 1 to 4)

scheduling@huntergeist.com         HUNTER + GEIST, INC.         303-832-5966/800-525-8490

57

1 Again, if -- if it's a matter of, You
2 need follow-up for this, then yes, the practitioner
3 should put in for that follow-up, but directing the
4 individual to send in a kite is not an unreasonable
5 expectation, assuming that -- that there are mechanisms
6 in place for that kite to be addressed.
7     Q. Okay. So you've been saying a lot, you
8 know, "If I were the practitioner" and, you know,
9 "There's not really a policy that addresses this." In
10 the circumstance where there isn't a written policy
11 about, you know, here's what you do under X, Y, Z
12 circumstance, the expectation is that the practitioner
13 is going to make a sound professional judgment about
14 what to do with somebody, right?
15     MR. ALBER: I'm going to object as to
16 outside the scope.
17     A. Yes.
18     Q. (BY MS. OWEN) And in the event that the
19 practitioner doesn't necessarily know what to do, like
20 as a matter of DOC policy, they should ask somebody or,
21 you know, educate themselves on that issue, right?
22     MR. ALBER: Objection, outside the scope.
23     A. I would expect someone to maximize their
24 resources and get whatever information they needed to
25 make sure that they were adequately caring for an

58

1 individual, yes.
2     MS. OWEN: Okay. Could we take a break?
3     THE DEPONENT: Yes.
4     (Recess taken, 10:27 a.m. to 10:42 a.m.)
5     Q. (BY MS. OWEN) All right. Coming back to
6 the -- so, first of all, I just want to say that we
7 re-marked the complete copy of the April 2004 treatment
8 protocol. So you have that in front of you.
9     Coming back to the chronic care system --
10     A. Okay.
11     Q. -- how does a patient know that he has
12 been assigned to a chronic care clinic?
13     A. So the -- in the Administrative
14 Regulations -- I think it's 700-02 -- 700-02 -- it
15 identifies which of the chronic conditions are going to
16 be followed under the chronic care system.
17     Q. Okay.
18     A. So -- and I believe the offenders are
19 able to access those, so they would know. In addition,
20 when they come through DRDC with -- for their intake,
21 then they would be told by the provider there that you
22 are going to be on chronic care, expect your next --
23 your appointment within a certain period of time at
24 your receiving facility.
25     Q. And it's the medical staff who set the

59

1 chronic care appointments?
2     A. Yes. Yes.
3     Q. Okay. And if it were a situation where a
4 patient was assigned to one particular provider for
5 chronic care, would he be notified of that in any way?
6     A. No. They would only -- they would find
7 out about their appointment right before their
8 appointment, when the -- so we put these appointments
9 in the kite system.
10     Q. Uh-huh.
11     A. The day or two the before the
12 appointments are scheduled, the list of our
13 appointments are distributed throughout the facility in
14 various capacities and in various areas, so then you
15 would know who it is that you are coming to. But in
16 most facilities, unless an individual facility has a
17 different way of handling it, most of the time an
18 offender is not going to know which provider they get
19 assigned to.
20     The only way they might is if a -- if
21 they know from other offenders that -- for example, all
22 the offenders in the pod go to see this particular
23 person, in which case they might get an idea of that,
24 but otherwise they would not get a specific
25 notification.

60

1     Q. Okay. That makes sense.
2     (Deposition Exhibit 4 was marked.)
3     Q. This is the most recent version of
4 700-02. Does that seem right to you?
5     A. I hope so.
6     Q. It's only 30 days old, so --
7     A. So it must be pretty recent. I can't say
8 we changed something I'm not aware of.
9     Q. At the end of this policy, on Attachment
10 B --
11     A. Let me get Attachment -- Attachment B,
12 okay.
13     Q. Okay. This is called a Clinical Needs
14 and Time Placement Matrix Waiver. What is this?
15     A. Ah, yes. So this is -- this is the --
16 the form that is completed by a provider and then also
17 I believe signed by the HSAs -- yes. When an offender
18 has medical needs that are -- that are indicated on
19 this matrix --
20     Q. And when you say "this matrix," you are
21 pointing to Attachment A?
22     A. I'm sorry. Attachment A, yes. So let me
23 go back, because Attachment B is related to Attachment
24 A.
25     Q. Right.

