**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge William J. Martínez**

Civil Action No. 14-cv-1433-WJM-CBS

JIMMY JOSEPH VASQUEZ,

    Plaintiff,

v.

JEANNE DAVIS, in her individual capacity,
KATHLEEN MARTORANO, in her individual capacity,
BRIAN WEBSTER, in his individual capacity,
GATBEL CHAMJOCK, in his individual capacity,
KATHLEEN MELLOH, in her individual capacity,
MAURICE FAUVEL, in his individual and official capacities,
JOHN and/or JANE DOE(s), Clinical Services Administrators and Supervisors, in their official and individual capacities, and
RICK RAEMISCH, in his individual and official capacities,

    Defendants.

## ORDER GRANTING DEFENDANT RAEMISCH'S MOTION TO DISMISS

Plaintiff Jimmy Joseph Vasquez is an inmate in the custody of the Colorado Department of Corrections ("CDOC") and housed at the Sterling Correctional Facility ("Sterling"). (ECF No. 113 ¶ 1.) He is infected with the hepatitis C virus ("HCV"). (*Id.* ¶ 42.) Vasquez brings this lawsuit under the Eighth Amendment to the U.S. Constitution, alleging that various CDOC employees (collectively, "Defendants") were deliberately indifferent over many years to the effects that HCV was having on him. Due to that indifference, he claims he developed end-stage liver disease that will likely kill him absent a liver transplant. (*Id.* at 1–2.) Subsequent developments have cast doubt on whether Vasquez in fact requires a liver transplant (*see* ECF No. 126 (finding,

in preliminary injunction proceedings, that Vasquez's condition is stable)), but he nonetheless appears to face lifelong complications from the effects of HCV on his liver.

Currently before the Court is Defendant Rick Raemisch's Motion to Dismiss. (ECF No. 136.) Invoking Federal Rule of Civil Procedure 12(b)(6), Raemisch specifically seeks dismissal of the claims brought against him in his individual capacity, as alleged in Vasquez's Third Amended Complaint. (*See id.* at 1–2.) For the reasons explained below, the Court grants this motion and dismisses Vasquez's claims with prejudice to the extent they seek to hold Raemisch liable in his individual capacity. Raemisch will remain a defendant in his official capacity.

## I. LEGAL STANDARD

The Rule 12(b)(6) standard requires the Court to "assume the truth of the plaintiff's well-pleaded factual allegations and view them in the light most favorable to the plaintiff." *Ridge at Red Hawk, LLC v. Schneider*, 493 F.3d 1174, 1177 (10th Cir. 2007). Having assumed that truth, the dispositive inquiry then usually becomes "whether the complaint contains 'enough facts to state a claim to relief that is plausible on its face.'" *Id.* (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). This analysis assumes that the plaintiff's legal theory is recognized in law and that the only salient question is whether the asserted facts state a claim under that theory. However, some Rule 12(b)(6) motions raise the argument that "a legal theory [is] not cognizable as a matter of law." *Golan v. Ashcroft*, 310 F. Supp. 2d 1215, 1217 (D. Colo. 2004), *aff'd sub nom. Golan v. Gonzales*, 501 F.3d 1179 (10th Cir. 2007). For reasons that will

become clear below, the Court finds this standard applicable here.[1]

## II. ANALYSIS

### A. Supervisory Liability Generally

Raemisch is CDOC's Executive Director. (ECF No. 113 ¶ 10.) As is generally known throughout this District, *see* Fed. R. Evid. 201(b)(1), Raemisch became Executive Director in July 2013, after the murder of the former Executive Director, Tom Clements, in March 2013. *See also Hebert v. Raemisch*, 2015 WL 9304634, at *6 (D. Colo. Dec. 22, 2015) ("As is well known, Clements was murdered in March 2013. Defendant Raemisch took over as Executive Director in July 2013 . . . ."). Thus, Raemisch's appointment post-dates most of the allegations in Vasquez's Third Amended Complaint (the currently operative complaint). Those allegations overwhelmingly focus on Vasquez's medical treatment or lack thereof between late 2004 and mid-2013, climaxing in May 2013 when Vasquez required emergency surgery for conditions secondary to liver deterioration and learned that a liver transplant might be his only chance of long-term survival. (*See* ECF No. 113 ¶¶ 42–151, 183–213.)

