IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Judge William J. Martínez**

Civil Action No. 14-cv-1433-WJM-CBS

JIMMY JOSEPH VASQUEZ,

     Plaintiff,

v.

JEANNE DAVIS, in her individual capacity,
KATHLEEN MARTORANO, in her individual capacity,
BRIAN WEBSTER, in his individual capacity,
GATBEL CHAMJOCK, in his individual capacity,
KATHLEEN MELLOH, in her individual capacity,
MAURICE FAUVEL, in his individual and official capacities, and
RICK RAEMISCH, in his official capacity,

     Defendants.

---

## ORDER ON PENDING SUMMARY JUDGMENT MOTIONS

---

Plaintiff Jimmy Joseph Vasquez is an inmate in the custody of the Colorado

Department of Corrections ("CDOC") and housed at the Sterling Correctional Facility

("Sterling").  (ECF No. 113 ¶ 1.)  He is infected with the hepatitis C virus ("HCV").  (*Id.*

¶ 42.)  Vasquez brings this lawsuit under the Eighth Amendment to the U.S.

Constitution, alleging that various CDOC employees or former employees (collectively,

"Defendants") were deliberately indifferent over many years to the effects that HCV was

having on him.  Due to that indifference, he claims he developed end-stage liver

disease that will likely kill him absent a liver transplant.  (*Id.* at 1–2.)  Subsequent

developments have cast doubt on whether Vasquez in fact requires, or will ever require,

a liver transplant.  (*See* Part II.B.11, below.)  But Vasquez nonetheless appears to face

lifelong complications from the effects of HCV on his liver.

Currently before the Court are the parties' cross-motions for summary judgment. Specifically:

- Defendants Davis, Fauvel, Martorano, Melloh, Raemisch, and Webster (collectively, "State Defendants") move for summary judgment on all of Vasquez's claims (ECF No. 152);

- Defendant Chamjock separately moves for summary judgment on all of Vasquez's claims (ECF No. 151); and

- Vasquez moves for partial summary judgment on all Defendants' liability, leaving only damages and the scope of injunctive relief for trial (ECF No. 154).

These motions frame well the issues in this difficult case. The thrust of Vasquez's claim is that he was caught in a Catch-22 scenario where he was required under CDOC medical guidelines to take certain drug and alcohol resistance courses before being authorized to receive HCV treatment, yet CDOC offered no such classes for inmates of Vasquez's high-security classification at Sterling. Thus, Vasquez's disease progressed unabated to the point where it caused substantial liver damage.

Vasquez claims that "[s]omeone is responsible to [him] for years of pain, suffering, and emotional distress, as well as his shortened life and the substantially decreased quality of that life; the only question is who." (ECF No. 154 at 27.) The answer to Vasquez's question would be fairly straightforward if he could sue CDOC directly for the damages caused by its policy. Vasquez himself claims that "the reason [he] did not receive adequate treatment" was simply that "he was in a high security

2

prison" (ECF No. 154 at 26), meaning he was caught in the trap created by the combination of the drug and alcohol education policy, his high security status, and CDOC's apparent unwillingness to offer the proper classes to high-security Sterling inmates.  Thus, it would seem that CDOC's policies, or perhaps those officials responsible for not authorizing the appropriate classes at Sterling, were the moving force behind Vasquez's injury.

Under the Eleventh Amendment, however, Vasquez cannot sue CDOC itself for damages.  And, for whatever reason, Vasquez has chosen not to sue those who made or enforced the relevant policies.  *Cf. Roe v. Elyea*, 631 F.3d 843, 858–67 (7th Cir. 2011) (affirming jury verdict against former Illinois Department of Corrections chief medical officer who had promulgated a policy categorically requiring all HCV treatment candidates to have at least two years left on their sentences before the prison system would consider treatment); *Johnson v. Wright*, 412 F.3d 398, 403–05 (2d Cir. 2005) (holding that a trial was necessary to determine whether senior prison officials were deliberately indifferent in enforcing a policy that denied HCV treatment to inmates with evidence of active substance abuse).  Vasquez has instead sued a chain of individual medical professionals and one case manager employed at Sterling, alleging that all "were aware of [his] hepatitis C and the risk it posed to his health, yet did nothing to ensure his access to treatment for the disease."  (ECF No. 154 at 27.)

Vasquez thus frames this case under a "gatekeeper" theory of Eighth Amendment liability.  *See, e.g.*, *Mata v. Saiz*, 427 F.3d 745, 751 (10th Cir. 2005) ("A prison medical professional who serves solely as a gatekeeper for other medical personnel capable of treating the condition may be held liable under the deliberate

indifference standard if she delays or refuses to fulfill that gatekeeper role." (internal quotation marks omitted; alterations incorporated)).  But two unusual factors present in this case complicate the gatekeeper framework in this case.  First, CDOC policies and practices themselves were to some degree the actual gatekeeper(s), and the individual Defendants whom Vasquez has chosen to sue had little or no control over them. Second, to the extent HCV causes serious symptoms (which it does only in about one-fourth of chronically infected individuals), it is nonetheless a slowly progressing disease, not usually manifesting itself as an acute condition that always and obviously requires immediate treatment.

In light of these considerations and for the reasons explained at length below, the Court rules as follows:

- Defendants Davis, Martorano, and Fauvel are entitled to judgment as a matter of law both as to liability and as to qualified immunity;

- Defendants Webster and Melloh are at least entitled to qualified immunity;

- Defendant Chamjock (who did not seek dismissal on the basis of qualified immunity) could conceivably be liable to Vasquez, but Vasquez filed his complaint against Chamjock too late; and

- the Court's All Writs Act injunction entered on February 29, 2016 will persist after final judgment.

Accordingly, the various Defendants' summary judgment motions are granted and Vasquez's summary judgment motion is denied.  Final judgment will enter, but the Court will retain jurisdiction to enforce its All Writs Act injunction.

4

# I.  LEGAL STANDARD

Summary judgment is warranted under Federal Rule of Civil Procedure 56 "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–50 (1986).  A fact is "material" if, under the relevant substantive law, it is essential to proper disposition of the claim.  *Wright v. Abbott Labs., Inc.*, 259 F.3d 1226, 1231–32 (10th Cir. 2001).  An issue is "genuine" if the evidence is such that it might lead a reasonable trier of fact to return a verdict for the nonmoving party.  *Allen v. Muskogee*, 119 F.3d 837, 839 (10th Cir. 1997).

In analyzing a motion for summary judgment, a court must view the evidence and all reasonable inferences therefrom in the light most favorable to the nonmoving party.  *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998) (citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).  In addition, the Court must resolve factual ambiguities against the moving party, thus favoring the right to a trial.  *See Houston v. Nat'l Gen. Ins. Co.*, 817 F.2d 83, 85 (10th Cir. 1987).

# II.  FACTS

The following narrative is undisputed unless otherwise noted.

## A.    HCV Among CDOC Prisoners

### 1.    HCV and its Treatments

HCV is an infection acquired usually through blood-to-blood contact, such as through sharing needles or reuse of unsterilized tattoo equipment.  (ECF No. 152 at 2,

¶ 5.)[1]  Between 15% and 20% of those infected with HCV will clear the infection

spontaneously.  (*Id*. at 3, ¶ 7.)  For the remainder, HCV becomes a chronic infection,

but approximately 75% of this group nonetheless suffer no serious problems.  (*Id*.

¶¶ 8–10, 13.)  The other 25% face progressive liver damage leading to cirrhosis.  (*Id*.

¶ 10.)  Sometimes this cirrhosis requires two or three decades to manifest itself.  (*Id*.

¶ 11.)

        Between 1998 and 2011, the only treatment for HCV was an antiviral regimen

that combined pegylated interferon with ribavirin.  (*Id*. at 4, ¶ 19.)  Such antiviral

treatment was contraindicated, however, for individuals with decompensated liver

cirrhosis.  (*Id*. at 5, ¶¶ 21–22.)  In 2011, additional medications were approved, but they

supplemented rather than replaced interferon/ribavirin.  (*Id*. ¶ 24.)

        In 2013, Sovaldi entered the market, which could be used together with

interferon/ribavirin, or solely with ribavirin.  (*Id*. ¶ 25.)  In 2014, Harvoni entered the

market, which can be prescribed on its own (*i.e.*, it need not be combined with any other

drug).  (*Id*. ¶ 26.)  However, Harvoni has not been approved to treat HCV genotype 3

(which, as described below, turns out to be the form with which Vasquez is infected).

(*See* ECF No. 126 at 4, 5, 9–10.)  HCV genotype 3 is most effectively treated with a

combination of Sovaldi and ribavirin.  (*Id*. at 4; ECF No. 152 at 5, ¶ 25.)

        2.    CDOC Protocols for Treating HCV

        None of the foregoing HCV treatments creates immunity against reinfection.

(ECF No. 152 at 6, ¶ 31.)  Moreover, HCV treatment can be costly—from $40,000 to

---

        [1] All ECF page citations are to the page number in the ECF header, which does not always match the document's internal pagination, particularly in exhibits.

$160,000, depending on the length of treatment, according to CDOC's chief medical officer, Dr. Susan Tiona.  (ECF No. 154-7 at 6.)  Thus, CDOC's treatment standards for HCV "place strong emphasis on treatment of substance abuse issues prior to treatment for [HCV], as well as avoidance of high risk behaviors such as tattooing and the consumption of alcohol."  (ECF No. 152 at 6, ¶ 30.)[2]  In other words, CDOC wishes to reduce the likelihood that a course of antiviral drugs will be nullified by a prisoner's later actions.  (ECF No. 154 at 7, ¶ 29.)  CDOC inmates seeking HCV treatment must therefore complete a drug and alcohol ("D&A") resistance education program.  (*Id*.)

Vasquez claims that CDOC's treatment standards direct medical providers to fill out various forms and refer HCV-positive inmates for treatment very soon after diagnosing HCV.  (*Id*. at 6, ¶ 23.)  There is no basis in the record for this claim.  To the contrary, CDOC's standards explicitly and repeatedly place the onus on the inmate to request HCV treatment and to provide notice of completing its prerequisites.  (*See* ECF No. 154-8 at 5, 6, 7, 14, 18, 21; ECF No. 154-17 at 5, 6, 7, 14, 18, 21; ECF No. 154-18 at 10, 43; ECF No. 154-19 at 10, 45.)  Accordingly, any inmate who "requests treatment for hepatitis C" (ECF No. 154-8 at 5) first needs to obtain a "D&A contract" from a medical provider (ECF No. 154 at 8, ¶¶ 36–37).  The D&A contract explains that "CDOC does not believe that treatment should be given to patients who are likely to become reinfected."  (ECF No. 154-8 at 19 (emphasis removed).)  Inmates therefore must commit to attending a six-month set of D&A classes before receiving treatment, and must continue in such classes during the course of treatment.  (*Id*.)  Any sign of

---

[2] Alcohol consumption itself would not lead to infection, but CDOC views it as "evidence of ongoing high risk behavior."  (*Id*. at 7, ¶ 32.)

noncompliance could lead to a requirement that the classes be repeated, and also to cessation of HCV treatment, if already underway.  (*Id*. at 19–20.)

Once a patient signs this contract, the CDOC medical provider is responsible for completing a referral form "that directs the drug and alcohol education department to enroll the patient" in D&A classes.  (ECF No. 154 at 8, ¶ 38.)  If such classes are not available where the inmate is incarcerated, CDOC policy has stated since at least 2004 that the inmate would be transferred to a suitable facility within sixty days of receiving the referral form.  (*Id*. ¶ 39.)

There have been "obstacles," however, "in car[ry]ing this out in reality[.]"  (ECF No. 152 at 7, ¶ 35.)  In particular, a prisoner's security classification could get in the way of an otherwise appropriate transfer, and CDOC medical personnel could not override the security classification.  (*Id*.; ECF No. 164 at 4, ¶ 35.)

Apparently in light of these problems, CDOC in 2008 relaxed its requirements somewhat.  (ECF No. 154 at 8, ¶ 41.)  Rather than requiring "'formal' drug and alcohol classes" (which the Court takes to mean D&A classes specifically developed or sponsored by CDOC), "CDOC medical administrative staff instructed providers that the drug and alcohol requirement could be satisfied by enrollment in any drug and alcohol program available at [an HCV-positive inmate's] assigned facility."  (*Id*. at 8–9, ¶¶ 40, 42.)  Under that directive, "attending [A]lcoholics [A]nonymous meetings for six months" could satisfy the prerequisite.  (*Id*. at 9, ¶ 43.)  Then, in 2012, CDOC returned to the requirement of "'formal' drug and alcohol classes," but made those classes available at all facilities regardless of an inmate's security classification.  (*Id*. ¶ 44.)

8

Assuming an inmate enrolls in the appropriate classes, "[i]t is [the inmate's] responsibility to provide medical services with proof of his or her completion of the six (6) months of substance abuse education." (ECF No. 154-8 at 7.) At that point, medical personnel must order a liver biopsy to determine the degree of damage, if any, already inflicted on the liver. (*Id*. at 9.) Inmates with only mild damage are monitored regularly but do not receive treatment. (*Id*.) The remainder "will be considered for enrollment in the [antiviral] protocol." (*Id*.)

**B.     Vasquez's Experience With HCV in CDOC Custody**

  1.   DRDC, Sterling Intake, and Davis's Testing Orders (October–November 2004)

Vasquez entered CDOC custody at CDOC's Denver Reception and Diagnostic Center ("DRDC") in October 2004. (ECF No. 154 at 3, ¶¶ 1, 4, 7; ECF No. 154-1.) Blood tests conducted by DRDC staff revealed that Vasquez was infected with HCV. (ECF No. 154 at 3, ¶ 4.) Vasquez was then given a two-page handout explaining HCV and then-current treatment protocols involving a liver biopsy and interferon/ribavirin. (*Id*. ¶ 7.)