### Page 61

A. So Attachment A is a placement matrix. And, essentially, what this attachment does, is -- it shows various medical, disability, dental, psychological, and then sex offender categories and needs, and matches the facilities that are able to accept individuals with those levels of needs.

So if an exception needs to take place, such that -- for example, if a person has an M4 code, but they need a class that is only offered at -- and some of this is cut off -- at, let's say -- I'm assuming that's Fremont -- Fremont Correctional Facility, for example, if an M4 is not allowed to be normally assigned to Fremont Correctional Facility, but -- which isn't the case, because it's just cut off -- but, anyhow, the form Attachment B would be used to indicate to Offender Services that it is okay to place that individual at this facility, even though they have an M code that otherwise would not allow them to be there, because that individual needs some sort of treatment not available at their current facility. So that would be one of these treatments.

Q. Like, for example, participation in the drug and alcohol program?

A. Yes.

Q. Okay. When were these two documents

### Page 62

created?

A. I do not -- I cannot say that I know the answer to that.

Q. Do you think that they're new or have they always existed?

A. They probably existed for quite some time. And, again, I did not have access to the old ARs, so I'm not sure how long ago, but this -- this matrix and this waiver pertain to noncustody issues.

Q. Okay.

A. So medical, by using this waiver, we can't -- we cannot request that -- that security -- that Offender Services place an offender at a lower custody facility based on medical needs. We can simply ask that -- or instruct them that it is okay to override one of these medical needs to place that offender.

Q. So this would only apply in the situation where somebody was going closed to closed, for example?

A. Yes.

Q. Okay. I understand. Got it. Thank you. Continuing to look at this policy, as we talked about, the effective date is June 1, 2016. I also don't have the old policies, so I'm sorry for that. But it appears to me that this policy is really quite

### Page 63

different from the ones that preceded it. Does that seem correct to you?

A. Well, I will say that I have been making some drastic changes to a lot of our policies and procedures in the last year, so it's possible that this might have some substantial changes, because I did make some changes, I believe.

Q. Do you know what -- and I know you don't have the old one sitting in front of you, but even without that, do you know what sort of generally the changes made to this policy are?

A. I -- I believe that some of the issues with -- under the Hunger Strike area are relatively updated. And is this not the policy where we say what our chronic care -- so I thought that we had in 700-02 in the past an indication of the chronic care conditions.

Q. You know what --

A. Oh, chronic care disease. There we go.

Q. I'm sorry. Do you have complete copy of this? Because now I'm looking at this and I'm missing pages 4 through 8.

MR. ALBER: Yeah, they're the same.

A. Wait. 2, 3, 4. I think I have them. 2, 3, 4, 5, 6, 7. What are you missing?

### Page 64

Q. (BY MS. OWEN) I'm missing 4 through 8, so you have the complete one?

A. I have a complete one. But let me look at this, because -- as I recollect, and I might be wrong, I thought the old -- the previous versions of this had an indication of which chronic care diseases fell under the chronic care clinic. But it does not say that currently.

Q. Okay. What section are you pointing to with the hunger strike changes?

A. 13. And I don't know if those are changes for sure, but I believe we had made some updates to that.

Q. Okay. Am I correct that DOC reserves the right to administer life-saving treatment to people on a hunger strike?

MR. ALBER: I'm going to object as to outside the scope.

A. Yes.

Q. (BY MS. OWEN) Okay. What's the reason for that?

MR. ALBER: Again, I'm going to object as to outside the scope.

A. And let me start by saying that I recognize this is a globally controversial issue;