Considering (i) Raemisch's late entry into Vasquez's timeline, (ii) Raemisch's status as something other than a medical official, and (iii) Raemisch's separation from the day-to-day affairs at Sterling, Vasquez's theory of liability against Raemisch necessarily draws on a concept sometimes known as "supervisory liability." The Supreme Court has deemed this term "a misnomer" to the extent it implies pure

---

[1] Because the Court dismisses for failure to state a legally cognizable claim, the Court need not reach Raemisch's other arguments regarding administrative exhaustion or qualified immunity. (*See* ECF No. 136 at 3–4, 9–10.)

vicarious (*respondeat superior*) liability. *Ashcroft v. Iqbal*, 556 U.S. 662, 677 (2009). With the understanding that § 1983 defendants "do not answer for the torts of their [subordinates]" and may only be "liable for [their] own misconduct," *id.*, this Court will continue to refer to "supervisory liability" as a convenient and already-established shorthand for the concept that government officials who did not personally interact with a plaintiff may still be liable, in certain circumstances, for constitutional violations ultimately carried out by those who did have personal interaction with the plaintiff.

The basic elements of supervisory liability are: "(1) the defendant promulgated, created, implemented or possessed responsibility for the continued operation of a policy that (2) caused the complained of constitutional harm, and (3) acted with the state of mind required to establish the alleged constitutional deprivation." *Dodds v. Richardson*, 614 F.3d 1185, 1199 (10th Cir. 2010). But these elements are not "distinct analytical prongs, never to be intertwined." *Id*. n.8. For example, in *Serna v. Colorado Department of Corrections*, 455 F.3d 1146 (10th Cir. 2006), the Tenth Circuit evaluated a claim that a senior CDOC official was ultimately responsible for the excessively violent removal of an inmate from his cell by a special SWAT-like team of prison guards who had received an (ultimately erroneous) report that the inmate possessed a gun. *Id*. at 1149, 1152. This was, at bottom, an Eighth Amendment claim, which requires the "deliberate indifference" state of mind. *Id*. at 1154–55. In evaluating only that element of the supervisory liability test, the Tenth Circuit noted that the CDOC official—who approved the guard team's use—had every reason to believe that they could accomplish its goal "safely and effectively," and the plaintiff failed to "offer[] any

evidence that [the official] turned a blind eye to evidence that would contradict that belief, such as a pattern or practice of constitutional abuses by his subordinates on prior occasions." *Id*. at 1155.

Although *Serna* discussed such a pattern or practice as potential evidence of deliberate indifference (the third element of a supervisory liability Eighth Amendment claim), such evidence would also show, under those circumstances, the existence of a "policy" (the first element). In layman's terms, turning a blind eye to repeated excessive force incidents would not normally be seen as a "policy." However, in the context of municipal liability—first approved in *Monell v. Department of Social Services*, 436 U.S. 658 (1978)—municipalities can be liable under § 1983 for damages when the municipality inflicts constitutional injury through a "policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy." *Id.* at 694. Such a policy or custom may include what is, in effect, a "policy of inaction" in the face of knowledge that municipal officials are routinely violating a specific constitutional right, thus becoming "the functional equivalent of a decision by the [municipality] itself to violate the Constitution." *Connick v. Thompson*, 563 U.S. 51, 61–62 (2011) (internal quotation marks omitted); *see also Monell*, 436 U.S. at 690–91 (discussing § 1983's application to "customs and usages," not just formally adopted policies and practices).

The fact that *Serna* would draw upon this concept of intentional inaction shows the degree to which individual supervisory liability has absorbed elements of *Monell* liability. Indeed, the Tenth Circuit has all but held that the law of supervisory liability for

failure to train or intervene is functionally interchangeable with the law of *Monell* liability for similar failures.  In particular, the Tenth Circuit in *Sutton v. Utah State School for the Deaf & Blind*, 173 F.3d 1226 (10th Cir. 1999), approvingly analyzed an Eleventh Circuit decision, *Greason v. Kemp*, 891 F.2d 829 (11th Cir.1990), that explicitly adopted its standard for individual supervisory liability from *City of Canton v. Harris*, 489 U.S. 378 (1989), which is the Supreme Court's seminal case regarding *Monell* liability for failure to train.  *See Sutton*, 173 F.3d at 1240–41 (discussing *Greason*'s reliance on *City of Canton*, and then applying *Greason*'s analytical framework to the case before it).