The State Defendants claim that this document informed Vasquez of his responsibility "to coordinate with his case manager in order to [enroll in D&A classes]." (ECF No. 152 at 8, ¶ 37.) However, all parties agree that Vasquez was given the document known as "Attachment B," found in the record at Vasquez's summary judgment Exhibit 8, pages 16–17 (ECF No. 154-8 at 16–17). The Court has reviewed Attachment B. It says nothing about D&A classes, or about the allocation of responsibility between the inmate and any other party in terms of requesting treatment.

9

Vasquez was transferred from DRDC to Sterling in November 2004. (ECF No. 154 at 4, ¶ 9; ECF No. 166 at 3, ¶ 9.) Soon after, Defendant Davis, a nurse practitioner, conducted an intake review of Vasquez's medical file, and noted his HCV diagnosis. (ECF No. 154 at 4, ¶ 14.) Davis ordered that Vasquez undergo additional lab testing in six months to determine whether Vasquez's HCV was chronic. (*Id*. at 5, ¶ 15.)

## 2.   Interactions with Martorano (March 2005)

On March 14, 2005, Vasquez asked his case manager at that time, Defendant Martorano, for assistance in enrolling in D&A classes so he could eventually get treatment for his HCV. (*Id*. at 9, ¶ 46.)[3] Vasquez's problem was that he was housed on Sterling's west side, which was the high-security side of the facility, and it did not at that time offer the appropriate classes. (*Id*. at 10, ¶ 49.) Martorano told Vasquez that he should go to Alcoholics Anonymous every weekend because "maybe that would help some." (*Id*. ¶ 47.) However, attending Alcoholics Anonymous would not have helped Vasquez at that time. (*Id*. ¶ 48.) As previously noted, only from 2008–12 did CDOC accept non-"formal" D&A classes as satisfying the pre-treatment requirements.

Thus, in 2005, Vasquez's only way of attending D&A classes would have been through a transfer to a CDOC facility that accommodated high-security inmates *and* offered the appropriate classes. CDOC's Limon Correctional Facility fit that description, and Martorano noted in her offender contact log for March 30, 2005, that she would "check into" the possibility of transferring Vasquez to Limon. (*Id*. ¶ 51.) There is no

---

[3] In other words, at least by this date, Vasquez understood the D&A education prerequisite.

record in Martorano's contact log that she in fact checked into such a transfer.  (*See* ECF No. 154-21.)  In her deposition in this case, Martorano testified that she could not remember whether she in fact checked into the transfer possibility, but she stated that it was her normal practice to follow up on such matters and so she assumes she did. (ECF No. 166-6 at 6–8.)

These interactions with Martorano in March 2005 are the only interactions the parties bring to the Court's attention.  It is unclear when Martorano ceased being Vasquez's case manager.

### 3.   Davis Confirms the Chronic Status of Vasquez's HCV (May 2005)

In May 2005, Sterling medical staff performed the follow-up tests ordered by Davis upon her intake review six months earlier.  Reviewing those tests, Davis confirmed Vasquez's chronic HCV diagnosis on May 27, 2005.  (*Id*. ¶ 16.)  Davis then sent a handwritten note to Vasquez informing him that he was eligible for HCV treatment but first needed to complete six months of D&A classes.  (*Id.* at 6, ¶ 26.) Davis further instructed Vasquez to "kite medical [*i.e.*, send a written request to Sterling's medical clinic] if he was interested in receiving treatment."  (*Id.* ¶ 27.) Vasquez did not submit a kite at this time, and Davis had no further interaction with Vasquez.

### 4.   Early Interactions with Webster (August 2006–January 2008)

Defendant Webster, a physician's assistant at Sterling, apparently first became aware of Vasquez in August 2006.  That is when Vasquez visited Webster complaining of chronic headaches.  (ECF No. 154-12 at 1.)  Webster wrote on the patient record for

that visit that Vasquez's "LFT's were very high last year" (*id.*), referring to abnormal results from liver function tests.  Webster also wrote "HCV" in the "Assessment" portion of the patient record.  (*Id.*)  Webster took no action aimed at treating Vasquez's HCV.  (ECF No. 154 at 13, ¶ 67.)

In October 2006, Webster reviewed new laboratory results from Vasquez and noted "LFT's are elevated, but lower than in the past...HCV Pos[itive]."  (ECF No. 154-12 at 2.)  In November 2006 and January 2007, Webster had follow-up visits with Vasquez about his headaches.  (ECF No. 154 at 13, ¶¶ 70–71.)

In October 2007, Webster received a kite from Vasquez for renewal of his Zantac and Colace prescriptions, which Webster renewed.  (*Id.* ¶ 72; ECF No. 154-28 at 2.)  No party argues that either Zantac or Colace was meant to treat symptoms of HCV or liver disease.  The Court therefore assumes that an unrelated medical condition was forefront in Vasquez's mind at the time.  Webster nonetheless noted "LFT's in 300's" (*id.*), which Webster says is "bad" (ECF No. 152-8 at 23).  Webster ordered "H. Pylori IgM Ab, LFT's" (ECF No. 154-28 at 2), which Vasquez views as tests aimed at his HCV diagnosis (*see* ECF No. 154 at 13–14, ¶ 72 (noting Webster's request for the lab tests and stating that Webster "took no *further* action with respect to Mr. Vasquez's hepatitis C" (emphasis added))).  Webster also added HCV to Vasquez's "active problems list."  (*Id.*)  No party explains the significance of the active problems list.

Webster reviewed the results of the lab work in December 2007.  (*Id.* at 14, ¶ 73.)  Those labs came back positive for the bacterium *H. pylori* and Webster ordered certain prescriptions in response.  (ECF No. 154-28 at 3.)  No party explains the

significance of these actions, if any, with respect to Vasquez's HCV diagnosis.

In January 2008, Webster reviewed lab results that showed Vasquez's "high liver enzyme . . . numbers." (ECF No. 154 at 14, ¶ 74.)

In February 2008, Vasquez completed the "Right Start - Right Step Drug and Alcohol Program." (ECF No. 154 at 11, ¶ 54; ECF No. 154-43.) No party explains the significance of this accomplishment. In particular, no party argues that Vasquez then became qualified to receive D&A classes.

5.   Interactions with Both Webster and Chamjock, and Diagnosis of Cirrhosis (May 2008–March 2009)

Defendant Chamjock, another physician's assistant at Sterling (ECF No. 105 ¶ 6), entered the picture in May 2008 (ECF No. 151 at 3, ¶ 10). Chamjock at that time "conducted a chart review of [Vasquez's] medical chart after [Vasquez] submitted a [k]ite requesting renewal of his medication for Irritable Bowel Symptoms[4] ('IBS') and Gastroesophageal reflux disease ('GERD')." (*Id.*) Through this chart review, Chamjock learned that Vasquez had untreated HCV. (ECF No. 154 at 14, ¶ 75.) Chamjock refilled Vasquez's prescriptions. (*Id.*)

On June 5, 2008, Webster again saw Vasquez and again noted his HCV and labwork numbers suggesting liver damage. (*Id.* ¶ 76.)

On June 20, 2008, Webster noted additional troubling labwork, including high ammonia levels, and diagnosed Vasquez with cirrhosis of the liver. (*Id.* ¶ 77; ECF No. 152 at 13, ¶¶ 69–70.) Webster also called Vasquez in to the clinic to speak with him

---

[4] So in original. The Court normally sees this illness referred to as irritable bowel *syndrome*.

about his condition.  (*Id*. ¶ 77.)  Webster met with Vasquez later that same day and, according to the patient record for that visit, "advise[d] him of worsening of Liver from HCV.  He is confused."  (ECF No. 154-30 at 4.)

The significance of the notation regarding confusion is unclear.  In particular, it is not clear whether Vasquez was confused specifically about what Webster had told him, or whether Vasquez showed general confusion (a common manifestation of high ammonia levels, *see* ECF No 152 at 13, ¶ 71).  Moreover, no party claims that Webster or anyone else informed Vasquez at that time of the cirrhosis diagnosis specifically (as opposed to telling Vasquez more generally that his liver was "worsening").  In any event, Webster gave Vasquez a prescription for Lactulose, a drug that treats high ammonia levels but does not treat HCV or liver damage.  (ECF No. 154 at 14, ¶ 78.)

On June 25, 2008, Webster noted on a patient record for Vasquez, "[r]ecent Liver labs all worsening" and "consider liver U.S. [ultrasound] if sx [symptoms] worsen." (ECF No. 154-30 at 6.)  Webster "wrote this note [regarding a liver ultrasound] so that he could have Vasquez monitored for a potential liver tumor."  (ECF No. 152 at 13, ¶ 74.)

In December 2008, Webster noted additional labwork showing "LFT's down into 250's" but "Ammonia is elevated to 250's."  (ECF No. 154-30 at 8.)  Webster again prescribed Lactulose.  (ECF No. 152 at 14, ¶ 76.)

In March 2009, Vasquez began complaining of severe abdominal pain.  (ECF No. 154 at 15, ¶ 80.)  In response, Webster ordered liver function labs.  (*Id*. ¶ 81; ECF No. 154-31 at 2.)  On the record as presented by the parties, this is the last time Webster had any contact with Vasquez or his medical file.

14

At his deposition in this case, Webster explained that, during his various years of interaction with Vasquez, he never referred Vasquez to D&A classes for two reasons. First, Webster believed that no such classes were available for inmates with Vasquez's security classification (ECF No. 152-8 at 5, 9, 13, 18), which may have been an incorrect belief in 2008–12 (the period in which informal D&A classes were deemed acceptable, *see* Part II.A.2, above).   Second, Webster believed that cirrhosis of the severity he diagnosed in June 2008 disqualified a patient from receiving HCV treatment. (ECF No. 152-8 at 5, 16, 17, 18, 22.)[5]   Vasquez does not dispute that Webster held the latter belief, but claims that it was incorrect—and the State Defendants do not argue otherwise.

6.   Interactions Chamjock (May–November 2009)

On May 14, 2009, Chamjock received and reviewed the lab results that Webster had ordered earlier that year.   (*Id.*)[6]   Chamjock's patient record for that day notes Vasquez's history of HCV and "possible cirrhosis of the liver."   (ECF No. 154-31 at 3.) With regard to the lab results, Chamjock "suspected that [Vasquez] might be suffering from pancreatitis or cholecystitis."   (ECF No. 151 at 4, ¶ 12.)   Chamjock requested a CT

---

[5] Relying on Webster's deposition testimony, Vasquez claims that his high security classification was the "sole reason" Webster did not refer him for D&A classes.   (ECF No. 164 at 7, ¶ 77.)   The Court has reviewed the various Webster deposition excerpts submitted by the parties and finds Vasquez's claim unfounded.   Webster repeatedly attributes his lack of referral both to Vasquez's custody status and to Vasquez's cirrhosis, which he believed disqualified Vasquez from HCV treatment.   (*See* ECF No. 152-8 at 5, 9, 13, 16–18, 22.)

[6] The parties dispute the reason why Chamjock reviewed these lab results instead of Webster.   Chamjock says that he reviewed the results because Webster was not there on the day the results came in.   (ECF No. 151 at 4, ¶ 12.)   Vasquez says that Chamjock reviewed the results because it was Chamjock's responsibility to do so.   (ECF No. 163 at 2, ¶ 11.)   It is not clear that this dispute is material.

scan of Vasquez's liver and pancreas but Correctional Healthcare Partners (an entity that acts as a health insurance administrator for CDOC) would not approve that procedure, so Chamjock ordered an ultrasound instead.  (*Id*. ¶ 13; ECF No. 154 at 15, ¶ 82 & n.1.)

Chamjock saw Vasquez in person for the first time on June 17, 2009, when Vasquez came to the Sterling clinic complaining of abdominal pain.  (ECF No. 151 at 4, ¶ 14.)  Vasquez apparently attributed this pain to the lapse of a Zantac prescription. (*Id*.)  Chamjock's patient record for that visit notes Vasquez's history of "ESLD," *i.e.*, end-stage liver disease.  (ECF No. 154-31 at 5.)  The patient record also notes a rash, jaundiced skin, yellowed corneas, and an enlarged liver.  (ECF No. 154 at 15, ¶ 83.) Chamjock prescribed Zantac and, for the rash, a topical cream, and also requested the results of the ultrasound he had ordered the previous month.  (*Id*.; ECF No. 151 at 4, ¶ 14.)

Chamjock received the ultrasound results on the following day, June 18, 2009. (ECF No. 154 at 14, ¶ 84.)  "The ultrasound returned no results related to an acute condition, but confirmed that Mr. Vasquez's liver had a 'dense echo pattern suggestive of either fatty infiltration of the liver or chronic liver disease.'"  (*Id*. (quoting ECF No. 154-32 at 1).)  Chamjock sent Vasquez a note informing him that the ultrasound was "negative" (*id*.), apparently meaning negative for pancreatitis or a tumor (*see* ECF No. 154-10 at 7).

On June 25, 2009, Chamjock responded to a medical kite for renewal of Vasquez's Lactulose (ammonia-reducing) medication.  (ECF No. 154 at 60, ¶ 86.)

Chamjock renewed that prescription, as requested.  (*Id.*)

On August 4, 2009, Chamjock saw Vasquez in person to follow up on the rash first noticed in June.  (*Id.* ¶ 87.)  The patient record for that visit contains nothing specific to HCV.  (*See* ECF No. 154-31 at 7.)

On November 4, 2009, Chamjock again renewed Vasquez's Zantac prescription. (ECF No. 154 and 16, ¶ 88.)  The patient record for that action similarly contains nothing specific to HCV.  (*See* ECF No. 154-31 at 8.)

7.    Interactions with Chamjock and Melloh (March–September 2010)

Defendant Melloh, a physician's assistant at Sterling, apparently first became aware of Vasquez in March 2010, when she responded to a medical kite to refill Vasquez's Zantac prescription.  (ECF No. 152 at 15, ¶ 83.)  Melloh reviewed Vasquez's chart and learned of his HCV and liver problems.  (ECF No. 154 at 16, ¶ 89.)  Melloh renewed the Zantac prescription and also ordered labwork that included a liver function test.  (ECF No. 152 at 15, ¶ 84; ECF No. 154-33 at 1.)  Melloh ordered the labwork not in response to Vasquez's HCV, but because she orders such tests for all of her patients on a yearly basis.  (ECF No. 152 at 15, ¶ 85.)