Given all of this, it appears that there are two general situations in which a supervisor may liable for failure to train or intervene.  First, as noted in *Serna*, the supervisor may be aware of a pattern of constitutional violations among his or her subordinates, yet choose to do nothing about it.  According to the Supreme Court, this is the "ordinar[y]" form of supervisory liability.  *Bd. of Cnty. Comm'rs of Bryan Cnty., Okla. v. Brown*, 520 U.S. 397, 409 (1997) (evidence of a "pattern of injuries [is] ordinarily necessary to establish . . . culpability and causation").  Second, absent evidence of such a pattern, the supervisor may nonetheless be held liable when, "in light of the duties assigned to specific officers or employees[,] the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the [supervisor] can reasonably be said to have been deliberately indifferent to the need."  *City of Canton*, 489 U.S. at 390; *see also Connick*, 563 U.S. at 63–64.

Even in that light, however, supervisory liability ultimately reduces to the question of proximate cause. *See Dodds*, 614 F.3d at 1195 (§ 1983 liability appropriate "where the plaintiff has shown the supervisor himself breached a duty to plaintiff which was the proximate cause of the injury" (internal quotation marks omitted)).[2] Thus, in some circumstances a supervisor may be liable for "set[ting] in motion a series of events" that the supervisor "knew or reasonably should have known would cause others" to violate constitutional rights. *Schneider*, 717 F.3d at 768 (internal quotation marks omitted). On the other hand, "[a]t some point, [a supervisor's] involvement simply becomes too tenuous to support liability." *Grimsley v. MacKay*, 93 F.3d 676, 680 (10th Cir. 1996).

## B. Vasquez's Theory of Raemisch's Supervisory Liability

In this case, Vasquez invokes *Serna*'s notion that a supervisor may be liable for turning a blind eye to evidence that would show a pattern or practice of unconstitutional abuses. (ECF No. 137 at 14.) *See also Serna*, 455 F.3d at 1155. But as already discussed, Raemisch was not in any sense a supervisor over anyone at CDOC throughout most of the relevant events alleged in the Third Amended Complaint. How,

---

[2] The cited portion of *Dodds* is a historical narrative of the Tenth Circuit's treatment of supervisory liability before *Iqbal*, and it is followed by an analysis of the changes *Iqbal* may have worked on that standard. *See id.* at 1194–1202. But *Dodds* does not conclude that *Iqbal* undermined any specific part of the Tenth Circuit's historical approach to supervisory liability, except perhaps where the constitutional claim at issue involves racial discrimination. *Id.* at 1197–99. In any event, the Tenth Circuit has subsequently cited *Dodds*'s historical narrative as if it is a statement of current Tenth Circuit law, even on matters that *Dodds* declared suspect in light of *Iqbal*. *Compare id.* at 1196, 1198 n.6 (noting the Tenth Circuit's frequent use of an "affirmative link" causation requirement but questioning whether it survived *Iqbal*) *with Schneider v. City of Grand Junction Police Dep't*, 717 F.3d 760, 767 (10th Cir. 2013) (citing *Dodds*'s historical narrative regarding the "affirmative link" requirement as a current statement of Tenth Circuit law: "The plaintiff therefore must show an 'affirmative link' between the supervisor and the constitutional violation."). Thus, *Dodds*'s historical narrative appears to state the law as it continues to be in the Tenth Circuit, at least outside of racial discrimination claims.

then, does Vasquez fit Raemisch into *Serna*'s "blind eye" paradigm?

The answer lies in a novel theory that begins with the Second Amended Complaint, in which Raemisch was first named as a defendant, although only in his official capacity. (*Compare* ECF No. 7 (First Amended Complaint) *with* ECF No. 55 (Second Amended Complaint).) Raemisch received the Second Amended Complaint no later than April 20, 2015. (*See* ECF No. 59.) Assuming Raemisch personally reviewed the Second Amended Complaint, he would have learned of Vasquez's allegation that multiple medical providers at Sterling repeatedly failed to take adequate steps to treat Vasquez's HCV, leading to end-stage liver disease and severe complications related to that diagnosis. (*See* ECF No. 99 at 3–9 (summary of Second Amended Complaint).)