Vasquez claims the labwork "revealed that, indeed, [his] liver enzymes were elevated."  (ECF No. 154 at 16, ¶ 91.)  The State Defendants dispute this because "it is not clear what [Vasquez] is referring to on the cited document [showing the lab results]." (ECF No. 166 at 11, ¶ 91.)  Vasquez does not claim that Melloh (or anyone else at Sterling) received and reviewed these results.

In May 2010, Chamjock saw Vasquez apparently for the last time.  (ECF No. 154 at 17, ¶ 93.)  This was a follow-up visit related to Vasquez's abdominal pain.  (ECF No.

17

154-33 at 3.)  According to the patient record for that visit, Vasquez "[s]tated that his pain ha[d] almost subsided after taking his medications," but it was "off and on all the time" and "worse after eating big meals."  (*Id*.)  Vasquez also informed Chamjock that he had obtained "some spicy food" from the Sterling canteen.  (*Id*.)  Chamjock advised Vasquez "to stop eating spicy food and big meals late at night," and ordered another lab test to check for the *H. pylori* bacterium.  (*Id*.)  The patient record contains nothing specific to Vasquez's HCV or liver condition, although Vasquez "reported tenderness to deep palpation over [the] epigastric area and RUQ [*i.e.*, the right upper quadrant of the abdomen, where the liver is located]."  (*Id*.)

In September 2010, additional labwork on Vasquez was performed at Melloh's request.  (*See* ECF No. 154-34 at 2.)  Vasquez claims that this was the result of a request by Melloh, in March 2010, that "liver enzyme labs be re-done in six months." (ECF No. 154 at 17, ¶ 92.)  Vasquez further claims that Melloh "never followed up on the results" of these additional tests.  (*Id*.)  Vasquez's cited evidence, however, does not support these assertions.  The evidence shows only that Melloh ordered additional labwork (which was done) in September 2010.  (*See* ECF No. 154-34 at 2.)  It is not clear whether this labwork was specifically related to liver enzymes, nor whether Melloh "followed up on the results."

8.  <u>Interactions with Melloh and Fauvel, and Eventual Completion of D&A Classes (January 2012–January 2013)</u>

Apparently nothing of significance to the claims in this case happened in 2011. The next event the parties bring to the Court's attention occurred on January 14, 2012, when Vasquez was seen in the Sterling clinic "after complaints that he had been

vomiting blood." (ECF No. 152 at 16, ¶ 86.)  Clinic staff observed Vasquez vomiting into the toilet, although without any blood in the vomit. (*Id*. ¶ 88.)  Melloh was not on-site but was on-call and was contacted for a consultation. (*Id*. ¶ 87.)  Melloh prescribed I.V. fluids, Prilosec, and Phenergan for the nausea. (*Id*. ¶ 89.)

Melloh saw Vasquez in person two days later (January 16, 2012) and noted that he was feeling better. (ECF No. 154-35 at 5.)  Melloh also noted jaundiced skin, viewed certain (otherwise unspecified) lab results, and "issued a consultation for an ultrasound [of his liver], prescribed Lactulose and Prilosec, and reordered laboratory testing." (ECF No. 152 at 16, ¶ 92; ECF No. 154 at 17, ¶ 97.)

On January 18, 19, and 23, 2012, Vasquez submitted kites requesting assistance in getting enrolled in D&A classes. (ECF No. 152 at 11, ¶ 59; ECF No. 152-4 at 1.)  Defendant Fauvel addressed these kites.  Fauvel, a CDOC physician, first met with Vasquez in early February 2012 to follow up on Melloh's concerns regarding jaundice. (ECF No. 152 at 17, ¶ 95; ECF No. 152-11 at 30.)  Fauvel observed that Vasquez's skin now showed "only the slightest hue of jaundice." (*Id*.)  Fauvel noted Vasquez's interest in receiving HCV treatment, discussed the treatment protocol with Vasquez "at length," and referred him "back to [his] case manager to get [him] enrolled" in D&A classes. (*Id*.)

Around that same time, Vasquez underwent the ultrasound Melloh had ordered. (*See* ECF No. 154-37 at 2.)  The ultrasound report states that Vasquez's liver had a "[h]eterogeneous appearance . . . consistent with cirrhosis." (*Id*.)  The report also notes abnormalities of the gallbladder and spleen, both likely related to chronic liver disease.

(*Id.*)  Fauvel reviewed this report on February 27, 2012, and made a note to discuss it with Vasquez at a follow-up appointment, although there is no record that any such discussion took place.  (ECF No. 154 at 17–18, ¶¶ 99–100.)

On March 7, 2012, Vasquez filed a grievance against "medical," and Melloh specifically, for allegedly neglecting his request for referral to D&A classes.  (*Id.* at 11, ¶ 57.)  Vasquez described an administrative runaround between "the care provid[e]r" and an individual named "Ms. Estrada," who is otherwise unidentified.  (ECF No. 154-22.)[7]  Vasquez claimed that the care provider was denying him the D&A contract under the belief that Sterling's west side did not offer D&A classes, while Estrada was telling the care provider the opposite and was "waiting for [the referral] document" from "medical."  (*Id.*)

On March 22, 2012, while this grievance was still pending, Vasquez visited the Sterling clinic seeking a copy of the D&A contract discussed above at Part II.A.2.  (ECF No. 154-20 at 2.)  A medical provider who is not a party to this case, Trudy Sicotte, told Vasquez that the clinic did not have the appropriate form and that he needed to obtain it from his case manager.  (ECF No. 154 at 11, ¶ 56.)  Sicotte sent a message to Vasquez's case manager—presumably about his request for the D&A contract, although the record does not specifically say so.  (*Id.*)

Melloh responded to Vasquez's grievance on March 27, 2012.  (ECF No. 154 at 11, ¶ 58.)  Melloh's response is essentially the opposite of the instructions Vasquez received from Sicotte:

---

[7] The Court surmises that Estrada was Vasquez's case manager at the time.

> This is a change that they are now giving [d]rug and alcohol classes on the west side [Sterling's high-security side].  If you want to have the paperwork filled out for consideration for the class you need to kite to medical for[ ]appointment to get the appropriate paperwork filled out and sent to appropriate personnel for consideration.

(ECF No. 154-22.)  This is the last contact between Melloh and Vasquez that the parties bring to the Court's attention.

The parties agree that, by this time, Vasquez had submitted five kites requesting the D&A contract.  (ECF No. 154 at 11, ¶ 59.)  Vasquez submitted yet another kite and was seen by Sicotte on May 10, 2012, because the needed form was "now available in the clinic."  (*Id*. at 12, ¶ 60.)  Vasquez signed the form and Sicotte gave Vasquez instructions "as to the proper way to distribute this paper work."  (*Id*.)

On May 15, 2012, Fauvel reviewed some lab results for Vasquez, noting his history of "cirrhosis with liver failure" and that various laboratory findings were "high."  (*Id*. at 18, ¶ 103.)  Fauvel "ordered the same labs and scheduled a follow-up with Mr. Vasquez for one month."  (*Id*.)

Vasquez was formally approved for D&A classes on July 23, 2012.  (ECF No. 152 at 8, ¶ 40.)  He began the first phase of those classes that same month.  (ECF No. 154 at 12, ¶ 61.)

On July 31, 2012, Fauvel saw Vasquez in person and discussed the possibility of HCV treatment.  (ECF No. 154 at 18, ¶ 104.)  Fauvel wrote in Vasquez's patient record, "I am not sure if this [inmate] will ultimately qualify for treatment of hep c with cirrhosis. Will email Judy Beeman RN to inquire about this."  (*Id*.)  Although the record is not explicit, the Court understands that Beeman was an upper-level medical administrator

21

at CDOC.

Vasquez returned to visit Fauvel on August 6, 2012, but certain laboratory tests had not taken place and Fauvel wrote that he had "not yet heard back from Judy Beeman RN as to whether this [inmate] is still eligible for treatment for HepC as he has cirrhosis." (*Id*. ¶ 105.)  The laboratory tests apparently took place soon thereafter because Fauvel was able to review them on August 14, 2012.  (*Id*. ¶ 106.)  Fauvel wrote that Vasquez's results were "abnl" (abnormal) and described Vasquez as an inmate "with severe liver d[isease] due to HepC." (*Id*.)

Fauvel saw Vasquez again the following day, August 15, 2012.  (*Id*. at 19, ¶ 107.)  Fauvel obtained this appointment on an "urgent" basis because he wanted to "continue to move things forward" and discuss a liver biopsy to test the severity of Vasquez's liver damage.  (*Id*.; ECF No. 152 at 18, ¶ 102.)  There is no indication that Fauvel followed up on this intent except that, on October 29, 2012, a physician's assistant named Ruth Ross noted that she would discuss a possible liver biopsy with Fauvel.  (ECF No. 154 at 18, ¶ 108.)  Fauvel believes that the biopsy may have run into red tape at Correctional Healthcare Partners.  (ECF No. 152 at 18, ¶ 103.)

Vasquez completed the first phase of D&A classes in November 2012, and then completed the second phase between November 2012 and January 2013.  (ECF No. 154 at 12, ¶¶ 61–62.)

9.    <u>Diagnosis of Decompensated Cirrhosis (May 2013)</u>

The next event of significance took place in May 2013.  No party explains what happened in between January 2013 and May 2013.  In any event, on May 3, 2013,

Vasquez began vomiting large amounts of dark red blood. (*Id*. at 19, ¶ 109.) Vasquez was transported by ambulance first to the Sterling Regional Medical Center, and then to the Denver Health Medical Center. (*Id*. ¶¶ 110–11.) Denver Health doctors diagnosed Vasquez with esophageal varices and surgically repaired them. (*Id*. ¶ 112.)

Vasquez claims that Denver Health doctors told him his varices were the result of decompensated cirrhosis, and that decompensated cirrhosis made it unsafe for him to receive then-available HCV treatments. (*Id*. ¶¶ 113–14.) The State Defendants deny this, noting that Vasquez's cited evidence (a patient record from over a year later, *see* ECF No. 154-4 at 1), does not support these assertions. (ECF No. 166 at 14, ¶¶ 113–14.) The Court agrees with the State Defendants that Vasquez's evidence does not directly support his claims. However, the State Defendants themselves elsewhere assert (and Vasquez does not dispute) that "Vasquez had clinical evidence for decompensated liver cirrhosis" following this episode with the bleeding varices, and that Vasquez was therefore "not a . . . candidate" for HCV treatment "using any of the drugs available at that time." (ECF No. 152 at 8, ¶ 43.) Thus, whether or not the esophageal varices resulted from cirrhosis,[8] the Court finds it undisputed that Vasquez was diagnosed with decompensated cirrhosis in or around May 2013, and that then-available HCV treatments (*e.g.*, interferon/ribavirin) were not appropriate in light of that diagnosis.[9]

---

[8] Quoting material published by the National Institutes of Health, CDOC protocols explicitly mention "bleeding esophageal varices" as a common consequence of cirrhosis. (ECF No. 154-8 at 3.)

[9] While in the Denver area, Vasquez was also seen by the Rocky Mountain Cancer Centers. (ECF No. 152 at 19, ¶ 109.) That institution diagnosed Vasquez with multiple

10.  Additional Interactions with Fauvel, and Filing of Grievances
(May–December 2013)

Fauvel resumed contact with Vasquez in July 2013 (ECF No. 154 at 19, ¶ 108),

when Vasquez returned from Denver and visited Fauvel apparently to discuss

continuing digestive problems and the need for a bland diet (ECF No. 154-13 at 2).

Also in July 2013, Vasquez filed a formal grievance against "Medical." (ECF No.

164-7 at 7.) This grievance was considered a "step one" grievance under CDOC's

grievance procedures. (ECF No. 164 at 12, ¶ 6.) Vasquez generally complained of his

inability to receive HCV treatment from the start of his incarceration (including the lack

of D&A classes on Sterling's west side before 2012), leading to liver damage that is

now "too advanced" to permit HCV treatment. (ECF No. 164-7 at 7.)

Fauvel "received, reviewed and appreciated" this grievance. (*Id*.) After

summarizing Vasquez's medical status, Fauvel stated,

> I understand that this information would be hard for
> [Vasquez] to accept but, HepC was diagnosed long ago and
> treatment consideration is a long[ ]and tortuous process. I
> cannot speak to why this was not treated in [the] past. Most
> of [the] liver damage was likely [incurred] long before
> completion of [the D&A] program.

(*Id*.) This apparently qualified as a denial of the grievance.

In August 2013, Vasquez filed a "step two" grievance, reiterating his complaints

and requesting special needs parole. (*Id*. at 8.) An individual named Jamie Soucie

---

myeloma. (*Id*.) Vasquez claims that his multiple myeloma was ultimately caused by the
cirrhosis resulting from his untreated HCV. (ECF No. 154 at 21, ¶ 123.) The State Defendants
deny this, again claiming that Vasquez's cited evidence does not support this assertion. (ECF
No. 166 at 15, ¶ 123.) The Court finds this dispute immaterial for purposes of resolving the
various summary judgment motions.

responded, "Mr. Vasquez - it appears you are currently receiving appropriate care through [Sterling] Medical.  It is recommended that you continue working with your current provider regarding current, available treatment options.  Remedy denied."  (*Id.*)

In September 2013, Vasquez filed a "step three" grievance, repeating his previous complaints.  (*Id.* at 9.)  A grievance officer at CDOC headquarters named Anthony DeCesaro responded.  (*Id.* at 10.)  DeCesaro noted that Vasquez received a letter on "5/27/2007" with "directions to kite medical if interested in hep C treatment." (*Id.*)[10]  But, according to DeCesaro, Vasquez did not meet with a medical provider and discuss the D&A requirements until 2012.  (*Id.*)  "There are no other records indicating that you requested [D&A] treatment prior to 2012; it appears that you did not actively pursue treatment."  (*Id.*)  DeCesaro concluded, "Your request for relief is denied.  This is the final administrative response in this matter you have exhausted your ministry remedies."  (*Id.*)

In November 2013, Fauvel noted in Vasquez's patient records that his request for a liver biopsy was over a year old, that there was no HCV "workup sheet on file," and that Vasquez had failed to attend a recently scheduled appointment.  (ECF No. 152 at 20, ¶ 112.)  Fauvel scheduled a new appointment for Vasquez "to explore options and desire to be treated."  (ECF No. 152-11 at 16.)