Vasquez's Third Amended Complaint was accepted by the Court about ten months later, on February 16, 2016. (ECF No. 113.) The Third Amended Complaint alleges that Raemisch is liable both in his individual and official capacities. (*Id*. ¶ 10.) The basis for his alleged individual liability is, in essence, his inaction since learning of Vasquez's allegations in the Second Amended Complaint.

To understand Vasquez's unique theory, his allegations in the Third Amended Complaint regarding Raemisch's individual liability deserve to be quoted in full:

> 152. Defendant Raemisch is the CDOC Executive Director and has the authority to order any CDOC employee or agent to comply with any lawful order related to the performance of his or her job duties.
>
> 153. As a matter of CDOC policy and state and federal law, Defendant Raemisch is responsible for ensuring that prisoners in CDOC's charge receive adequate medical care. Specifically, Defendant Raemisch is charged with enforcing

8

CDOC policy that "ensure[s] that [prisoners] have access to medical care [that] is consistent with [the] community standard of care."

154.   CDOC policy, which Defendant Raemisch is charged with enforcing, requires that "[m]edical services [] be provided in a manner that ensures the maintenance of basic health and prevention of health deterioration."  The scope of medical services Defendant Raemisch and CDOC are charged with providing include "medical cases that, without treatment, could result in further deterioration of an essential nature of an offender's condition…."

155.   At least as early as March 18, 2015, Defendant Raemisch has been aware of Mr. Vasquez's medical condition as set forth herein by virtue of being a named Defendant in this lawsuit [in the Second Amended Complaint].

156.   As a defendant named in this lawsuit, Defendant Raemisch is responsible for educating himself about the basis for the lawsuit and making decisions about how to respond to the allegations made in it.

157.   As a defendant in this lawsuit, Defendant Raemisch is also aware of his employees' and agents' past and current deliberate indifference to Mr. Vasquez's serious medical needs.

158.   As the man in charge at CDOC, it falls to Defendant Raemisch to ensure constitutionally adequate medical care for prisoners when he is aware, as he is here, that his employees and agents are failing to provide such care.

159.   On April 8, 2015, Defendant Raemisch waived service of the Second Amended Complaint and acknowledged his obligation to respond to it.

160.   After the Court denied all Defendants' motions to dismiss, on November 19, 2015, Defendant Raemisch answered Mr. Vasquez's Second Amended Complaint.

161.   In his Answer, Defendant Raemisch, speaking on behalf of CDOC, denies every single allegation against him. As to the vast majority of the allegations against him,

Defendant Raemisch says that he has no knowledge. Based on his responses to the allegations in Mr. Vasquez's Second Amended Complaint, CDOC is apparently unaware of the date on which Mr. Vasquez entered CDOC custody, where Mr. Vasquez has lived while in CDOC custody, that Mr. Vasquez has been diagnosed with HCV, or what the current status of his condition is.

162.   Defendant Raemisch's "without information and belief" denials are all made even though he has in his custody and control documentation confirming each and every allegation relating to Mr. Vasquez's current state of health. That documentation was created by Mr. Raemisch's own employees and agents and is both incontrovertible and uncontroversial.

163.   Defendant Raemisch did not retrieve Mr. Vasquez's medical records before responding to Mr. Vasquez's allegations against him, nor did he take any other measures to evaluate Mr. Vasquez's treatment needs and ensure, as CDOC policy requires, that those needs are being met by his staff.

164.   In sum, Defendant Raemisch has not a clue what Mr. Vasquez's medical needs are or what any medical provider has to say about appropriate treatment of those needs, but he is definitely sure that he is not violating Mr. Vasquez's Eighth Amendment rights.

165.   On information and belief, Defendant Raemisch chose not to investigate Mr. Vasquez's allegations that he is dying because Mr. Vasquez is suing CDOC and various of its employees and agents.

166.   While Defendant Raemisch was burying his head in the sand, CDOC approved use of a contemporary HCV treatment called Harvoni.

167.   Harvoni is revolutionary in that even sufferers of HCV with advanced stage liver disease can safely receive the treatment. That distinguishes Harvoni from traditional HCV anti-viral treatment, which people with serious liver damage, like that Mr. Vasquez has suffered, cannot receive.