In December 2013, a gastrointestinal specialist recommended against HCV treatment, apparently in light of Vasquez's decompensated cirrhosis.  (ECF No. 152 at

---

[10] The year listed, "2007," is almost certainly a typographical error, and should have been "2005."  (*See* Part II.B.3, above (discussing Davis's May 27, 2005 letter instructing Vasquez to "kite medical" if interested in HCV treatment).)

8–9, ¶¶ 43–44.)  All parties agree, however, that the combination of Sovaldi and ribavirin was approved in 2013 (*see* Part II.A.1, above), and that it can be safely administered to patients with decompensated cirrhosis (ECF No. 152 at 9, ¶ 45; ECF No. 154 at 20, ¶ 115).  It is therefore unclear why the gastrointestinal specialist provided the recommendation that he did.

### 11. This Lawsuit and Subsequent Developments (May 2014–August 2016)

Vasquez filed this lawsuit in May 2014.  (ECF No. 1.)  His original complaint claimed that Defendants, as well as others, unconstitutionally neglected his medical needs to the point where his only chance of survival was a liver transplant.  (*Id*. at 7–9.)

In early 2015, CDOC approved the Sovaldi/ribavirin combination for its inmates with decompensated cirrhosis.  (ECF No. 154 at 20, ¶ 115.)  In October 2015, "for the first time," a CDOC medical provider completed all of the necessary paperwork to permit Vasquez to receive Sovaldi/ribavirin.  (*Id*. ¶ 116.)  This paperwork was then submitted to CDOC's Infectious Disease Committee ("IDC"), which is apparently responsible for approving HCV treatment requests.  (ECF No. 152 at 9, ¶ 45.)

The IDC took up Vasquez's case at its next quarterly meeting, on February 19, 2016.  (*Id*. ¶ 47.)  The IDC "found that Vasquez had completed a lower level of substance abuse treatment than was actually required," but "had substantially satisfied the intent of the alcohol and drug treatment requisites, and was therefore approved for Hepatitis C treatment."  (*Id*.)  Dr. Tiona, who sits on the IDC, further explained her belief at that time that Vasquez "clearly was not going to tolerate another six months of a

[D&A] program" in light of "his medical situation." (ECF No. 154-7 at 15.)[11]  Vasquez's

approval for Sovaldi/ribavirin became formally effective on February 22, 2016.  (ECF

No. 152 at 9, ¶ 48.)

On the same day that the IDC considered Vasquez's case (February 19, 2016),

Vasquez filed a motion for a temporary restraining order, which the Court construed as

a motion for a preliminary injunction ("PI Motion").  (ECF No. 114; *see also* ECF No.

116.)  Through the PI Motion, Vasquez sought to force CDOC to provide him with

Harvoni (ECF No. 114 at 2–4), apparently unaware that he was infected with HCV

genotype 3, making Harvoni inappropriate.  The Court held a Preliminary Injunction

Hearing on February 26, 2016, where Dr. Tiona testified that the IDC had approved

Vasquez for Sovaldi/ribavirin treatment.  (*See* ECF No. 126 at 4.)  The Court also heard

testimony from Vasquez's expert, Dr. Bruce Bacon, to the effect that Sovaldi/ribavirin

was the appropriate drug regimen under the circumstances, and also that Vasquez's

overall condition was, at present, relatively stable—*i.e.*, there was little likelihood that

Vasquez would suffer total liver failure during the normal 24-week course of

Sovaldi/ribavirin.  (*Id*. at 6.)  The Court therefore denied the PI Motion as such, but

nonetheless invoked the All Writs Act to order CDOC to regularly perform certain

laboratory tests to evaluate Vasquez's liver functioning.  (*Id*. at 16–17.)

Vasquez began a 24-week regimen of Sovaldi/ribavirin in March 2016.  (ECF No.

152 at 9, ¶ 49.)  As of August 2016, Dr. Bacon, "[did] not believe that Vasquez should

be worked up for a liver transplant, but rather, [he] would wait to see how the Hep C

---

[11] As noted in Part II.A.2, above, Dr. Tiona is CDOC's chief medical officer.  She is also
the State Defendants' designated expert in this case.

goes and whether [Vasquez's liver functioning worsens]." (*Id*. at 21, ¶ 121.)

### III.  ANALYSIS

### A.      PLRA Exhaustion

The Prison Litigation Reform Act ("PLRA"), states that "[n]o action shall be

brought with respect to prison conditions under section 1983 of this title, or any other

Federal law, by a prisoner confined in any jail, prison, or other correctional facility until

such administrative remedies as are available are exhausted."  42 U.S.C. § 1997e(a).

Chamjock and the State Defendants both argue that Vasquez did not exhaust his

CDOC grievance remedy against each of them specifically.  (ECF No. 151 at 5–6; ECF

No. 152 at 35–36.)  The State Defendants particularly argue that Vasquez "has a claim

against each individual and therefore should be required to exhaust again [*sic*?] each

claim."  (ECF No. 152 at 36.)

The Court agrees with Vasquez that such person-by-person exhaustion is not

required.  To the contrary, CDOC exhaustion policy states that "[p]roblems that arise

from the same incident or set of facts shall be grieved in one grievance, even though it

may involve multiple [CDOC] employees, contract workers, or volunteers."  (ECF No.

163-2 at 5.)  Duplicative grievances are procedurally barred.  (ECF No. 163-6 at 3.)

Thus, Vasquez was not required to do as Defendants suggest, and likely would have

been barred from doing so.

The State Defendants' argument that person-by-person exhaustion "should be

required" is also meritless.  Nearly ten years ago, the Supreme Court ruled that the

judiciary has no power to invent exhaustion requirements, and specifically cannot

require (if prison regulations do not) that each later-sued defendant be named in a grievance.  *Jones v. Bock*, 549 U.S. 199, 217–19 (2007).  Defendants' respective exhaustion defenses therefore fail.

**B.     Liability & Qualified Immunity**

     1.     <u>Deliberate Indifference Generally</u>

     The Eighth Amendment's prohibition against cruel and unusual punishment encompasses "deliberate indifference" by prison officials to a prisoner's "serious medical needs," and can state a cause of action against those prison officials under 42 U.S.C. § 1983.  *Estelle v. Gamble*, 429 U.S. 97, 104–05 (1976).  A deliberate indifference claim involves "a two-pronged inquiry, comprised of an objective component and a subjective component."  *Self v. Crum*, 439 F.3d 1227, 1230 (10th Cir. 2006).  The objective component requires a "sufficiently serious" medical need, meaning "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention."  *Sealock v. Colorado*, 218 F.3d 1205, 1209 (10th Cir. 2000) (internal quotation marks omitted).  The subjective prong examines the state of mind of the defendant, asking whether "the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference."  *Farmer v. Brennan*, 511 U.S. 825, 837 (1994).

     Deliberate indifference is a high standard.  "[N]egligent failure to provide adequate medical care, even one constituting medical malpractice, does not give rise to

a constitutional violation." *Perkins v. Kan. Dep't of Corrs.*, 165 F.3d 803, 811 (10th Cir. 1999).

    2.   <u>Causation</u>

    Before proceeding to the objective and subjective analyses, the Court finds it appropriate to highlight a causation issue that lurks in this case, but which no party addresses directly. *See Scott v. Hern*, 216 F.3d 897, 911 (10th Cir. 2000) ("A plaintiff must allege factual causation—i.e. 'but for' causation—in order to state a claim under § 1983.").

    Vasquez's theory of liability is that Defendants had a duty to somehow get Vasquez enrolled in D&A classes (or perhaps to find a way to waive or loosen the D&A requirement) and then to get Vasquez considered for antiviral therapy, and Defendants' failure to provide such assistance led to Vasquez's liver damage. (*See* ECF No. 154 at 25–35; ECF No. 163 at 16–20.) The Court addresses whether Defendants had any such duty or duties in Part III.B.5, below. For present purposes, the Court notes that this theory presumes that, had any particular Defendant tried, he or she would have succeeded in placing Vasquez in an acceptable D&A program (or in convincing those in authority to waive or loosen the D&A requirement), and, after accomplishing that, Vasquez would have been approved by those in authority for antiviral treatment.[12]

    Vasquez's theory is open to question. For example, in *Johnson v. Wright*, *supra*,

---

[12] Also necessary to the chain of causation would be Vasquez's positive response to antiviral treatment. On this, however, Vasquez has submitted competent evidence. (*See* ECF No. 154-6 ¶¶ 40–41 (opinion of Dr. Bacon that, before 2013, Vasquez had a 50–70% chance of being cured from HCV through antiviral therapy; and, in 2014 and forward, his chances rose to 85–90% in light of newly available drugs).)

the defendant chief medical officer of the New York State Department of Corrections ignored "the unanimous, express, and repeated . . . recommendations of the plaintiff's treating physicians, including prison physicians," that the plaintiff should receive HCV treatment.  412 F.3d at 400.  For this, the Second Circuit found that the chief medical officer would have to go to trial on the question of deliberate indifference.  *Id*.  *Johnson* illustrates that even if subordinate officials request HCV treatment, it will not necessarily be approved.

Absent evidence from which a jury could conclude that a specific Defendant's actions at any particular point in time would have removed the barriers preventing Vasquez from obtaining HCV treatment, Vasquez's claim against that Defendant must fail.  *See, e.g.*, Restatement (Second) of Torts § 432 cmt. b (1965) ("if the same harm, both in character and extent, would have been sustained even had the actor taken the required precautions, his failure to do so is not even a perceptible factor in [causing the harm] and cannot be a substantial factor in producing it"); *cf. Al-Turki v. Robinson*, 762 F.3d 1188, 1193 (10th Cir. 2014) (finding that a prisoner in excruciating pain—later found to be the result of the kidney stone—experienced additional pain and mental anguish flowing from a nurse's refusal to treat him, because the nurse "could have reduced his pain" to some degree and her diagnosis of the kidney stone "could have removed his fear of death").  Here, however, no Defendant has raised a lack-of-causation argument.  The Court therefore deems it conceded, at least for summary judgment purposes, that Vasquez more probably than not would have been enrolled in D&A classes and received HCV treatment earlier than he actually did, had any particular Defendant undertook efforts to promote those outcomes.

31

With this understanding, the Court now turns to the objective and subjective components of the deliberate indifference analysis.

3.    Objective Component

a.    *"Substantial Harm" in Delay-in-Care Cases*

The Court begins by determining whether there is any genuine dispute of material fact regarding the existence of an objectively sufficiently serious medical need. This inquiry has an overlay in the present circumstances, given that Vasquez's claim is based on delay of medical care.  "[A] delay in medical care only constitutes an Eighth Amendment violation where the plaintiff can show that the delay resulted in substantial harm.  We have held that the substantial harm requirement may be satisfied by lifelong handicap, permanent loss, or considerable pain."  *Garrett v. Stratman*, 254 F.3d 946, 950 (10th Cir. 2001) (citation and internal quotation marks omitted).  In other words, the objectively sufficiently serious condition must also qualify as a "substantial harm" under this analysis.[13]

b.    *Before 2006*

Vasquez lacks evidence from which a reasonable jury could conclude that he faced substantial harm before 2006.

In light of HCV's slowly progressing nature, a recent unpublished Tenth Circuit decision and a recent unpublished District of Colorado decision both held that delay in

---

[13] The Court is unaware of any Tenth Circuit case holding that lifelong handicap, permanent loss, and considerable pain are the exclusive categories into which any claimed "substantial harm" must fit.  At a minimum it is clear, however, that to the extent a prisoner seeks an *injunction* to prevent a life-threatening condition from ripening into injury, that prisoner would not need to satisfy any such categorical restriction. *See Farmer*, 511 U.S. at 845.

treating HCV, without more, does not satisfy the substantial harm requirement, and therefore does not satisfy the objective component of the deliberate indifference test. *Whitington v. Moschetti*, 423 F. App'x 767, 773 (10th Cir. 2011); *Wright v. Hodge*, 2015 WL 1408753, at *5–6 (D. Colo. Mar. 25, 2015).  These decisions are not binding, but the Court finds them persuasive as applied to the record developed here.  In particular, Vasquez's expert, Dr. Bacon, is unprepared to offer testimony regarding any clinical signs and findings between 2004 and 2006 showing that Vasquez was *not* among the 75% of chronic HCV patients who suffer no serious complications—the statistically more probable scenario.  (*See generally* ECF No. 154-6 (Dr. Bacon's original report); ECF No. 154-15 (Dr. Bacon's supplemental report).)

Accordingly, no jury could reasonably conclude that a sufficiently serious condition existed from 2004 to 2006.  Davis and Melloh are entitled to summary judgment on this basis alone, given that neither had any interaction with Vasquez later than mid-2005.

          c.    *2006 and Later*

For 2006 and later, Dr. Bacon still has no specific opinions about when, specifically, Vasquez crossed the threshold into an objectively serious state.  However, in light of evidence Vasquez gathered from Defendants and Dr. Tiona, a reasonable jury could conclude that Vasquez crossed that threshold as early as August 2006, or, absent that, sometime in 2008 or 2009.

**First**, Webster began noting high liver enzyme numbers in August 2006.  (Part II.B.4, above.)  Webster himself characterized these numbers as "bad."  (ECF No.

152-8 at 23.)  Viewing this in the light most favorable to Vasquez, it alone might be

enough for a jury to conclude that Vasquez had reached an objectively serious state.

**Second**, in June 2008, Webster diagnosed Vasquez with cirrhosis of the liver.

(Part II.B.5, above.)  As explained by Vasquez's expert, Dr. Bacon

> [c]irrhosis is a progressive disease in which healthy liver
> tissue is replaced with scar tissue, eventually preventing the
> liver from functioning effectively.  The scar tissue blocks the
> flow of blood through the liver and interferes with the
> processing of nutrients, hormones, drugs, and toxins.
> Cirrhosis also slows the production of proteins and other
> substances by the liver.