168. Harvoni is also revolutionary in that it actually cures HCV, which anti-viral therapies do not.

169. Harvoni also allows for a simple course of treatment, consisting of a pill a day for eight weeks.

170. Mr. Vasquez is medically eligible to receive Harvoni treatment.

171. Mr. Vasquez is eligible, according to CDOC policy, to receive Harvoni treatment.

172. Receiving Harvoni will stop the progression of Mr. Vasquez's liver disease occurring as a consequence of his untreated HCV.

173. Mr. Vasquez is personally aware of two people at [Sterling] who have received Harvoni since July 2015, and on information and belief, there are at least two others.

174. At the same time, Mr. Vasquez has gotten sicker and sicker, suffering from increasing (and unsafe) ammonia levels, infection, edema, jaundice, and abdominal swelling. In response to these symptoms, rather than treat Mr. Vasquez's HCV, CDOC has prescribed rest, antacid, and a chili-mac free diet.

175. Mr. Vasquez is rapidly deteriorating and is receiving no meaningful medical care at this point.

176. In response to Mr. Vasquez's condition, Mr. Vasquez's counsel notified Defendant Raemisch, through his counsel, that Mr. Vasquez would be filing a motion for temporary restraining order to compel Defendant Raemisch to cease withholding treatment from Mr. Vasquez. Mr. Vasquez's counsel requested Defendant Raemisch's position on the motion, and specifically notified him:

> We are aware that at least two, and possibly three people with less advanced HCV symptoms than Mr. Vasquez's are receiving Harvoni at [Sterling]. This is a safe treatment with a high likelihood of efficacy for Mr. Vasquez and we are unaware of any reason he should not also be receiving it. It would appear, then, that [Sterling] is actively withholding the

> drug for unknown reasons that I sincerely hope do not include that Mr. Vasquez is currently suing the Department and various of its current and former staff members for access to he very medical treatment he is being denied.
>
> 177. In this conferral e-mail, Mr. Vasquez's counsel requested that Defendant Raemisch's counsel advise as to the Department's position on Mr. Vasquez's proposed motion and if the motion was opposed, why.
>
> 178. Moreover, Mr. Vasquez's counsel specifically advised Defendant Raemisch, through his counsel:
>
>> Of course, the easier course for all of us is that CDOC just treats Mr. Vasquez. I will remain optimistic that this is the course your client chooses. If Mr. Raemisch is reticient [*sic*] to take that path, please do remind him that he is on notice of Mr. Vasquez's ever-worsening medical condition via this lawsuit and his continued disregard of Mr. Vasquez's medical needs, now ongoing for over nine months, subjects him to individual capacity liability as well.
>
> 179. In response, Defendant Raemisch's counsel said nothing more than, "As for the TRO, I would oppose the motion."
>
> 180. Similarly, Defendant Raemisch refuses to even discuss resolving this matter—*i.e.*, providing Mr. Vasquez with treatment—with Mr. Vasquez.
>
> 181. In other words, when faced with an express opportunity to agree to secure necessary treatment for Mr. Vasquez, Defendant Raemisch continues willfully ignore and disregard Mr. Vasquez's serious medical need.
>
> 182. There is no medical justification for Defendant Raemisch's decision to tell Mr. Vasquez to kick rocks in response to his request that Defendant Raemisch ensure that Mr. Vasquez receives the treatment he needs.

(ECF No. 113.)

For various reasons explained below, the Court finds this theory not cognizable as a matter of law.

**C.      The Bootstrapping Problem**

Vasquez's allegations present a theory that could lead to liability for any supervisor, immediate or otherwise, under the following circumstances:

1.   The complaint alleges continuing (not only historical) abuses by subordinates;

2.   The supervisor is made aware of the complaint's allegations, such as through service of process as an official-capacity defendant;

3.   The lawsuit progresses for a certain amount of time; and

4.   The supervisor refuses to discuss settlement, confess judgment, or otherwise accede to the plaintiff's demands.

In other words, Vasquez attempts to bootstrap official-capacity liability into individual-capacity liability after a sufficient amount of time has passed.