(ECF No. 154-6 ¶ 34.)

For reasons having to do with the statute of limitations (discussed in Part III.C,

below), Vasquez actually argues that cirrhosis—or at least "mere cirrhosis," which

Vasquez does not define—should not be considered "substantial" enough to satisfy the

Tenth Circuit's delay-in-care objective standard.  (ECF No. 164 at 18.)  But Dr. Bacon

appears to disagree.  Dr. Bacon explicitly attributes Vasquez's cirrhosis to his untreated

HCV.  (ECF No. 154-6 ¶ 34.)  Dr. Bacon further opines that "[t]he progression of

Mr. Vasquez's hepatitis C disease has resulted in permanent liver damage."  (*Id*. ¶ 37.)

Dr. Bacon elsewhere opines that "the liver damage and related complications and

conditions [Vasquez] has suffered are permanent, in the absence of a liver transplant."

(*Id*. ¶ 42.)

If this is not sufficient support, the permanence of the scarring characterizing

cirrhosis (and the resulting drop in liver functioning), is a question that "can be

accurately and readily determined from sources whose accuracy cannot reasonably be

questioned."  Fed. R. Evid. 201(b)(2); *cf. Hines on Behalf of Sevier v. Sec'y of Dep't of Health & Human Servs.*, 940 F.2d 1518, 1526 (Fed. Cir. 1991) ("Well-known medical facts are the types of matters of which judicial notice may be taken. . . . Here, Sevier has offered no evidence that the incubation period of measles is disputed among treatise writers."); *Barnes v. Indep. Auto. Dealers Ass'n of Cal. Health & Welfare Benefit Plan*, 64 F.3d 1389, 1395 n.2 (9th Cir. 1995) ("If necessary, we could take judicial notice that a condition requiring such major surgery, and the surgery itself, involve pain and suffering and may well cause permanent partial disability.").  According to *The MERCK Manual of Diagnosis and Therapy* (19th ed. 2011), "Treatments aimed at reversing the fibrosis [scarring of the liver] are usually too toxic for long-term use . . . or have no proven efficacy. * * * Cirrhosis is usually considered irreversible."  *Id.* at 240; *see also* American Medical Association, *Complete Medical Encyclopedia* 800 (2003) ("scarring [from cirrhosis] is permanent and the liver afterward remains vulnerable to alcohol and infection").

Given all this, the Court could conceivably hold that cirrhosis of the liver is, generally speaking, a "permanent loss" for purposes of the delay-in-care substantial harm standard.  *Garrett*, 254 F.3d at 950.  However, on this record, the Court need only hold that a prisoner with untreated HCV who has progressed to the cirrhosis stage has suffered permanent loss potentially attributable to the delay in treating his or her HCV.  Thus, a jury could find that Vasquez faced an objectively sufficiently serious condition at least as of June 2008.

**Third**, Chamjock's treatment notes for a year later (June 2009) note a history of

end-stage liver disease.  (Part II.B.6, above.)  The Tenth Circuit's unpublished *Whitington* decision, discussed above, determined that the inmate did not face an objectively serious risk of harm in light of an affidavit from a CDOC medical official stating that HCV progresses slowly *and* that the inmate in question showed no signs end-stage liver disease.  423 F. App'x at 773.  This Court is similarly persuaded that a diagnosis of end-stage liver disease could be accepted by a jury as evidence that the inmate faced a substantial harm as of that diagnosis.  Thus, in this case, a jury could conclude that Vasquez crossed the substantial harm threshold in June 2009.

**Fourth**, Dr. Tiona testified at her deposition that, "between 2008 and about 2010," there was a "missed opportunity to recognize that [Vasquez's liver functioning was] deteriorating."  (ECF No. 154-7 at 9.)  And, "by 2008 or 2009 . . . there were signs that . . . it would be important for him to be successfully treated for his disease."  (*Id.* at 13.)

Accordingly, the Defendants who interacted with Vasquez in 2006 or later (Webster, Chamjock, Melloh, and Fauvel) are not entitled to summary judgment on the objective component of the deliberate indifference test.  However, given that the jury could find the objective component satisfied at varying points in time, Vasquez is also not entitled to summary judgment that the objective component is satisfied as a matter of law.  The Court holds only that a triable question of fact remains on this issue.

4.   Subjective Component

The Court now turns to the subjective component.  As noted above, the subjective component asks whether the government official in question was "aware of

facts from which the inference could be drawn that a substantial risk of serious harm

exists" and whether the official actually "dr[e]w the inference." *Farmer*, 511 U.S. at 837.

> Whether a prison official had the requisite knowledge of a
> substantial risk is a question of fact subject to demonstration
> in the usual ways, including inference from circumstantial
> evidence, and a factfinder may conclude that a prison official
> knew of a substantial risk from the very fact that the risk was
> obvious.

*Id*. at 842 (citation omitted).

Interestingly, this view of circumstantial evidence and obviousness permits

"objective evidence" to influence the first portion of the subjective analysis, *i.e.*, whether

the prison official was aware of the relevant facts. In medical cases particularly,

objective standards of proper care may be introduced as circumstantial evidence of

what a medical provider knew. *See Mata v. Saiz*, 427 F.3d 745, 757–58 (10th Cir.

2005) (finding that prison regulations about treatment of chest pain could be

circumstantial evidence of a prison medical provider's knowledge of the seriousness of

such pain); *see also LeMarbe v. Wisneski*, 266 F.3d 429, 436–38 & n.6 (6th Cir. 2001)

(accepting as circumstantial evidence a physician's affidavit that any medically

educated individual would have realized that the prisoner in question faced an extreme

and obvious risk from bile leaking into his abdominal cavity).

In this light, the Court analyzes the subjective prong as to each Defendant.[14]

---

[14] In preliminary injunction proceedings, Vasquez's counsel argued that "the collective knowledge of the employees of the Colorado Department of Corrections satisfies the subjective prong." (ECF No. 126 at 13.) Vasquez's case would be much simpler if collective knowledge could satisfy the deliberate indifference standard. But Vasquez has never cited any authority in this regard, nor has he explained how subjective awareness can be accomplished collectively. The Court therefore must analyze each Defendant individually.

a.   *Davis (2004–05)*

The Court has already concluded that no reasonable jury could find an objectively serious condition during the time period in which Davis interacted with Vasquez.  Even if the jury could find otherwise, the Court would find that Vasquez lacks evidence to satisfy the subjective component as to Davis.  In terms of what Davis knew, the only relevant fact to which Vasquez points is Davis's confirmation in May 2005 that Vasquez had chronic HCV.  Vasquez does not offer any evidence showing that this should lead to an inference of a substantial risk of serious harm (*e.g.*, that such an inference would be obvious even though a diagnosis of chronic HCV means nothing of serious medical significance for 75% of those diagnosed).  Nor does Vasquez point to any evidence from which a jury could conclude that Davis in fact drew an inference of a substantial risk of serious harm.  Accordingly, Davis is entitled to summary judgment on the subjective component of the deliberate indifference standard.

b.   *Martorano (2005)*

On the subjective component, Martorano's case is even easier than Davis's. Martorano's only alleged interaction with Vasquez was in March 2005, when Vasquez requested help enrolling in D&A classes despite his high-security classification.  (Part II.B.2, above.)  Vasquez does not claim that he told Martorano of any medical symptoms he was then experiencing, nor that Martorano (a case manager) would have known the significance of any such symptoms.  Indeed, Martorano's interaction with Vasquez took place before anyone at CDOC had confirmed the chronicity of Vasquez's HCV.  Thus, no one at CDOC, much less Martorano, could have then drawn the inference that Vasquez was facing a substantial risk.  Martorano thus deserves

38

summary judgment on the subjective component of the deliberate indifference standard.

      c.    *Webster (2006–09), Chamjock (2008–10), and Melloh (2010–12)*

It is undisputed that Webster subjectively knew of Vasquez's worsening condition on account of his HCV, and of the risks it posed.  From 2006 to 2008, Webster routinely noted laboratory results showing that Vasquez's liver enzyme numbers were in a "bad" range.  Webster was also the first to formally diagnose Vasquez with cirrhosis.  (Parts II.B.4–5, above.)

It is similarly undisputed that Chamjock subjectively knew of Vasquez's worsening condition on account of his HCV, and of the risks it posed.  Chamjock noted Vasquez's history of end-stage liver disease in June 2009.  (Part II.B.6, above.)

Finally, although Melloh's subjective knowledge is somewhat disputed, it is at least undisputed that Melloh was ordering tests potentially related to Vasquez's HCV diagnosis.  (Parts II.B.7–8, above.)  This is evidence from which a jury could conclude that Melloh was subjectively aware of the results of those tests.  Moreover, at her deposition, Melloh was asked, "You were aware during the time that you worked at Sterling that somebody with untreated hepatitis C could develop end-stage liver disease, yes?"  Melloh answered, "Yes.  That's a given."  (ECF No. 154-14 at 5.)  Thus, evidence exists that Melloh drew the inference that Vasquez faced a substantial risk of harm if he did not receive HCV treatment.

Neither Webster, Chamjock, or Melloh took any action to assist Vasquez in obtaining HCV treatment.  To the extent any of them possessed a duty to do so (discussed below), a jury could conclude that these three Defendants displayed

39

deliberate indifference toward Vasquez.[15]

        d.    *Fauvel (2012–13)*

Fauvel's situation is different from those of the Defendants that preceded him in caring for Vasquez.  As described in Part II.B.8, above, Fauvel in his very first meeting with Vasquez discussed the HCV treatment protocol and referred Vasquez to his case manager to get enrolled in D&A classes.  From there, Vasquez experienced an understandably frustrating administrative tangle as his case manager and the medical clinic apparently disagreed over who was responsible for providing and/or submitting the appropriate paperwork.  However, Vasquez points to no evidence that Fauvel was aware of or somehow responsible for this.  In any event, the paperwork was completed and Vasquez was enrolled in D&A classes in July 2012.  Throughout this time, Fauvel monitored Vasquez's condition, met with him to discuss laboratory results, attempted to secure a liver biopsy, and investigated whether Vasquez was qualified to receive then-available HCV treatments.

Fauvel's case resembles that described in *Kneen v. Zavaras*, 2012 WL 5493854 (D. Colo. Nov. 13, 2012).  In that action, the plaintiff, Ronald Kneen, was a CDOC inmate infected with HCV.  *Id*. at *1.  Like Vasquez, Kneen experienced worsening

---

[15] The Court notes a caveat with respect to Webster specifically.  To the extent his liability turns on precisely when he could have or should have taken some action on Vasquez's behalf, that liability would be cut off beginning with the cirrhosis diagnosis in June 2008.  All parties agree that Webster mistakenly but genuinely believed that cirrhosis of any degree disqualified an individual from receiving antiviral treatment.  (Part II.B.5, above.)  In such a situation, Webster's decision not to assist Vasquez in obtaining antiviral treatment after June 2008 would not amount to deliberate indifference, but, at most, medical malpractice based on a mistaken judgment about the availability of treatment.  *See Estelle*, 429 U.S. at 106 ("a complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment").

symptoms such as suspected cirrhosis accompanied by esophageal varices.  *Id*. at *3. One defendant, Dr. Louis Cabiling, required Kneen to complete D&A classes before receiving treatment, and Cabiling continued to monitor Kneen in the meantime.  Kneen accused Cabiling of unnecessary delay in that regard, but he "presented no evidence that the doctor's treatment decisions," including the decision to require D&A classes, "reflected anything other than considered medical judgment."  *Id*. at *10.  Summary judgment was therefore appropriate for Cabiling on the subjective prong of the deliberate indifference test.  *Id*.  The Tenth Circuit affirmed.  *See* 568 F. App'x 580, 584–85 (2014).

The Court finds that the same result obtains here.  There is likewise no evidence that Fauvel's behavior was motivated by anything other than considered medical judgment.  Thus, although Fauvel was certainly aware of Vasquez's troubling symptoms, he cannot be said to have been deliberately indifferent to Vasquez's medical condition.  Summary judgment is therefore appropriate in favor of Fauvel on the question of his liability.

5.     Duty & Qualified Immunity

a.     *Need for a Separate Duty Analysis*

Even if a jury could find Webster, Chamjock, or Melloh liable in a typical deliberate indifference analysis—and even if the same could be said for Davis, Martorano, and Fauvel—this is not a typical deliberate indifference case.  It is not even a typical "gatekeeper" case.  In such a case, the defendant is almost always the sole obstacle between the plaintiff and the persons who will presumably provide treatment.

Vasquez at times attempts to frame this case in gatekeeper terms.  In particular,

Vasquez claims that he "requested hepatitis C treatment explicitly and implicitly when[ever] he went to medical seeking treatment" (ECF No. 164 at 5, ¶ 39) and further claims that he "recalls inquiring about hepatitis C treatment whenever he was in medical" (*id*. at 9, ¶ 93).  The matter of *implicit* requests is a legal one addressed below.  As for *explicit* requests, if Vasquez's claim is true, one could infer that his various medical providers simply turned down these requests—a scenario which begins to look much more like a traditional gatekeeper case.  However, Vasquez never straightforwardly claims that any Defendant refused his requests for HCV treatment or for assistance in any of the prerequisites, such as obtaining the D&A contract.  Moreover, the deposition testimony Vasquez cites in support of his supposed recollection of repeated requests does not support the claim he now makes:

> Q.   Turning your direction back to Jeanne Davis, is it fair to say, looking at this kite log as well as Exhibit 1, that at least in around June of 2005 you didn't send in a kite to medical requesting treatment for HCV?
>
> A.   I was having—any time I have some type of pain, I don't actually put, you know, treatment for Hep C on a medical kite; I put in to see someone for my health, for my care.
>
>        And I don't specifically write down on a kite what I'm asking for until I am present with them and they're in the examinations or . . .
>
> Q.   So are you saying then on kites that you don't indicate that you have Hep C and need treatment?
>
> A.   No, I—I later on have indicated, but that's when I notice the change in my body and I started getting sicker, sicker.
>
>        And I was notified that they—back in 2010 that they did offer drug and alcohol.  So I did put on the

kites I wanted treatment for drug and alcohol.