There is no conceivable limit to the supervisors that a plaintiff could reach under this approach, as long as the supervisor in question is somewhere up the chain of command from a defendant against whom the plaintiff alleges direct liability. Under the allegations of this case, for example, Sterling's warden and the governor of Colorado could be just as liable as Raemisch. If Vasquez had been housed in a federal prison, the Attorney General and the President could be just as liable as any official in the Bureau of Prisons.

Vasquez cites no authority in support of such a theory, and the Court is confident that it goes far beyond the narrow theory of supervisory liability acknowledged by the

Supreme Court and the Tenth Circuit.

### D. Liability for Defending the Lawsuit

Vasquez's theory also raises the prospect of holding a supervisor liable simply because the supervisor chooses to defend against a lawsuit. A party may not defend with frivolous theories, of course, *see, e.g.*, Fed. R. Civ. P. 11(a)–(b), but Vasquez does not allege that a Raemisch stakes his defense on a frivolous theory. Vasquez simply alleges that he must have Harvoni and no one could possibly disagree.[3] The Court will not hold that a defendant with a good faith defense may be liable *purely because* the defendant chose in good faith to disagree.

Indeed, proceedings in this case since the Third Amended Complaint demonstrate the wisdom in permitting a defendant to litigate a good faith disagreement, particularly when medical judgment is involved. Vasquez's allegations quoted above focus on his demands for Harvoni, but Vasquez's own expert later admitted that Harvoni is not appropriate for the form of HCV with which Vasquez is infected (HCV genotype 3). (*See* ECF No. 126 at 4, 5, 9–10.) Thus, if Raemisch had done as Vasquez apparently expected—*i.e.*, immediately ensured that Vasquez received Harvoni—he would have ordered a medically inappropriate treatment.

### E. Attorney-Client Privilege Complications

The Supreme Court has declared that, "in a § 1983 suit[,] . . . masters do not answer for the torts of their servants." *Iqbal*, 556 U.S. at 677. The Supreme Court

---

[3] Vasquez justifiably complains that Raemisch's answer to the Second Amended Complaint pleaded lack of sufficient information to admit or deny basic facts such as the date that Vasquez entered CDOC custody. (*See* ECF No. 113 ¶¶ 161–62.) But Vasquez does not explain how this equates to a frivolous defense.

could have easily have substituted "agents" for "servants."

Here, Vasquez in part seeks to hold Raemisch liable for a decision that may have been made by Raemisch's agents, *i.e.*, his attorneys. Specifically, Vasquez complains that Raemisch's counsel opposed Vasquez's motion for a temporary restraining order. (ECF No. 113 ¶¶ 176–79.) Vasquez's allegations could also be construed as imposing liability generally for decisions usually made by attorneys (*e.g.*, how to defend the lawsuit).

Potentially holding Raemisch liable on this account raises the possibility that discovery must eventually explore attorney-client privileged communications. For example, to ensure that Raemisch is not held liable for his agents' decisions, discovery would appear to be required into whether Raemisch or his attorneys made the various decisions that, according to Vasquez, create supervisory liability. Assuming without deciding that this basic fact (who made the decision?) is not protected by the attorney-client privilege, decisions admittedly made by Raemisch nonetheless probably involved consultation with and advice from his attorneys—or at least it is difficult to imagine how Raemisch could make a litigation decision without being informed about the need for a decision from his attorneys.

Raemisch's decisions could not be fairly evaluated without also understanding the advice he received from his attorneys, but such advice is almost always protected by the attorney-client privilege. Vasquez's theory, in other words, would almost always require the supervisory defendant to waive the attorney-client privilege to present a proper defense. This is an additional reason counseling against recognizing the theory Vasquez currently proposes.

### III.  CONCLUSION

For the reasons set forth above, the Court ORDERS as follows:

1. Defendant Rick Raemisch's Motion to Dismiss (ECF No. 136) is GRANTED;

2. Vasquez's claim against Raemisch in his individual capacity is DISMISSED WITH PREJUDICE; and

3. The Clerk shall LIFT THE STAY related to Raemisch (ECF No. 156) and TERMINATE Raemisch as a party in his individual capacity, but shall maintain Raemisch as a party in his official capacity.

Dated this 30th day of November, 2016.

BY THE COURT:

William J. Martinez
United States District Judge