(ECF No. 164-2 at 3–4 (ellipses in original).)  This passage only describes Vasquez's

general practice with medical kites, which was that he often omitted specifics on paper

but supplied them in person.  Vasquez says nothing about specifically recalling

repeated requests to medical personnel for HCV treatment or assistance with the D&A

requirement.  Thus, even viewing the evidence in the light most favorable to Vasquez,

no Defendant fits the gatekeeper prototype.  Vasquez therefore cannot claim that any

Defendant actually prevented him from obtaining HCV treatment.

In this light, it is not enough in this case for Vasquez simply to prove that he

suffered from the effects of untreated HCV and that a Defendant knew of his condition

and the serious risks of not treating it.  That analysis necessarily supposes that the

Defendant had power to take the appropriate action, *i.e.*, to treat his HCV or to order

such treatment.  No Defendant had such authority.  In particular, no Defendant was

authorized by CDOC to ensure Vasquez's enrollment in D&A classes despite CDOC-

imposed barriers (*e.g.*, lack of such classes at the facility), or to waive the D&A

requirement.  Moreover, CDOC's HCV treatment policies explicitly place the burden on

the inmate both to request HCV treatment and to provide proof of successfully

completing D&A classes.  (Part II.A.2, above.)

Accordingly, Vasquez's theory must rest—to extend the gatekeeper analogy—on

Defendants' alleged duty to (1) assist him in unlocking a gate erected by someone else,

which neither Vasquez nor any Defendant controlled; and/or (2) assist him through the

gate in the absence of a specific request, despite policies that place the burden on the

inmate to make such a request.  The Court accordingly must examine whether either

43

duty exists.

      b.    *Relationship to Qualified Immunity*

The Court must address the duty question not only to establish the contours of liability, but also because Davis, Fauvel, Martorano, Melloh, and Webster (all of the State Defendants who have been sued in their individual capacities, *i.e.*, all but Raemisch)[16] claim qualified immunity.[17] "Qualified immunity shields federal and state officials from money damages unless a plaintiff pleads facts showing (1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct." *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011). The first element of this analysis is, in these circumstances, functionally indistinguishable from the duty question. If Defendants had a duty under the Eighth Amendment to take certain actions, and if they failed to take those actions, then they violated Vasquez's constitutional right.

Although summary judgment usually places the burden of persuasion on the moving party, a claim of qualified immunity shifts the burden to the non-moving party—Vasquez, in this case—to demonstrate the violation of the constitutional right and, even more significantly, that the right was clearly established at the time of the challenged conduct. *Gross v. Pirtle*, 245 F.3d 1151, 1155 (10th Cir. 2001).

---

[16] In this Part III.B.5, "State Defendants" means all such Defendants except Raemisch, who has no need for or entitlement to qualified immunity in his official capacity. *See Cox v. Glanz*, 800 F.3d 1231, 1257 n.1 (10th Cir. 2015).

[17] Chamjock did not plead qualified immunity in his answer (ECF No. 127), has not asserted it as a defense in the Final Pretrial Order (ECF No. 175 at 5–8), and does not argue for qualified immunity in his summary judgment motion (ECF No. 151).

c.      *Existence of a Duty/Violation of a Constitutional Right*

The Court begins by asking whether prison officials have a duty at any point to disregard prison policies or practices that place the onus on the inmate to request treatment and to offer the treatment regardless of an inmate request; and/or whether prison officials have a duty to assist inmates to overcome prison-imposed circumstances that have the effect of preventing needed treatment.  The Court could avoid this inquiry by assuming that these rights exist and then asking whether they were clearly established at the appropriate time.  *See Pearson v. Callahan*, 555 U.S. 223, 236 (2009) ("The judges of the district courts and the courts of appeals [may] exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand.").  In these circumstances, however, the Court finds it appropriate to answer the duty question—or at least attempt an answer—and not simply to assume its answer for purposes of argument.  This case demonstrates a need to clarify for prisoners and prison officials their rights and obligations, particularly given the prevalence of HCV in prison populations.  (*See* ECF No. 154-17 at 2 ("The prevalence of chronic hepatitis C in the Colorado state prison population [in 2006] is estimated to be 20%.").)

(i)      Duty to Offer Treatment Without Being Asked

Vasquez argues that "'He didn't ask [for treatment]' is, as a matter of law, not a defense to a deliberate indifference claim where the medical provider was actually aware of the medical condition and need for treatment."  (ECF No. 163 at 18.)  The Court ultimately agrees, but Vasquez's statement deserves some elaboration in light of the facts of this case.

45

Failure to ask for treatment would of course be no defense if the inmate were unconscious and therefore incapable of asking for treatment.  Likewise, it would be no defense if the medical provider knew of the inmate's serious condition but withheld that knowledge from the inmate, thus depriving the inmate of a reason to ask for treatment.  And in most cases it would also be no defense to say that the inmate never made a sufficiently specific request (*e.g.*, a request for HCV treatment generally rather than for a specific antiviral regimen).

This case does not fit any of those scenarios.  Here, a CDOC policy set up an *expectation* among medical providers that inmates will request treatment for a specific condition.  Moreover, the policy does not apply in obviously absurd circumstances ("if the inmate requests treatment for his stab wound . . ."), but instead applies to a specific condition—HCV—that usually progresses slowly enough such that the policy itself delays care by at least six months from the date of the request.  And in practice, the delay will nearly always be longer than six months, considering the time needed to prepare and submit the paperwork, enroll in D&A classes, complete the classes, conduct a liver biopsy and any other pre-treatment diagnostic tests, and obtain final approval from senior CDOC medical officials for the antiviral regimen—which itself lasts many weeks.  These are relevant considerations, and they demonstrate that it is not obviously unconstitutional in these circumstances to fail to disregard a policy which requires the inmate to take the initiative.

Nonetheless, the Court is persuaded that such a policy cannot entirely excuse prison officials from Eighth Amendment liability for failure to offer treatment.  The Court finds this situation roughly analogous to that faced by the Second Circuit in the *Johnson*

case mentioned previously.  There, senior prison officials denied an inmate HCV

treatment, despite repeated recommendations from the inmate's treating physicians,

because prison policies dictated denial where there was evidence of active substance

abuse—which there allegedly was.  412 F.3d at 400–02.  The Second Circuit found that

there was enough evidence for a trial on whether the prison officials displayed

deliberate indifference by "mechanically following" prison policies rather than making a

decision in light of the inmate's specific circumstances.  *Id*. at 403–06.

The Seventh Circuit's *Roe* decision reached a similar conclusion.  In that case,

the Illinois Department of Corrections had a policy refusing HCV treatment to inmates

with less than eighteen months remaining on their sentences.  631 F.3d at 850.  The

Seventh Circuit affirmed a jury verdict finding that the senior prison official who had

promulgated the policy had been deliberately indifferent because the policy elevated

administrative convenience above medical judgment regarding a particular inmate's

health care needs, ultimately causing injury to specific inmates.  *Id*. at 862–63.

Neither *Johnson* nor *Roe* address a prison official's duty to *offer* care, but the

Court agrees with the underlying principle in both cases, *i.e.*, that prison officials may

not reflexively fall back on a prison policy to avoid considering an inmate's specific

medical needs.  Applying that principle here, the Court notes that no Defendant has

offered any justification, medical or otherwise, for placing the burden on an inmate to

request treatment.  The Court therefore holds that, in the following circumstances,

prison officials have an Eighth Amendment duty to offer treatment regardless of a

system-wide or facility-specific written policy or unwritten practice placing the burden of

requesting treatment on the inmate: (1) an inmate faces an objectively serious medical

47

condition; (2) the prison official is subjectively aware of that condition and the substantial risks of not treating it; (3) the official knows that the inmate is not currently being treated for this condition, or is unaware whether the inmate is currently being treated for this condition; and (4) the official knows that the inmate has not specifically refused treatment, or is unaware of any documented refusal.

The Court does not mean to establish a duty to offer any specific treatment, or to offer treatment regardless of prerequisites (such as D&A classes).  The Court holds only that prison officials in the above-described circumstances cannot entirely fail to offer to treat the serious condition of which they are aware.

(ii)      Duty to Assist Inmate to Overcome Prison-Imposed Obstacles to Treatment

For reasons outside the control of any Defendant, Vasquez faced an unusual obstacle to obtaining HCV treatment.  CDOC policy required him to attend D&A classes, yet CDOC did not offer such classes to inmates of Vasquez's security classification at Sterling between 2004 and 2007.  From 2008 to 2011, Vasquez was technically permitted to attend any D&A class available at his facility, but Vasquez does not submit evidence that he or any Defendant who worked with him during that time actually knew of that relaxation of the pertinent policy.[18]  Moreover, it is Vasquez's

---

[18] The evidence actually shows continual confusion.  Martorano suggested Alcoholics Anonymous classes in 2005, when they would not have counted toward the D&A requirement.  Webster, who worked with Vasquez in 2008 in 2009, apparently did not understand that informal D&A classes were acceptable during that time.  And in 2012, Melloh considered it "a change" that D&A classes were now being offered the high-security side at Sterling.  (Part II.B.8, above.)  To the extent any Defendant knew that informal-but-acceptable D&A classes were available from 2008 to 2011, that Defendant's liability would then be analyzed under the duty to offer treatment, discussed previously.  This may include Chamjock.  Vasquez says that Chamjock, at his deposition, stated he would have referred Vasquez to D&A classes if Vasquez

48

position that, "[f]rom 2004 to 2012, CDOC did not offer any drug and alcohol classes on the West Side of [Sterling] that would satisfy CDOC's hepatitis C treatment protocol criteria." (ECF No. 154 at 10, ¶ 49.)  The question, then, is whether—and when—any Defendant was required to take any efforts aimed at breaking this logjam.

No party offers any particularly helpful authority on this question.  The closest case offered by either party—and it is not very close—is the Sixth Circuit's *LeMarbe* decision, cited by Vasquez.  *LeMarbe* involved a prison surgeon who performed an exploratory surgery to determine the cause of the inmate's worsening condition after a gallbladder removal.  266 F.3d at 432–33.  The surgeon found a large amount of bile in the inmate's abdominal cavity, drained the bile, searched unsuccessfully for the source of the bile leak, and then ended the surgery.  *Id.* at 433.  The surgeon made no immediate plans to send the inmate to a specialist who might be better capable at locating the leak.  *Id*. at 437.  The inmate suffered injuries from the continual leak until another surgeon found and fixed it.  *Id*. at 433–34.  On these facts, the Sixth Circuit held that there was enough evidence to go to trial against the first surgeon because a jury could find that he was deliberately indifferent when he ended the exploratory surgery without locating the leak or making plans to find it quickly.  *Id*. at 438–39.

Vasquez seeks to analogize *LeMarbe* to his own situation on the theory that Defendants had a duty to do more than just monitor his condition—that, like the surgeon in *LeMarbe*, they were required to ensure that the source of the serious problem is treated, not just the symptoms.  (*See, e.g.*, ECF No. 154 at 23; ECF No. 163

---

would have asked.  (ECF No. 154 and 31.)  But the deposition excerpts cited in support of this assertion were not included with Vasquez's exhibits.

at 18.)  This analogy would be more apt here if Defendants controlled the decisions regarding where to offer D&A classes, but they did not.  *LeMarbe* is nonetheless indirect authority for the proposition that prison medical officials cannot learn of a serious medical problem and make no efforts aimed at its treatment.

Whether derived from *LeMarbe* or not, the Court basically agrees with that proposition.  Conceivably, then, the Court could hold that, in circumstances where (1) an inmate faces an objectively serious medical condition; (2) the prison official is subjectively aware of that condition and the substantial risks of not treating it; and (3) prison-imposed policies or practices over which the prison official has no control prevent the inmate from obtaining the treatment a medical professional would otherwise recommend, the Eighth Amendment imposes on that official a duty at least to attempt to help the inmate obtain relief from those policies or practices.[19]  The Court might further hold that this duty exists even when the medical condition at issue is generally known to progress slowly, so long as the official subjectively draws the inference that the prison-imposed hindrances could last long enough such that the inmate's condition could materially deteriorate.

But the Court does *not* hold as much, because the Court sees no reasonable way of defining what attempts would satisfy the prison official's duty.  Moreover, on a much more concrete level, it is difficult to predict how this holding would interact with a fact noted both in this case and with some frequency in this District, namely, that Correctional Healthcare Partners often rejects, based on expense, CDOC medical

---

[19] Whether breach of this duty was the legal cause of the inmate's injuries would be a separate question.  (*See* Part II.B.2, above.)

officials' recommended treatments and diagnostic procedures.  *See, e.g.*, *Sherman v. Klenke*, 653 F. App'x 580 (10th Cir. 2016); *Handy v. Andrews*, 2016 WL 1253621 (D. Colo. Mar. 30, 2016)*; Swan v. Fauvel*, 2015 WL 7755493 (D. Colo. Dec. 2, 2015).  (*See also* Part II.B.6, above (Chamjock's request for a CT scan rejected).)  Such cost-cutting measures would seem to qualify as a policy or practice preventing an inmate from obtaining the treatment a medical professional would otherwise recommend.  Does a prison medical official always have an Eighth Amendment duty to seek reconsideration of that denial or challenge it all the way up to the CDOC Chief Medical Officer or Executive Director?  The Court can think of no standards by which to answer that question, or to give prison officials appropriate guidance, particularly given the Tenth Circuit's statement that "prisoners do not have a constitutional right to limitless medical care, free of the cost constraints under which law-abiding citizens receive treatment." *Sherman*, 653 F. App'x at 592 (internal quotation marks omitted).  Without such an answer, the Court's proposed holding would likely create, not dispel, uncertainty.

The Court emphasizes that it does not hold that no duty exists such as the one proposed above.  The Court holds only that, on this record, Vasquez has not carried his burden to establish the existence of a constitutional right to assistance in overcoming prison-imposed barriers from prison officials who do not control those barriers.

d.    *Whether the Duty/Right Was Clearly Established*

The Court has held that prisoners have an Eighth Amendment right to be offered medical care that they have not asked for, in the circumstances described above.  The next question is whether this right was clearly established at the time each Defendant

acted or failed to act.

(i)    Specificity vs. Generality

"A right is clearly established in this circuit when a Supreme Court or Tenth Circuit decision is on point, or if the clearly established weight of authority from other courts shows that the right must be as the plaintiff maintains." *Thomas v. Kaven*, 765 F.3d 1183, 1194 (10th Cir. 2014) (internal quotation marks omitted).  Whether this standard is satisfied often raises difficult questions about the level of generality at which a right can be deemed to be established.  On the one hand, the Supreme Court has "repeatedly told courts not to define clearly established law at a high level of generality. The dispositive question is whether the violative nature of *particular* conduct is clearly established.  This inquiry must be undertaken in light of the specific context of the case, not as a broad general proposition." *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) (internal quotation marks and citations omitted; alterations incorporated; emphasis in original).  On the other hand, a plaintiff cannot be required in regards to all possible fact patterns to present "a case directly on point." *Taylor v. Barkes*, 135 S. Ct. 2042, 2044 (2015).  Nonetheless, "existing precedent must have placed the . . . constitutional question beyond debate." *Id*. (internal quotation marks omitted).

To balance the mandate for specificity with the counsel to avoid "a scavenger hunt for prior cases with precisely the same facts," the Tenth Circuit has "adopted a sliding scale to determine when law is clearly established.  The more obviously egregious the conduct in light of prevailing constitutional principles, the less specificity is required from prior case law to clearly establish the violation." *Casey v. City of Fed.*

*Heights*, 509 F.3d 1278, 1284 (10th Cir. 2007) (internal quotation marks omitted).

Looking at Vasquez's treatment from 2004 to present, one might fairly say that CDOC, as an institution, provided him egregiously substandard medical care in light of his circumstances.  But that is not the proper inquiry at this stage.  Rather, the Court must examine whether the constitutional rights and duties at issue here were clearly established at the time each particular Defendant acted or failed to act.

(ii)     Prior Analysis of this Question

In two prior Rule 12(b)(6) motions to dismiss, the State Defendants argued generically for qualified immunity as follows: "There is no clearly established law in this jurisdiction that states that the actions of Defendants, as alleged in the Complaint, violated any law."  (ECF No. 57 at 9; ECF No. 84 at 6.)  Given the extreme level of generality at which this argument was made, the Court likewise applied the general Eighth Amendment deliberate indifference standard to find that the allegations of the complaint, assumed to be true, showed that the State Defendants had violated a clearly established right.  (ECF No. 99 at 17 ("Defendants, *on this record*, are not entitled to qualified immunity." (emphasis added)).)

(iii)     Analysis in Light of the Summary Judgment Record

Vasquez asks the Court to reaffirm its previous conclusion.  (ECF No. 164 at 29–30.)  However, the summary judgment record—which is largely undisputed— presents a more complicated and nuanced scenario than what Vasquez alleged in his complaint.  Thus, it is Vasquez's burden to show that each Defendant had fair notice, at the time he or she acted or failed to act, that his or her acts or omissions were unconstitutional.  Vasquez does not present any case law in this regard, instead relying

53

on generic deliberate indifference standards and citing *Hope v. Pelzer*, 536 U.S. 730, 741 (2002), for the notion that "officials can still be on notice that their conduct violates established law even in novel factual circumstances." (*Id*. at 30.)

The Court understands Vasquez to be saying that this case should fall on the "obviously egregious" side of the general-specific dichotomy, *Casey*, 509 F.3d at 1284, and if this case involved an acute medical condition, the Court would likely agree. Take, for example, a counterfactual scenario in which CDOC officials ignored Vasquez when he began vomiting blood in May 2013. The "clearly established" element of the qualified immunity analysis would not require a specific case about vomiting blood before CDOC officials could be held liable. *Cf. Al-Turki*, 762 F.3d at 1194–95 (prison nurse who left inmate to writhe in pain for hours had violated clearly established law, even though no prior case precisely tracked the inmate's medical condition).

This case is not about acute care, however, or even about normal chronic care. It is about each Defendant's interaction with Vasquez over many years as influenced by a CDOC policy that establishes certain duties and expectations for treatment of a disease that usually progresses very slowly. In this light and on the record presented, the Court cannot characterize any particular Defendant's act or omission, or any particular Defendant's cumulative acts or omissions, as "obviously egregious." Each Defendant instead participated for a time in an unusual and slow-moving scenario that, in hindsight, should have been handled differently. Having been presented with the scenario, the Court finds it appropriate to declare the constitutional duty arising from it (Part II.B.5.c(i), above). However, to overcome qualified immunity, it remains Vasquez's burden to present case law—from the Supreme Court, the Tenth Circuit, or a

"clearly established weight of authority from other courts"—that fairly closely tracks the duty as announced by this Court.  *Thomas*, 765 F.3d at 1194.

Beyond generic statements of Eighth Amendment law, Vasquez offers no authority from any jurisdiction specifically on the "clearly established" question.  (*See* ECF No. 164 at 29–30.)  The Court, however, is compelled by the Supreme Court to evaluate qualified immunity "in light of the specific context of the case, not as a broad general proposition."  *Mullenix*, 136 S. Ct. at 308.  As to those specifics, Vasquez's arguments about liability (rather than qualified immunity) cite various more-specific cases that might be relevant here.

Vasquez's most analogous cases are from the Second, Sixth, and Seventh Circuits, which this Court has largely already addressed.  The Seventh Circuit's *Roe* decision, decided in 2011, establishes (at least as of that date and that circuit) that a policymaker may be liable under the Eighth Amendment if he or she propounds a policy that causes prison medical officials to deny care solely for administrative reasons, irrespective of the inmate's specific health circumstances.  631 F.3d at 856–61.  *Roe* could also be read as a more general statement about the need to provide individualized care regardless of administrative policies.  The Second Circuit's *Johnson* decision, decided in 2005, similarly stands for the proposition that medical providers must provide individualized care regardless of administrative policies.  412 F.3d at 403–06.  The Sixth Circuit's *LeMarbe* decision, decided in 2001, emphasizes that prison medical officials cannot satisfy their duty by providing purely "stopgap" care when they are subjectively aware of a serious condition that needs immediate treatment and

they make no plans for such treatment.  266 F.3d at 435–40.

The only relevant case Vasquez cites that the Court has not already discussed is a Second Circuit decision from 2000, *Harrison v. Barkley*, 219 F.3d 132.  This case involved a prisoner who sought treatment for tooth pain but was told that an even more decayed tooth was present in his mouth, and prison regulations supposedly required that the latter tooth be pulled before any other work would be done.  *Id*. at 134.  The prisoner, however, "did not want the non-restorable tooth pulled, because it was causing him no pain and because he considered that he had no teeth to spare."  *Id*. The prisoner then endured about a year of tooth pain before a state court ordered that his aching tooth be addressed without regard to the other tooth.  *Id*. at 135.  The Second Circuit held that the named defendants (none of whose roles are explained clearly other than the original dentist who denied care) were not qualifiedly immune as a matter of law, given that they had refused needed medical care, and also that they had imposed "a seriously unreasonable condition" on needed medical care.  *Id*. at 138.

*Harrison* bears some obvious resemblances to Vasquez's case, particularly the allegations regarding a prison policy requiring the inmate to take an arguably unnecessary step before obtaining the necessary treatment.  However, a crucial part of the Second Circuit's rejection of qualified immunity was a finding that the alleged policy did not actually exist.  "We need not decide therefore whether the defendants would be immune if their decisions had been compelled by departmental policy."  *Id*. at 139. *Harrison* is nonetheless indirectly instructive on the broader idea that unreasonable conditions on an inmate's medical care, whether dictated by policy or not, may violate

56

the Eighth Amendment.

Considering all of these authorities, and having given the matter significant and extensive thought, the Court cannot declare that they represent a "clearly established weight of authority from other courts show[ing] that the right must be as the plaintiff maintains," *Thomas*, 765 F.3d at 1194, particularly at the time any Defendant here acted or failed to act.  These authorities simply do not address prison officials' constitutional obligation to *disregard* prison policies or practices that place the burden on the inmate to exercise some initiative in seeking treatment for slowly progressing disease.  Vasquez therefore has not met his burden to show that prison officials' constitutional duty to offer care in these circumstances was clearly established at the time any Defendant acted or failed to act.  The State Defendants are therefore entitled to qualified immunity.

e.    *Concluding Remarks on Qualified Immunity*

Under the Court's reading of Supreme Court and Tenth Circuit case law regarding the need for reasonable specificity when examining whether the law has become clearly established, the Court understands that it must require authority fairly closely tracking the allegedly established obligation, which Vasquez has not presented. Nonetheless, the Court has great sympathy for Vasquez's plight and would welcome a decision on appeal from the Tenth Circuit providing greater guidance on the issues with which the Court has here grappled.  One such result on appeal may be that our reviewing court concludes that this Court required more specificity than is truly necessary under these circumstances, a result with which the undersigned would be comfortable in applying on remand.

In addition, to the extent Vasquez appeals this ruling, this Court would strongly urge the Tenth Circuit to refrain from reviewing only the question of whether the law was clearly established, thus bypassing the question of whether a right exists.  Although *Pearson*, 555 U.S. at 236, permits analysis of the clearly established question only, there is a hole in the jurisprudence, so to speak, regarding prison officials' and inmates' rights and obligations with respect to non-acute care, slowly progressing conditions, and prison administrative policies related to them.  Such cases are sure to continue to arise given the prevalence of chronic disease in the prison population, as well as the "graying" of the prison population that is the inevitable consequence of lengthy mandatory sentences.

This case alone cannot fill all of the jurisprudential holes, but the need for uniform guidance is clear, particularly if this Court is correct in the level of specificity required to show a clearly established right in these circumstances.  Without such guidance (*i.e.*, by bypassing the first element of the qualified immunity analysis), inmates in similar scenarios could find themselves in an endless loop, seeking redress for their injuries yet continually being told that their Eighth Amendment rights were not sufficiently clear at the time of the harm, a harm difficult to pinpoint temporally, precisely because of the nature of slowly progressing, chronic but potentially fatal conditions.  In other words, the Court sees this as one of those "particular cases" where it remains "worthwhile" to define the right before asking whether it was clearly established. *Pearson*, 555 U.S. at 242.  The Court encourages the Tenth Circuit to adopt the same view.

**C.    Statute of Limitations**

The foregoing analysis leaves only Chamjock potentially on the hook.  Chamjock

argues, however, that Vasquez failed to file this lawsuit within the statute of limitations.

The State Defendants make the same argument.  The Court agrees as to all

Defendants save for Fauvel.

1.    Limitations Period and Standard for Accrual

Because Congress did not enact a statute of limitations for § 1983 claims,

Colorado law supplies the limitations period.  *See Burnett v. Grattan*, 468 U.S. 42,

47–49 (1984).  Colorado law provides a two-year statute of limitation for "[a]ll actions

upon liability created by a federal statute where no period of limitation is provided in

said federal statute."  Colo. Rev. Stat. § 13-80-102(1)(g).

Despite reliance on the Colorado statute, "federal law controls issues related to

when federal causes of action accrue."  *Alexander v. Oklahoma*, 382 F.3d 1206, 1215

(10th Cir. 2004).  Generally, federal claims accrue "when the plaintiff knows or has

reason to know of the existence and cause of the injury which is the basis of his action."

*Id.* (internal quotation marks omitted).

2.    Prior Ruling on This Issue

Vasquez's claim rests on the delay in receiving HCV treatment, leading to liver

damage that allegedly could have been avoided absent the delay.  As discussed above,

"a delay in medical care only constitutes an Eighth Amendment violation where the

plaintiff can show that the delay resulted in substantial harm.  We have held that the

substantial harm requirement may be satisfied by lifelong handicap, permanent loss, or

considerable pain." *Garrett*, 254 F.3d at 950 (citation and internal quotation marks omitted).

The Court previously addressed this standard, and its applicability to Vasquez and the statute of limitations, in an order denying Defendants's various Rule 12(b)(6) motions. (ECF No. 99 at 9–12.) At that time, the State Defendants argued that Vasquez knew of his injury and its cause in 2005, when he supposedly learned that CDOC required him to take D&A classes but also would not approve a transfer to a facility that offered D&A classes to inmates of his security classification. (*See id*. at 10.) Chamjock argued that Vasquez knew of his own worsening symptoms and Chamjock's failure to refer him to D&A classes no later than May 2010 (Chamjock's last alleged interaction with Vasquez). (*Id*.) Under either theory, Vasquez did not file this lawsuit within two years of the relevant event.

In response, Vasquez asserted that relevant precedential and non-precedential decisions established that his claim did not accrue until May 2013, when he experienced esophageal bleeding and was diagnosed with decompensated cirrhosis, likely requiring a liver transplant. Specifically, Vasquez reasoned that the Tenth Circuit's *Whitington* decision, 423 F. App'x at 773, and this Court's *Wright* decision, 2015 WL 1408753, at *5–6, show that delay in treating HCV, without more, does not satisfy the substantial harm requirement, and therefore does not satisfy the objective component of the deliberate indifference test. And, there was no "without more" until his May 2013 esophageal bleeding episode and subsequent diagnosis.

Defendants offered no cogent response to this argument and the Court therefore agreed with Vasquez, at least under the Rule 12(b)(6) framework where the Court was

required to accept Vasquez's allegations as true.  On that record, the Court accordingly concluded that Vasquez's claim was timely filed in May 2014, only a year after the event that triggered the limitations period.  (ECF No. 99 at 11–12.)

   3.   Analysis in Light of the Summary Judgment Record

Having considered the matter anew in this summary judgment posture, and in light of this fully developed record, the Court finds that a different conclusion is required.

Again, "[a] civil rights action accrues when facts that would support a cause of action are or should be apparent."  *Alexander*, 382 F.3d at 1215 (internal quotation marks and alterations omitted).  In this light, all Defendants point to the fact that Vasquez was diagnosed with cirrhosis of the liver in June 2008 (ECF No. 151 at 7; ECF No. 152 at 34–35), which the Court has declared to be an objectively serious condition sufficient to meet the delay-in-harm standard (Part III.B.3.c, above).  The State Defendants say that Vasquez's cause of action therefore accrued in June 2008.  Chamjock, however, takes a different approach.  Perhaps because there is no evidence that anyone explained the cirrhosis diagnosis to Vasquez (the record reveals only that Webster told Vasquez that his liver was "worsening," ECF No. 154-30 at 4), Chamjock instead argues that the statute of limitations was triggered in February 2012, when Fauvel responded to Vasquez's January 2012 kites seeking assistance in enrolling in D&A classes and discussed the treatment protocol "at length" (ECF No. 152-11 at 30).

The Court does not rule out the possibility that a jury could find that Vasquez knew enough to trigger the limitations period in June 2008.  However, the Court agrees with Chamjock to the extent that no reasonable jury could find the limitations period to have accrued any later than February 2012.  The evidence described in Part II.B.8,

above, compels this conclusion, particularly:

- Vasquez had an episode of (according to him) vomiting blood on January 14, 2012, leading to significant medical care.

- On January 18, 19, and 23, 2012, Vasquez submitted kites requesting assistance in getting enrolled in D&A classes.

- Fauvel thoroughly discussed the D&A process with Vasquez in early February 2012, and referred Vasquez to his case manager to get enrolled.

- On March 7, 2012, Vasquez filed a grievance about his inability to get enrolled.  This grievance, although primarily about the administrative hassle he is faced, confirms that the conversation with Fauvel the previous month had provided him with a clear understanding of his predicament (if he had not already reached such an understanding). Among other things, Vasquez stated that his last visit "to medical [was] in regard [to] treatment that I <u>need</u> for hepatitis C," that "I need to sign a contract for attendance of substance abuse education classes with medical because it[']s been long enough," and again that "I need this treatment."  (ECF No. 154-22 at 1 (underscoring in original).)

Given this, a jury could not reasonably find that the cause of action had accrued any later than February 2012.  By then, Vasquez had learned enough to know that he faced a serious medical condition (regardless of whether he knew or understood its official diagnostic title) caused or exacerbated by (in the light most favorable to Vasquez) repeated obstruction or ignorance of his requests for treatment.  Vasquez did not file this lawsuit until May 2014, more than two years later.  Thus, Vasquez did not

file within the limitations period.[20]

4.   Continuing Violation Doctrine

To overcome this problem, Vasquez argues that the Court should apply the continuing violation doctrine.  (ECF No. 163 at 14–16.)  The continuing violation doctrine was developed in the context of employment discrimination claims brought under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq*. ("Title VII").  *See Hunt v. Bennett*, 17 F.3d 1263, 1266 (10th Cir. 1994).  Application of the doctrine "permits a Title VII plaintiff to challenge incidents that occurred outside the statutory time limitations of Title VII if such incidents are sufficiently related and thereby constitute a continuing pattern of discrimination."  *Id*.

No Tenth Circuit published opinion has squarely decided whether the continuing violation doctrine applies to § 1983 claims.  An unpublished disposition in 2011 flatly states that "the doctrine of continuing violations does not apply to § 1983 claims," *Mercer-Smith v. N.M. Children, Youth & Families Dep't*, 416 F. App'x 704, 712 (10th Cir. 2011), while an unpublished disposition from 2015 states only that "this court has never held that the continuing-violation doctrine applies to § 1983 cases," *Canfield v. Douglas Cnty.*, 619 F. App'x 774, 778 (10th Cir. 2015).  Thus, even non-precedential decisions provide little guidance.

The continuing violation doctrine, although it could conceivably apply in § 1983 cases, cannot be adopted wholesale from its original Title VII context.  The Title VII

---

[20] Vasquez has not argued for equitable tolling of the statute of limitations during the time that he was exhausting his administrative remedies through the CDOC grievance process. *Cf. Braxton v. Zavaras*, 614 F.3d 1156, 1159–62 (10th Cir. 2010).

standard is expressed in the Tenth Circuit as follows: "A plaintiff may establish a continuing violation by showing either that (1) a series of related acts was taken against him, with one or more of those acts occurring within the limitations period, or (2) the defendant maintained a company-wide policy of discrimination both before and during the limitations period." *Davidson v. Am. Online, Inc.*, 337 F.3d 1179, 1183–84 (10th Cir. 2003). The continuing violation doctrine can speak of company-wide policies, and of "a series of related acts . . . taken against him" by unspecified persons, because Title VII claims are claims against the plaintiff's employer as an institution, not against individual coworkers or supervisors. *See Haynes v. Williams*, 88 F.3d 898, 901 (10th Cir. 1996) (Title VII claims not available against individuals). Thus, a series of acts or a policy can be attributed to the employer as an institution—the constant of the equation, as opposed to the individual employees who come and go. And if one act in furtherance of that policy takes place within the limitations period as calculated backwards from the filing of the complaint, then the complaint is timely (*e.g.*, if the limitations period is two years, at least one unlawful act must take place within the two years preceding the complaint's filing).

This framework translates without much difficulty into the context of civil rights claims against cities and counties (such as a county jail), because cities and counties, similar to employers under Title VII, can be sued for policies carried out over time by multiple officials. *See Monell v. Dep't of Social Servs.*, 436 U.S. 658 (1978). Indeed, of the continuing-violation cases Vasquez cites in which the plaintiff sought damages, and in which the court actually acknowledges the existence of the continuing violation doctrine, all of them involved a municipality (city, county, or school board), or at least

explicitly discussed the need for a continuing governmental policy or practice.  *See Shomo v. City of New York*, 579 F.3d 176 (2d Cir. 2009); *Heard v. Sheahan*, 253 F.3d 316 (7th Cir. 2001); *Gutowsky v. Cnty. of Placer*, 108 F.3d 256 (9th Cir. 1997); *287 Corp. Ctr. Assocs. v. Twp. of Bridgewater*, 101 F.3d 320 (3d Cir. 1996); *Muniz-Cabrero v. Ruiz*, 23 F.3d 607 (1st Cir. 1994); *Hull v. Cuyahoga Valley Joint Vocational Sch. Dist. Bd. of Educ.*, 926 F.2d 505 (6th Cir. 1991); *Stallworth v. Shuler*, 777 F.2d 1431 (11th Cir. 1985); *Lavellee v. Listi*, 611 F.2d 1129 (5th Cir. 1980); *Neel v. Rehberg*, 577 F.2d 262 (5th Cir. 1978).

The same framework cannot be imposed wholesale on a state prison.  In the prison context, it is the prison as an institution that is the constant of the equation, while prison officials come and go—as well-illustrated in this case.  But the Eleventh Amendment prohibits a § 1983 suit for damages against the state prison as an institution.  Thus, the presumed target of a lawsuit invoking the continuing violation doctrine is immune from suit.  Inmates must sue individual prison officials if they hope to receive any relief.  Moreover, inmates must sue individual prison officials for their own unconstitutional actions, not those of anyone else.  *See, e.g.*, *Ashcroft v. Iqbal*, 556 U.S. 662, 677 (2009).  If various officials' actions over time are not, in themselves, civil rights violations, one cannot chain the various officials' actions together to create a "policy" and then sue all of them "individually" for carrying out the policy.[21]

Moreover, even in the municipal context, the continuing violation analysis as to

---

[21] Such a chain would not only violate the Supreme Court's directive that officials be held liable for their own actions only, but it would also probably fail to satisfy the subjective prong of the deliberate indifference standard.

individual defendants (as opposed to the municipality itself) still requires that the individual defendant have committed some relevant act within the limitations period as calculated backwards from the filing of the complaint.  This is well illustrated in the Second Circuit's *Shomo* decision.  The plaintiff there sued New York City and various New York City correctional officials for Eighth Amendment and other violations when they allegedly ignoring his paralyzed or near-paralyzed arms and the special assistance he therefore required.  579 F.3d at 179–80.  Facing a statute-of-limitations argument, the Second Circuit declared that "the continuing violation doctrine can apply when a prisoner challenges a series of acts that together comprise an Eighth Amendment claim of deliberate indifference to serious medical needs."  *Id*. at 182.  A prisoner must therefore "allege acts within the relevant statutory period that are traceable to a policy of deliberate indifference."  *Id*.  As to individual defendants, however, the Second Circuit required that each one have committed wrongful acts within the limitations period.  *Id*. at 183–84.  This led to dismissal of some individual defendants, even though those defendants' actions "may still be relevant to any claim against the City."  *Id*. at 183.

If the Court were to hold that the continuing violation doctrine applies to the facts of this case, it would agree with the approach exemplified in *Shomo*.  As a result, the Court need not actually determine whether the continuing violation doctrine in fact applies here, because the only Defendant who performed allegedly wrongful acts in the two-year period preceding the filing of the complaint (May 2012–May 2014) was Fauvel, and the Court has already declared that he is entitled to summary judgment in his favor on both on liability and qualified immunity grounds.  The next-closest would be Melloh,

but her last direct interaction with Vasquez was in January 2012, and her last indirect interaction (by way of a grievance response) was in March 2012. (Part II.B.8, above.) And Chamjock—for whom this analysis matters the most—had no interaction after May 2010, well over two years before Vasquez filed his complaint. (Part II.B.7, above.)

Accordingly, Chamjock is entitled to summary judgment that Vasquez failed to timely file this lawsuit against him. Defendants Davis, Martorano, Webster, and Melloh are, in the alternative to the bases already stated, likewise entitled to summary judgment on the timeliness of Vasquez's lawsuit against each of them.

## D. Injunctive Relief

In light of all the foregoing, the only remaining defendant is Raemisch, CDOC's Executive Director, sued in his official capacity for injunctive relief.[22] Vasquez clarifies that, at this point, he only seeks injunctive relief in the form of "an order requiring CDOC to continue its MELD score monitoring as set forth in the Court's order on Mr. Vasquez's request for preliminary injunctive relief." (ECF No. 164 at 17.) This requires a certain amount of explanation.

Vasquez's PI Motion requested "that the Court order Defendant Raemisch to immediately start Mr. Vasquez on a course of Harvoni." (ECF No. 114 at 4.) At the hearing on the motion, it became clear that (1) Harvoni was not appropriate for Vasquez, given that he is infected with HCV genotype 3, and (2) CDOC had already approved Vasquez to begin receiving Sovaldi/ribavirin in the ensuing weeks. (ECF No.

---

[22] Fauvel is also named in his official capacity, but no party has ever explained the purpose for so naming him, nor what relief Vasquez could obtain that differs from the relief he seeks against Raemisch.

126 at 4–5.)  Vasquez's expert, Dr. Bacon, agreed that Sovaldi/ribavirin was the appropriate treatment.  (*Id*. at 5.)

Taking CDOC's word (specifically, Dr. Tiona's word) that Vasquez truly would begin receiving Sovaldi/ribavirin soon, the Court found that the deliberate indifference standard could not justify an injunction because the prison authorities' current attitudes and conduct did not show deliberate indifference.  (*Id*. at 13 (quoting and citing *Farmer*, 511 U.S. at 837, for the proposition that the availability of an injunction to remedy deliberate indifference turns on prison officials' attitudes and conduct at the time the Court is considering whether to grant an injunction).)  The Court therefore denied the preliminary injunction, but granted alternative relief under the All Writs Act, finding that the Court's jurisdiction would be threatened if appropriate measures were not taken to ensure that Vasquez's condition is monitored and reported to his counsel—thus enabling counsel to act on any sudden change for the worse, including through a renewed request for an injunction.  (*Id*. at 14–16.)  The Court specifically ordered CDOC to calculate Vasquez's MELD score—a measure of liver function that informs when a patient should be considered for placement on a transplant list—at least every three months, and to report the score and the underlying data to Vasquez's counsel. (*Id*. at 5–7, 16–17.)  This is what Vasquez wishes to continue even after judgment.

Because there is no evidence of current deliberate indifference, the Court may not enter this relief as a permanent injunction under Vasquez's Eighth Amendment claim.  However, the parties have failed to cite to the Court (nor could the Court locate) any authority stripping this Court of its discretion to continue its All Writs Act injunction post-judgment for the very same reasons the Court entered it pre-judgment, *i.e.*, the

need to ensure that Vasquez's condition does not "become dire and perhaps irreversible before CDOC has time to react appropriately." (*Id*. at 16.)  The Court accordingly will not dissolve its All Writs Act injunction upon final judgment, but will retain jurisdiction to enforce it.

## IV.  CONCLUSION

For the reasons set forth above, the Court ORDERS as follows:

1.   Defendant Chamjock's Motion for Summary Judgment (ECF No. 151) is GRANTED;

2.   The State Defendants' Motion for Summary Judgment (ECF No. 152) is GRANTED;

3.   Vasquez's Partial Motion for Summary Judgment (ECF No. 154) is DENIED;

4.   The Final Trial Preparation Conference scheduled for June 9, 2017, and the 8-day jury trial scheduled to begin on June 19, 2017, are VACATED;

5.   The Court's previous statement that the All Writs Act injunction entered on February 29, 2016 would expire upon entry of final judgment (ECF No. 126 at 17) is VACATED;

6.   The Clerk shall enter final judgment in favor of all Defendants and against Plaintiff, and the final judgment shall specifically state that the Court retains jurisdiction to enforce its All Writs Act injunction entered on February 29, 2016; and

7.      The Clerk shall terminate this case.  The parties shall bear their own costs.[23]


Dated this 28th day of December, 2016.

BY THE COURT:

William J. Martinez
United States District Judge

---

[23] The Court is permitted to decline to award costs when the issues in a case were close and complex, and are of significant public importance.  *See Ass'n of Mexican-Am. Educators v. State of Cal.,* 213 F.3d 572, 591 (9th Cir. 2000).  The Court finds this scenario present here.